No. 24-6953

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

BRANDON CASE,

*Plaintiff-Appellant,*

v.

BRANDON BEASLEY et al.,

*Defendants-Appellees.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
No. 5:21-CT-03157-D

---

## CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT

---

Rosalind E. Dillon
Alison R. Leff
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1A, the undersigned counsel for Brandon Case hereby certifies that Brandon Case is an individual.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ....................................................3

STATEMENT OF ISSUES .................................................................3

STATEMENT OF CASE ....................................................................3

   I.   Factual Background ...........................................................3

   II.  Procedural Background ....................................................10

   III. Standard of Review...........................................................16

SUMMARY OF ARGUMENT .........................................................17

ARGUMENT ...................................................................................20

   I.   Defendants Violated Case's Eighth Amendment Rights. ...........................20

       A.   A Jury Could Reasonably Infer That Defendants Knew Leaving The Hallway Doors Open Created A Substantial—And Preventable—Risk Of Harm But Did Nothing In Response. ...............................20

       B.   Defendants Are Not Entitled To Qualified Immunity. ..........................32

   II.  The District Court Abused Its Discretion In Allowing Custodio To Oppose Case's Motion For Summary Judgment........................................40

CONCLUSION................................................................................43

STATEMENT REGARDING ORAL ARGUMENT ...........................44

CERTIFICATE OF COMPLIANCE..................................................45

CERTIFICATE OF SERVICE ..........................................................46

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Kingsley*, 877 F.3d 539 (4th Cir. 2017) ................................ 20

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .............................................. 33

*Booker v. S.C. Dep't of Corr.*, 855 F.3d 533 (4th Cir. 2017) ................................ 34

*Brown v. N.C. Dep't of Corr.*, 612 F.3d 720 (4th Cir. 2010) .......................... 25, 38

*Calloway v. Lokey*, 948 F.3d 194 (4th Cir. 2020) .......................................... 16, 17

*Case v. Ahitow*, 301 F.3d 605 (7th Cir. 2002) .......................................... 25

*Cox v. Quinn*, 828 F.3d 227 (4th Cir. 2016) ................................... passim

*Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014) ................................ 35, 37, 38

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................................ passim

*Fernandes v. Craine*, 538 F. App'x 274 (4th Cir. 2013) ................................ 17, 40

*Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. 2015)............. 41

*Helling v. McKinney*, 509 U.S. 25 (1993) ............................................ 29

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559 (2014)............... 17

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................. 34

*Hughes v. Blankenship*, 672 F.2d 403 (4th Cir. 1982) .......................... 32

*King v. Riley*, 76 F.4th 259 (4th Cir. 2023) .......................... 16, 32, 33, 37

*Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015) ................................ passim

*Mallatere v. Town of Boone*, 808 F. App'x 213 (4th Cir. 2020) ......................... 41

*Pearson v. Callahan*, 555 U.S. 223 (2009) ........................................... 32

*Quinn v. Zerkle*, 111 F.4th 281 (4th Cir. 2024) ..................................... 34

*Rich v. Bruce*, 129 F.3d 336 (4th Cir. 1997) ................................... 37, 39

*Robinson v. Wix Filtration Corp., LLC*, 599 F.3d 403 (4th Cir. 2010) ........... 40, 41

*Singleton v. Wulff*, 428 U.S. 106 (1976) ............................................. 41

*Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530 (4th Cir.1996) ..... 17, 40

*Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) .................................. 33

*Tolan v. Cotton*, 572 U.S. 650 (2014)............................................... 34

*Torraco v. Maloney*, 923 F.2d 231 (1st Cir. 1991)................................ 32

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ................... 17, 41

*Williams v. Benjamin*, 77 F.3d 756 (4th Cir. 1996) ..................................................20

**Statutes**

28 U.S.C. § 1131 .............................................................................................3

28 U.S.C. § 1291 .............................................................................................3

42 U.S.C. § 1983 .........................................................................................3, 10

**Rules**

Civ. L.R. 56.1(a)(2) ..........................................................................................42

Fed. R. Civ. P. 56(c) ........................................................................................17

Fed. R. Civ. P. 6(b)(1)(B) ............................................................................. 40, 41

## INTRODUCTION

All three Defendants—correctional officers working in the Central Prison control booth—knew that their job was to keep doors to certain hallways closed and locked, allowing prisoners to pass only after conducting safety checks to make sure the area was safe and clear. And they understood that their job was important to prevent violence from general population prisoners mixing with "safekeepers"—a group of prisoners that includes unusually violent pre-trial detainees. Indeed, Defendants' supervisor reminded them "over and over" of the danger that leaving the hallway doors open would lead to violence from safekeepers and general population prisoners mixing. Despite that knowledge, Defendants left the hallway doors wide open for an extended period one morning because they did not want to be bothered with requests to open the doors by general population prisoners going to and from the barber while safekeepers were out at recreation. Defendants didn't bother to close and lock the doors even after they were alerted of the safekeepers' imminent return.

Brandon Case, a general population prisoner, suffered the consequences of Defendants' actions. As Case was passing through the secured hallways after a haircut, he came face to face with the group of safekeepers returning from recreation. Unprovoked, a safekeeper attacked Case—an obvious risk that the locked doors were meant to combat—shattering the bones in his face. After the attack, Case

1

needed an operation to place metal plates and screws in his skull to repair the injuries to his face. The beating caused nerve damage that will leave Case in severe pain for the rest of his life.

The Defendants' actions exhibited deliberate indifference to a substantial risk of serious harm in violation of the Eighth Amendment. The district court held otherwise, summarily concluding that the record lacked any evidence that Defendants were aware of any substantial risk of harm to Case. And, because the court determined Case failed to prove a constitutional violation, it concluded that qualified immunity shielded the Defendants. That was wrong: Case offered ample evidence supporting an inference that Defendants knew leaving the doors to the secured hallways wide open—especially after they were alerted that safekeepers would soon be coming through those very hallways—presented a serious risk of harm to any general population prisoner who was also in those hallways. And the evidence also shows that, although Defendants could have easily shut the doors, they did nothing to mitigate that risk. Accordingly, Defendants have not shown their entitlement to judgment as a matter of law. What's more, by allowing one of the Defendants to oppose Plaintiff's summary judgment motion despite his inexcusable neglect, the lower court also made a reversible procedural error.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1131. On August 30, 2024, it granted summary judgment and dismissed Brandon Case's complaint filed under 42 U.S.C. § 1983. JA202-12.[1] Brandon Case timely filed a notice of appeal on September 27, 2024. JA213. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.   Whether a reasonable jury could conclude that Defendants failed to protect Brandon Case, a general population prisoner, from a brutal attack at the hands of a "safekeeper" prisoner based on evidence suggesting that they knew their conduct created a substantial risk of serious harm yet did nothing in response.

II.  Whether Defendants violated clearly established law when, for the sake of convenience, they created a substantial safety risk for general population prisoners yet chose to do nothing even after receiving information suggesting harm was imminent.

III. Whether the district court abused its discretion in granting Custodio a third chance to oppose summary judgment against him when, under controlling precedent, Custodio failed to demonstrate excusable neglect as a matter of law.

## STATEMENT OF CASE

### I.   Factual Background

Plaintiff Brandon Case, while incarcerated at Central Prison in North Carolina, was seriously and permanently injured after he was attacked by another prisoner. One morning, Case went to the second floor of the building where he was

---

[1] Cites to the "JA" are to the parties' Corrected Joint Appendix. Cites to the "ECF" are to the district court's docket.

housed—D block in Unit 2—to get a haircut. ECF No. 52-3, Custodio Dep. Tr., at 81:20-82:19; JA030. Afterwards, Case walked down the hallway toward the stairwell to the first floor, through an open door separating the hallway from the stairwell, down the stairs, and through another open door separating the stairwell from the first-floor hallway. ECF No. 52-11, Video of Unit 2, Second Floor; ECF No. 52-12, Video of Unit 2, First Floor; ECF No. 52-5, Juehrs Dep. Tr., at 45:18-46:10.

As Case descended the stairs, a group of prisoners classified as "safekeepers" was entering the first-floor hallway, coming in from recreation. ECF No. 52-12, Video of Unit 2, First Floor. Safekeepers are pre-trial detainees who are legally in the county's custody; but they are housed at state prisons either because they are unusually violent or there is some other reason they cannot be housed in a county jail. ECF No. 52-5 at 23:5-21; JA022. Safekeepers and general population prisoners like Case are supposed to be kept separate from one another for security reasons. ECF No. 52-3 at 41:23-42:13, 133:4-135:12; ECF No. 52-4, Beasley Dep. Tr., at 43:9-48:14.

Case emerged through the open door at the bottom of the stairwell onto the first floor and walked down the last few steps on the other side of the door. ECF No. 52-12, Video of Unit 2, First Floor. At the same time, the group of safekeepers moved toward him, on their way to their cells on the second floor. *Id*. Just after Case

descended the final stairs into the hallway, a safekeeper named Kenneth Kennion attacked him. *Id*. Kennion punched Case on the right side of the face, and Case flew sideways, struck his head against the concrete wall, and fell to the ground. *Id*. Kennion stooped down and punched Case's head repeatedly. *Id*. A correctional officer standing in the hallway ordered Kennion to stop. *Id*. Kennion then put his hands up. *Id*. While the officer moved to handcuff Kennion, Case struggled to his feet and staggered off down the hallway, a trail of blood dripping from his face. *Id*.

Case and Kennion should have never met in the hallway as they did. The hallways at Central Prison are closed off by sliding doors—referred to at the prison as "sallyport" doors—that lock in place and should always remain closed when no one is passing through. ECF No. 52-3 at 45:4-65:17; ECF 52-4 at 113:3-9; ECF No. 52-5 at 31:9-32:2, 92:17-94:13. Correctional officers sit in control booths on each floor of the cell block, directly across from the hallway doors. ECF No. 52-3 at 29:9-31:13, 45:4-65:17. Those officers are responsible for opening and closing the hallway doors, which can be done using buttons on a control panel in their booths. ECF No. 52-3 at 45:4-65:17. Before opening the doors to allow general population prisoners into or out of the hallway, the control booth officers are supposed to check to make sure it is safe to do so—i.e., they are supposed to make sure no safekeepers are in the area. ECF No. 52-3 at 45:4-65:17; ECF No. 52-5 at 30:1-32:2, 92:17-94:13. They can check visually—by looking down the hallway in both directions—

5

or they can make a radio call to ensure the area where the prisoner is headed is safe and clear. *Id*.

That didn't happen on the day Case was attacked. Defendant Kenny Custodio was in the control booth—a position he was regularly assigned—on the second floor of D block in Unit 2 that day. ECF No. 52-3 at 26:3-28:18, 73:23-74:5. He'd left the secure door to the stairwell open for an extended period because there were general population prisoners coming and going to get haircuts from the barber who was set up in the second-floor hallway, and he didn't want to be bothered by repeated requests to open the door. ECF No. 52-3 at 81:20-86:21. Custodio did not leave the door open by accident. *Id*. He made a conscious decision, knowing there was a risk that doing so might lead a general prison population prisoner to walk into the hallway while the safekeepers were returning from recreation, and that allowing those two populations to mix was unsafe. *Id*. at 35:23-36:23, 41:23-42:24, 46:17-47:6, 81:20-87:15; ECF No. 52-10, Black Dep. Tr., at 55:25-58:3.

Downstairs from Custodio, Defendant Eric Urieta, another experienced correctional officer who was posted in the first-floor control booth of D block, made the same decision: He left the secure door separating the stairwell from the first-floor hallway open to avoid the hassle of responding to repeated requests from prisoners wishing to go upstairs for a haircut or returning from the barber. ECF No. 68-2, Urieta Dep. Tr., at 26:15-34:10, 41:1-21, 54:12-56:6, 72:7-24, 84:18-85:6, 91:24-

94:14. Like Custodio, Urieta made that decision knowing it created a risk that safekeepers and general population prisoners might encounter each other in the hallway; Urieta knew it was unsafe for those populations to mix. *Id*. at 26:15-34:10, 41:1-21, 54:12-56:6, 72:7-24, 92:15-95:1, 118:24-119:10, 165:2-168:24.

Sometime after opening the first-floor hallway door, Urieta called Defendant Brandon Beasley, a correctional officer with about a decade of experience, over to relieve him in the control booth so he could use the bathroom. ECF No. 52-4 at 26:19-27:1, 68:8-69:4. Beasley took over, and Urieta walked out of the booth, leaving the hallway door open. ECF No. 68-3 at 6:55-10:21, Extended Video of Unit 2 First Floor; ECF No. 52-4 at 129:16-130:9. Beasley saw that the hallway door leading to the staircase was open; he knew it shouldn't have been because it created a risk that safekeepers and general population prisoners might mix and that such mixing was unsafe; he had the time and ability to close it; but he decided to leave it that way. ECF No. 52-4 at 15:16-16:2, 32:19-33:1, 37:7-12, 39:6-44:4, 57:16-63:19, 91:20-92:22, 129:16-131:6; ECF No. 68-3 at 9:29-10:21, Extended Video of Unit 2 First Floor.

Defendants chose not to close the hallway doors even after the imminent arrival of the safekeepers was announced via radio to Custodio, Beasley, and Urieta. ECF No. 68-4, Smith Dep. Tr., at 39:1-16 (escort officer Richard Smith testifying that a radio call was made); ECF No. 52-10 at 60:7-22, 84:25-88:24 (escort officer

Kassey Black initially recalling that a radio call was made and testifying that she can't think of a reason it would not have been made); ECF No. 52-4 at 76:1-25 (Beasly testifying that his radio was on and working); ECF No. 52-3 at 48:6-18, 79:11-80:9 (Custodio testifying that his radio was on and working). And they chose to do so even though they knew general population prisoners—including Case—had been frequenting the hallways and stairwell all morning for haircuts. *See* ECF No. 52-3 at 81:20-86:21 (Custodio testifying that general population prisoners were getting haircuts, he knew Case was a general population prisoner, and he could see Case walking unescorted through the hallway to and from the barber.); ECF No. 68-2 at 92:15-25 (Urieta testifying he left the door open because prisoners were getting haircuts); ECF No. 68-3, Extended video of Unit 2, First Floor at 9:29-10:21 (showing three prisoners pass through the door within a minute of Beasley assuming the post).

Because Defendants left the doors separating the stairwell from the first and second floors of D block open, Case was allowed to walk through the secure doors and pass into the stairwell even though safekeepers were moving through the hallway. ECF No. 52-5 at 63:23-65:12; ECF No. 52-11, Video of Unit 2, Second Floor; ECF No. 52-12, Video of Unit 2, First Floor.

Case's injuries from the attack were grave. JA031. Case was transported to Duke Medical Center where imaging showed a nasal bone fracture and complex

fractures on both sides of his face. JA032-34. He was admitted to the hospital for surgery, which included placing three metal implants secured by screws in the bones of his face. JA033-34. Case will suffer from chronic facial pain for the rest of his life. JA035-38.

Case was not the first general population prisoner attacked on Unit 2 by a safekeeper. Urieta testified that a safekeeper had attacked a general population prisoner barber while getting his haircut—after that, safekeepers wore full restraints when they came out for a haircut, ECF No. 68-2 at 165:2-168:24; Custodio also testified about the barber who had been attacked by a safekeeper, ECF No. 52-3 at 138:8-145:19.[2] And Defendants' supervisor, John Juehrs, sent a memo after Case's attack scolding them: "I have told everyone *over and over* about the sally-port effect and the back doors being left open. I will not be telling anyone again …. This directive is due to safe keepers and [general] population coming into contact too many times when they shouldn't. Staff have become complacent when it comes to

---

[2] Urieta testified that, even though he could not "recall the date," he believed this attack occurred before Case was beaten by a safekeeper. ECF No. 68-2 at 165:2-168:24. Custodio testified to the same attack but could not remember when it occurred. ECF No. 52-3 at 138:8-145:19. And Juehrs, Defendants' supervisor, testified that the barber attack may have occurred before Case's attack. ECF No. 52-5 at 56:10-57:17. Accordingly, a jury could reasonably infer not only that Defendants were aware of that attack, but also that the attack occurred before Case's attack and that Defendants knew about it.

security and controlled movement of inmates in Unit Two." JA039-40 (emphasis added).

## II.   Procedural Background

Case filed this civil rights action under 42 U.S.C. § 1983, alleging that Defendants Beasley and Urieta violated his Eighth Amendment rights by failing to protect him from Kennion's assault. ECF No. 1, Complaint. Case later filed his operative, amended complaint, adding Defendant Kenny Custodio as a defendant to the Eighth Amendment claim. JA014-21. Although they had answered the initial complaint, neither Beasley nor Urieta answered the amended complaint. Custodio also failed to answer the amended complaint and did not respond to requests for admissions served on him under Federal Rule of Civil Procedure 36. And in the more than two years the case was pending, Defendants never served any written discovery, noticed any depositions, or disclosed any expert witness.

On August 14, 2023—the filing deadline for dispositive motions—Case moved for partial summary judgment against Custodio. ECF No. 50, Pls. Partial Summary Judgment Mot. Because Custodio had failed to respond to Case's requests for admission under Rule 36, Case argued, he had conceded them. *Id*. at 2, 6, 11-12. What's more, Custodio's deposition testimony was consistent with those admissions. *Id*. at 2, 6. And, because Custodio plead no affirmative defenses, served no discovery, and took no depositions, Case argued it was the rare circumstance

10

under which summary judgment for a plaintiff is warranted. *Id*. at 2. Meanwhile Defendants moved for an extension to file their summary judgment motion—after 10:00 P.M. on the filing deadline. ECF No. 54, Defs. Mot. for Extension re Dispositive Mots.

Case opposed Defendants' request for more time to file their summary judgment motion, arguing that Defendants could not show good cause to justify the extension. ECF No. 55, Pls. Opp. to Defs. Extension Mot. Defendants had not demonstrated diligence in defending the case at any point leading up to summary judgment, Case urged, and the motion was futile considering Defendants' failure to answer the Amended Complaint or conduct any discovery. *Id*. at 1-5. The district court agreed that "Defense counsel [had a] … 'history of failing to adhere to the Court's deadlines and of being generally nonresponsive,'" but it nevertheless granted Defendants a second chance to move for summary judgment. ECF No. 56, D.Ct. Order Granting Extension Mot.

Several weeks later, Defendants filed a summary judgment motion. ECF No. 61, Defs. Mot. for Summary Judgment. Defendants' filing was rife with procedural deficiencies. The errors were so glaring, the district court ordered Defendants to show cause why the filing should not be stricken. ECF No. 72, D. Ct. Show Cause Order. At the same time, Defendants filed their first ever answer to Case's amended complaint, and Custodio moved for relief from the deemed admissions that resulted

11

from his failure to answer Case's discovery requests under Rule 36. ECF No. 57, Defs. Answer to Am. Compl.; ECF No. 59, Custodio's Admissions Mot. Critically, Custodio *did not* oppose Case's summary judgment motion against him. Though his opposition was due the same day, Custodio simply missed the deadline.

Case opposed Custodio's motion to amend his admissions, pointing to the lack of diligence Custodio had shown in mounting a defense to the lawsuit and arguing no purpose would be served by allowing withdrawal of the admissions but for prejudicing Case. ECF No. 65, Pls. Opp. to Custodio's Admission Mot. Case also moved to strike Defendants' deficient summary judgment motion, and he opposed the motion on the merits. ECF No. 66, Pls. Opp. to Summary Judgment.

Over Case's objection, the district court allowed Custodio to amend his admissions. ECF No. 73, D. Ct. Order, at 1-4. Because Case cited those admissions in his summary judgment motion, the Court then denied Case's motion without prejudice, even though Custodio never filed an opposition brief. *Id*. at 2-3. In the same order, the Court denied Defendants' summary judgment motion seemingly on its merits, but it then allowed Defendants a *third* chance to re-file the motion. *Id*. at 3-4.

Case moved for reconsideration of two aspects of the Court's order. ECF No. 74, Pls. Mot. for Reconsideration. First, Case asked the Court to reconsider its decision to give Defendants a third chance to file their summary judgment motion.

*Id.* at 2-3. Case noted that, just four days before issuing the order, the Court had ordered Defendants to show cause why it should not strike their motion for summary judgment for its deficiencies under the local rules. *Id.* The Court's order denying the motion on its merits, without prejudice, failed to mention or discharge the show-cause order. *Id.* Second, Case asked the Court to reconsider its decision to deny his motion when Custodio had failed to oppose it. *Id.* at 3.

The Court had not ruled on Case's reconsideration motion when the deadline for refiling summary judgment arrived.  Case refiled his motion for partial summary judgment against Custodio. JA041-52. This time, he did not rely on any exhibit or fact statement related to Custodio's failure to answer the complaint or the requests for admissions. JA042-45. Case argued that, because Custodio had admitted to all material facts during the prison's internal investigation of the Kennion attack and at his deposition, Custodio's liability was beyond dispute. JA047-51.

Defendants took advantage of the third chance the Court had given them and filed another motion for summary judgment that complied with the local rules. JA053-87. They argued that Defendants' actions allowing Kennion to attack Case were, at most, negligent. JA069-79. In addition, Defendants argued they were entitled to qualified immunity because, although they were aware of a general risk of harm related to inmate-on-inmate violence, they were not "'obviously' require[d]

13

… to keep safekeepers and regular population inmates away from each other at all times or keep stairway doors closed at all times." JA079-84.

The deadline for responses on both summary judgment motions was February 16, 2024. *See* L.R. 7.1(f)(1); JA010. Custodio *again* missed the deadline to oppose the summary judgment motion and *again* failed to ask for an extension. Four days after the deadline, Custodio moved for an extension with a simultaneous motion to treat the extension as timely. JA141-45; JA146-50. In support, Custodio explained that Defendants' previous counsel left the employ of the North Carolina Department of Justice and was busy "preparing for his departure from NCDOJ" in the time leading up to the deadline. JA146-47. Custodio argued that, under Federal Rule of Civil Procedure 6(b), this series of events constituted excusable neglect for his failure to timely file a response or a motion for an extension. JA147-48.

Case opposed. JA151-56. Custodio's second failure to respond was not an anomaly, Case argued, but instead was part of a larger pattern of failing to defend this case and squandering second chances. JA151-52. What's more, counsel's heavy workload, even if it were the cause of the missed deadline, would not satisfy the excusable neglect standard such that Custodio would be entitled to a third opportunity to oppose summary judgment. JA153 (collecting cases).

The district court then ruled on the outstanding motions. JA157-59. It denied Case's motion for reconsideration. JA158. And *without reasoning*, the court granted

Custodio's request for an extension of time to oppose Case's summary judgment motion. *Id*.

Case opposed Defendants' summary judgment motion. JA160-81. Because record evidence supported a reasonable inference that Defendants knew leaving open the hallway doors created a risk that violent safekeepers would mix with general population prisoners causing someone to get hurt, Case argued that he should be allowed to proceed to trial on his claims. JA169-75. That is so even though Defendants did not know Case was specifically likely to be attacked by Kennion. *Id*. As for qualified immunity, Case argued that because the evidence supported an inference that Defendants intentionally left the hallway doors open knowing it would present a real and obvious safety hazard, they were not shielded by the doctrine under Fourth Circuit precedent. JA175-78. What's more, it had been clearly established long before 2020 that a prison official could not knowingly disregard an obvious—and easily avoidable—risk of serious harm to a prisoner purely for their own convenience. JA176-77 (collecting cases).

For his part, Custodio, armed with a third chance, finally responded to Case's partial motion for summary judgment. JA182-201. Custodio argued that Case could not meet the Eighth Amendment standard for deliberate indifference. JA187-90. He also insisted that he was entitled to qualified immunity because it was not clearly

established in January 2020 that "a constitutional violation occurs when the control booth is operated in a deficient manner." JA196-200.

The district court entered summary judgment for Defendants. JA202-11. The court noted that some prisoners classified as safekeepers did not have a history of violence, and Case had failed to show that Kennion had a history of assaulting other inmates. JA203. Accordingly, the court reasoned, the record lacked any evidence demonstrating that Defendants knew "the risk to which [Case] was exposed in the [stairwell] was any different from, or greater than, the risk of violence that exists generally in the prison environment." JA208 (citation omitted). And, because the court determined Case failed to prove a constitutional violation, it concluded the Defendants would be entitled to qualified immunity. JA211 (citing *King v. Riley*, 76 F.4th 259, 266-68 (4th Cir. 2023)). The court denied Case's motion for partial summary judgment against Custodio without further analysis. *Id*.

Case timely appealed. JA213.

## III. Standard of Review

This Court reviews a district court's entry of summary judgment *de novo*. *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020). Summary judgment is appropriate only where, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Calloway*, 948 F.3d at 201.

This Court reviews a district court's grant of a motion to extend a filing deadline for abuse of discretion. *See Fernandes v. Craine*, 538 F. App'x 274, 275 (4th Cir. 2013) (citing *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir.1996)); *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014) ("Traditionally … decisions on 'matters of discretion' are 'reviewable for abuse of discretion.'") (citation omitted). "A district court abuses its discretion if its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted).

## SUMMARY OF ARGUMENT

**I.** Defendants violated Case's Eighth Amendment rights when they acted with deliberate indifference to a substantial risk of serious harm of their own making. **A.** The Eighth Amendment forbids "fail[ing] to act despite … knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Despite that fundamental command, Defendants knew of a substantial risk of serious harm and did nothing in response. The consequences for Brandon Case were dire: He was beaten so badly that he now has metal plates and screws in his face and will suffer severe facial nerve pain for the rest of his life. **i.** As for knowledge, the record

is replete with evidence supporting a reasonable inference that Defendants knew that leaving the doors to the secure hallways open created a substantial risk of harm. Each Defendant had years of experience working on the Unit where Case was attacked and so they knew safekeepers included violent detainees that could not mix with general population prisoners for safety reasons; they knew keeping the doors closed and conducting safety checks before opening the doors was a mandatory safety rule in place to prevent safekeepers and general population prisoners from mixing; they knew safekeeper attacks were pervasive prior to Case's attack; and they knew that the safekeepers were returning to the Unit while general population prisoners, including Case, were still moving freely in the secure hallways to receive haircuts.

**ii.** Notwithstanding that known risk, and even though all Defendants had to do to avert the danger to Case was push a button to close the doors, Defendants chose to do nothing in response. There is thus a material issue of fact as to whether Defendants acted with deliberate indifference.

**B.** The district court concluded otherwise only after disregarding material disputes of fact and ignoring controlling precedent. The district court ignored *Farmer*'s clear mandate that Case was not required to prove that Kennion specifically posed a risk of harm to him. And it ignored key evidence—including that Defendants knew their job was to control prisoner movement to prevent the mixing of safekeepers and general population prisoners to prevent the very harm that

Case faced—supporting an inference that Defendants were exposed to information concerning the risk Case ultimately faced and thus must have known about it. Those mistakes warrant reversal.

**C.** The district court also concluded that Defendants were entitled to qualified immunity. But because Case adequately supported his deliberate indifference claim, Defendants cannot hide behind qualified immunity because the doctrine offers no shield for those who knowingly violate the law. Regardless, it's long been established that where a prison official has been given the information they need to know that there is a substantial risk of prisoner-on-prisoner violence, they cannot do nothing in response.

**II.** The district court abused its discretion when it allowed Custodio a *third* opportunity to respond to Case's partial motion for summary judgment after Custodio blew the deadline to do so. An extension of time after missing a filing deadline should be granted only if a party's failure to act was the result of "excusable neglect"—a high standard. Under this Court's precedent, excusable neglect cannot be demonstrated where a party has failed to act with diligence. Yet the district court concluded that Custodio's excuse that he missed the filing deadline because his counsel was very busy in the leadup to the deadline satisfied the high standard required for an extension. That was an abuse of discretion.

19

## ARGUMENT

**I.    Defendants Violated Case's Eighth Amendment Rights.**

**A.    A Jury Could Reasonably Infer That Defendants Knew Leaving The Hallway Doors Open Created A Substantial—And Preventable—Risk Of Harm But Did Nothing In Response.**

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Because prisons strip from prisoners "virtually every means of self-protection and foreclose[] their access to outside aid," the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (cleaned up); *see also Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016). This obligation gives rise to so-called "failure-to-protect" claims under 42 U.S.C. § 1983. To prove such a claim, a prisoner must show: (1) a substantial risk of serious harm; and (2) the defendants' deliberate indifference to that risk. *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

To show deliberate indifference, a prisoner must establish both that (1) the defendant knew the prisoner faced a substantial risk of harm and (2) the defendant consciously disregarded that known risk by "fail[ing] or refus[ing] to take reasonable measures to prevent that harm." *Anderson v. Kingsley*, 877 F.3d 539, 545-46 (4th Cir. 2017). Although "deliberate indifference entails something more than mere negligence, … it is satisfied by something less than acts or omissions for the very

purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Because the record below contains ample evidence supporting an inference that Defendants knew that leaving the doors to the secured hallways open when safekeepers were returning from recreation presented a serious risk of harm to any general population prisoner who was passing through those hallways and chose to do nothing to mitigate that risk, the district court erred in concluding Case failed to support his failure-to-protect claim.

      **i.**      **Record Evidence Supports A Reasonable Inference That Defendants Knew Their Actions Created A Substantial Risk Of Harm.**

Start with the first prong of deliberate indifference: Knowledge of a substantial risk of harm.

Direct evidence of knowledge is difficult—sometimes impossible—to obtain; therefore, the Supreme Court has held that deliberate indifference need not be proven by direct evidence: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S at 842; *see also Makdessi*, 789 F.3d at 133. A prisoner can show knowledge by showing, for example, "that a substantial risk of serious harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances

suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Cox*, 828 F.3d at 236 (cleaned up). Or a factfinder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842). That makes sense—a defendant will rarely admit awareness of a risk.

Here, there is substantial evidence in the record to show that Defendants were subjectively aware of facts from which the inference could be drawn that a substantial risk of harm existed—i.e., they knew that leaving the sallyport doors open created a substantial risk that safekeepers and general population prisoners would mix in the secured hallways, mixing that was forbidden because it was unsafe.

First, at the time Case was attacked, Defendants Custodio, Urieta, and Beasley each had years of experience working on Unit 2. ECF No. 52-3 at 26:3-28:18, 73:23-74:5; ECF No. 68-2 at 26:15-34:10, 41:1-21; ECF No. 52-4 at 26:19-27:1. From that experience, they all knew safekeepers posed a special risk—specifically, they knew that the safekeepers included detainees who were so violent and aggressive they could not be safely housed at county jail. ECF No. 52-3 at 28:18-56:9; ECF No. 68-2 at 26:15-34:10, 41:1-21, 54:12-56:6, 165:2-168:24; ECF No. 52-10 at 55:18-56:4. In fact, each Defendant explicitly testified that he knew it was unsafe for general population prisoners and safekeepers to mix. *Id*.

22

Second, Defendants Custodio, Urieta, and Beasley knew that keeping the sallyport doors to the stairwells closed to secure the hallways was a mandatory safety rule specifically aimed at preventing the mixing of safekeepers and general population prisoners. ECF No. 52-3 at 45:4-65:17, 133:4-135:12; ECF No. 52-4 at 43:9-48:14, 113:3-9; ECF No. 52-5 at 31:9-32:2, 92:17-13. They were trained that the doors are supposed to stay closed and locked absent an emergency, ECF No. 52-5 at 94:8-97:2; that before allowing general population prisoners or safekeepers into secured hallways, they're supposed to check to make sure the hallways are clear, ECF No. 52-3 at 45:4-65:17; ECF No. 52-5 at 31:9-32:2, 92:17-94:13; and that those checks are necessary to keep prisoners safe, ECF No. 52-3 at 45:4-65:17.

Third, there's evidence that the risk of safekeeper attacks was pervasive, long-standing, and expressly noted in the past. Defendants' supervisor, John Juehrs, sent a memo after Case's attack scolding Defendants that he had "told everyone over and over" about the dangers of leaving the hallway doors open and that staff complacency on the matter would not be tolerated. JA039-40; *see also* ECF No. 52-5 at 85:2-87:11. And Custodio and Urieta testified about a safekeeper who attacked a general population barber during a haircut, after which safekeepers wore full restraints during haircuts. ECF No. 52-3 at 138:8-145:19; ECF No. 68-2 at 165:2-168:24.

23

Finally, Defendants Custodio and Urieta knew that the safekeepers had gone out to recreation the morning of Case's beating. ECF No. 52-3 at 83:8-86:21; ECF No. 68-2 at 94:9-95:1. They knew that recreation lasted an hour, and so they knew to expect the safekeepers' return around the time Case finished his haircut and Urieta left the control booth for the bathroom. *Id*. They also knew that general population prisoners were receiving haircuts on the second floor of Unit 2, requiring those prisoners to move through the secured hallways. ECF No. 52-3 at 81:20-82:19; ECF No. 92:15-25. Custodio even testified that he knew Case was a general population prisoner, and he could see Case walking unescorted through the hallway to and from the barber. ECF No. 52-3 at 81:20-82:19. And the imminent arrival of the safekeepers to Unit 2 was announced to Custodio, Beasley, and Urieta by radio. ECF No. 68-4 at 39:1-16; ECF No. 52-10 at 60:7-22; *see also* ECF No. 52-3 at 48:6-18; ECF No. 52-4 at 76:1-25. So, even if Defendants could somehow claim ignorance of a substantial risk of harm caused by leaving the doors open to that point, the risk certainly became obvious once they knew the safekeepers' were coming.

From those facts, a jury could reasonably find that Defendants knew keeping open the sallyport doors separating the stairwell from the hallways on each floor created a substantial risk that the safekeepers coming in from recreation would mix with general population prisoners in the secured hallways, and that someone could get hurt in exactly the way Case got hurt.

24

ii.      **Record Evidence Supports A Reasonable Inference That Defendants Consciously Disregarded The Risk Of Serious Harm Their Actions Created.**

As for the second prong of the deliberate indifference inquiry—whether Defendants consciously disregarded a known risk of serious harm by failing to act reasonably to abate it—the evidence supports an inference that Defendants could have easily averted the danger to Case but chose not to do so.

Prison officials are deliberately indifferent if they are aware that "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). And "a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." *Cox*, 828 F.3d at 236 (citation omitted).

Defendants' job as control booth officers the day Case was attacked was to keep the sallyport doors to the secured hallways closed, and to open them to allow prisoners to pass only after conducting safety checks. Defendants knew their job was important to prevent prisoner-on-prisoner violence from safekeepers and general population prisoners mixing.

Defendant Custodio, however, who was in the control booth on the second floor, testified that he left the secure door to the stairwell open for an extended period on purpose because he did not want to be bothered by repeated requests to open the door while haircuts were ongoing. ECF No. 52-3 at 81:20-86:21. He continued that decision even after being alerted by radio that the safekeepers were returning from recreation, and even though he saw Case—a prisoner he recognized as general population—moving through the secured hallway. *Id.*; ECF No. 68-4 at 39:1-16; ECF No. 52-10 at 60:7-22. Based on his experience and training, the jury could find that Custodio chose to leave the door open knowing a general population prisoner could go downstairs while the safekeepers were returning from recreation, and that allowing the two populations to mix was unsafe.

Downstairs from Custodio, Defendant Urieta made the same decision: He left the secure door to the first-floor hallway open to avoid the hassle of responding to repeated requests from prisoners wishing to go upstairs for a haircut or returning from the barber. JA228-30. Like Custodio, Urieta knew, when he left the door open, that a general population prisoner could walk by while the safekeepers were coming in from the yard. *Id.* And when Defendant Beasley took over for Urieta as the first-floor control booth officer, he made the same intentional choice as his colleagues, even after he was alerted that the safekeepers were returning from recreation. ECF

No. 52-4 at 91:20-92:22, 129:16-131:6; ECF No. 68-4 at 39:1-16; ECF No. 52-10 at 60:7-22.

That evidence supports a jury finding that Defendants intentionally left the hallway doors open because it was convenient to do so; knew that doing so might give safekeepers and general populations prisoners a chance to meet in the hallway; knew it was dangerous for those populations to mix; knew that the safekeepers were on their way back from recreation at the same time general population prisoners, including Case, were in the secure hallways; and had the ability and opportunity to close the doors before the attack occurred, but chose not to.

Viewing the facts in a light most favorable to Case, a jury could conclude that the Defendants' response to the risk of harm they created by leaving the sallyport doors open—doing nothing—even after being informed that the safekeepers were returning from recreation was not only unreasonable, but "so patently inadequate as to justify an inference that the [Defendants'] actually recognized that [their] response to the risk was inappropriate under the circumstances." *Cox*, 828 F.3d at 236.

### iii.      The District Court Granted Summary Judgment Only After Disregarding Material Fact Issues And Ignoring Controlling Precedent.

The district court concluded otherwise only after disregarding material disputes of fact and ignoring controlling precedent.

The district court summarily concluded that Case had put forth no evidence—direct or circumstantial—demonstrating that he was at any sort of "truly obvious" substantial risk from Defendants' leaving the sallyport doors open beyond the risk of violence that exists generally in prison. JA208-09. The Court reasoned that "not all safekeepers receive their designation as a result of being violent and aggressive," and Case failed to present evidence that Kennion himself "had ever before attacked another inmate." *Id*. Defendants' conduct, the court concluded, amounted to at most negligence. JA213.

To start, the district court seemed to believe that Case needed to prove that the Defendants knew of a substantial risk that Kennion specifically might attack Case. But *Farmer* conclusively rejected that argument. There, the Court admonished that a defendant correctional officer may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. That makes sense: "The question under the Eighth Amendment is whether the prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health,' and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to

him or because all prisoners in his situation face such a risk." *Id*. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). The district court's reasoning that Case was required to prove *Kennion* posed a risk of harm was wrong under *Farmer*.

The district court also seemed to believe that Case had to prove the Defendants had *actual* prior knowledge of the risk that Case would be assaulted. The law demands no such proof. Instead, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," as where the official "had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842. Here, the district court ignored Case's evidence on that front.

The district court ignored the fact that each Defendant, all veterans on Unit 2, testified at his deposition that he was aware that the mixing of safekeepers and general population prisoners presented a safety risk and, for that reason, they knew they needed to keep the secure hallway doors closed. ECF No. 52-3 at 28:18-56:9; ECF No. 68-2 at 26:15-34:10, 41:1-21, 54:12-56:6, 165:2-168:24; ECF No. 52-10 at 55:18-56:4. It ignored evidence that safekeeper-on-general-population attacks were pervasive, long-standing, and expressly noted in the past: Defendants' supervisor "told everyone over and over" that the doors should not be left open for security reasons, and Defendants testified that they were aware of other incidents where safekeepers had attacked general population prisoners. JA039-40; ECF No.

52-3 at 138:8-145:19; ECF No. 52-5 at 85:2-87:11; ECF No. 68-2 at 165:2-168:24. And the court ignored evidence that Defendants knew the safekeepers were on their way back from recreation while Case was in the secured hallways, yet intentionally chose to leave the hallway doors open anyway. ECF No. 52-3 at 81:20-86:21; ECF No. 68-4 at 39:1-16; ECF No. 52-10 at 60:7-22.

The fact that there were other reasons a prisoner could be classified as a safekeeper besides unusual violence changes nothing. *See* JA203. The Supreme Court has said so. *Farmer* is crystal clear: "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. There, the Supreme Court reversed and remanded because it found a transgender prisoner may have been able offer evidence that Defendants knew the prison to which they transferred her was violent "with a history of sexual assault." *Id*. at 849. In other words, the Supreme Court held that the prisoner *did not* have to offer evidence that *all* prisoners at the institution had a history of committing sexual assault, only that the institution was dangerous for her as a transgender woman.

Here, the evidence is that Defendants knew that safekeepers was a group that included violently aggressive prisoners who were too dangerous to house in county jail, ECF No. 52-3 at 28:18-56:9, 81:20-87:15, 133:4-135:12, ECF No. 68-2 at 43:9-

48:14, 54:12-56:6, 72:7-24, ECF No. 52-10 at 55:18-56:4, ECF No. 52-4 at 32:19-44:4; they knew there was a history of violent altercations between safekeepers and general population prisoners, JA039-40, ECF No. 52-3 at 138:8-145:19, ECF No. 52-5 at 85:2-87:11, ECF No. 68-2 at 165:2-168:24; they knew there were specific policies in place to control the movement of prisoners through secure hallways to prevent safekeepers from mixing with general population prisoners because of security reasons, ECF No. 52-3 at 28:18-65:17, 133:4-135:12; ECF No. 52-4 at 43:9-48:14, 113:3-9; ECF No. 68-2 at 56:10-57:6, 72:7-24, ECF No. 52-5 at 31:9-32:2, 92:17-13; and they knew their job was to control that movement by keeping the doors to the secured hallways closed unless and until they confirmed the hallways were clear and that the prisoners—general population or safekeepers—could pass safely, *id*. That is all evidence that Defendants knew the safekeepers as a whole presented an unacceptable safety risk to general population prisoners like Case, even if some of them were not classified as safekeepers because of violence.

Based on the evidence the district court ignored, a reasonable jury could conclude not only that Defendants created a substantial risk to Case that was greater than the risk of inmate-on-inmate violence generally in a prison setting, but also that Defendants were aware of that risk, could easily have prevented it, and chose not to. And where, as here, the record contains evidence from which a reasonable juror could infer a Defendant's actual knowledge, it is for the jury to decide whether

Defendant's conduct constitutes "simple negligence or manifested … deliberate indifference." *See Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir. 1982); *see also Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) ("A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question."). As such, the district court erred by holding that Case presented insufficient evidence to support a jury finding that Defendants' conduct was unconstitutional.

### B.      Defendants Are Not Entitled To Qualified Immunity.

The district court also erred in concluding that Defendants were entitled to qualified immunity. In evaluating whether a defendant is entitled to qualified immunity, this Court asks two questions: (1) whether the relevant facts "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also King*, 76 F.4th at 265.

On the first question, as explained, a reasonable jury could find a violation of a constitutional right—namely that Defendants acted with deliberate indifference toward a substantial risk of harm of their own making. That is dispositive on the qualified immunity analysis.

The Fourth Circuit has "carved out a class of deliberate indifference claims to treat differently" when it comes to qualified immunity, reasoning that "officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly

established prong." *King*, 76 F.4th at 265. This is because "qualified immunity does not shield 'those who knowingly violate the law.'" *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). And, when it comes to claims involving deliberate indifference, corrections officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and actually draw the inference before liability attaches." *Id*. (cleaned up). In other words, "when plaintiffs have made a showing sufficient to demonstrate an intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity." *Id*. (cleaned up)

This is such a case. The evidence at summary judgment is that Defendants intentionally left the hallway doors open, knowing that closing those doors was important to maintain the safety and security of safekeepers and general population prisoners. A jury could also find that they did so knowing the safekeepers were on their way back from recreation and, at the same time, that general population prisoners were traveling through the hallways to and from the barber. Having intentionally ignored a known risk to inmate safety, Defendants cannot rely on the clearly established prong to avoid liability. *See id*. at 934 (explaining that dismissal on qualified immunity grounds is "improper so long as the officers' mental state remains genuinely in issue."); *see also supra* Subsections I.A.i & ii.

33

But even if this Court disagrees that this case falls into the class of deliberate indifference claims to be treated differently, the right at issue here was clearly established by the time Defendants Custodio, Urieta, and Beasley failed to protect Case in January 2020.

In evaluating whether a defendant violated clearly established law, "'the salient question … is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). A plaintiff need not point to a prior case with identical facts, he just needs to identify a reasonably analogous case. *Quinn v. Zerkle*, 111 F.4th 281, 294 (4th Cir. 2024). And in the absence of "directly on-point, binding authority," courts may also consider whether "a general constitutional rule already identified in the decisional law [] appl[ies] with obvious clarity to the specific conduct in question." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (quoting *Hope*, 536 U.S. at 741).

Since at least *Farmer*, the Supreme Court has been clear that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 825. The Fourth Circuit has expressly defined the constitutional right in the same terms: "The constitutional right at issue is [the prisoner's] Eighth Amendment right to be protected from violence committed by other prisoners."

*Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014). And just a few years before the events in this case, the Fourth Circuit denied qualified immunity in a similar Eighth Amendment failure-to-protect case, holding: "It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners." *Cox*, 828 F.3d at 239.

In *Cox*, the plaintiff had been severely beaten by another prisoner. *Id*. at 234. The plaintiff had complained to Defendants that he was being threatened by the group of prisoners who ultimately orchestrated his beating. *Id*. at 232-33. The Defendants said they would speak to the group of prisoners over plaintiff's protest that it would only make things worse. *Id*. at 233. When the plaintiff continued to complain, Defendants did nothing. *Id*. at 233-34. Shortly thereafter, the plaintiff was attacked. *Id*. at 234. The district court denied Defendants' motion for summary judgment, finding a genuine issue of material fact as to whether the Defendants had acted with deliberate indifference. *Id*. at 234-35. It also found that the Defendants were not entitled to qualified immunity because their duty to protect prisoners from inmate violence was clearly established. *Id*. at 235. This Court upheld the decision denying qualified immunity. *Id*. at 239. Based on the record, this Court noted that Defendants had been given the information they needed to know that there was a substantial risk of harm, yet in response they did the one thing the plaintiff had warned them would increase the risk to his safety and thereafter did nothing. *Id*. at

238-39. An "objectively reasonable correctional officer," this Court continued, "would have known that these actions were unreasonable, ran afoul of clearly established law, and violated rights 'manifestly included within more general applications of the core constitutional principle' articulated in *Farmer*." *Id*. at 239 (citation omitted).

Here, just as in *Cox*, Case was brutally beaten by another prisoner. Here, just as in *Cox*, a reasonable jury could find Defendants had been given the information they needed to know that there was a substantial risk of that harm occurring. *See supra* Subsections I.A.i & ii. Here, just as in *Cox*, Defendants increased the risk of serious harm when they decided to carry on leaving the hallway doors open for convenience sake, even though they were warned via radio that safekeepers—a group they knew included violently aggressive prisoners—were on their way back from recreation at the same time general population prisoners, including Case, were using the secured hallways to go to the barber. And so here, just as in *Cox*, the law of this Circuit put Defendants on notice that their actions violated the constitution. *See Cox*, 828 F.3d at 239; *see also Makdessi*, 789 F.3d at 133.

The district court cited, without analysis, three Fourth Circuit cases to support its conclusion that "Case has not shown that the defendants violated the Constitution or that the alleged right was clearly established. At most, defendants were

negligent." JA211 (citing *King*, 76 F.4th at 226-68; *Danser*, 772 F.3d at 348-49; *Rich v. Bruce*, 129 F.3d 336, 338-40 (4th Cir. 1997)). Those cases change nothing.

In *King*, a prisoner (King) was murdered by two fellow prisoners. 76 F.4th at 263. All three were living on a unit that housed prisoners with serious mental illness, but the two prisoners that perpetrated the murder had been entrusted as the unit's janitors, giving them special privileges including free movement throughout the unit and the ability to have other prisoners in their cell. *Id*. One morning, the two perpetrators lured King into one of their unlocked cells, strangled him with an extension cord, and shoved his body underneath the bed. *Id*. While the murder was occurring, a Defendant officer was supposed to conduct a security check on the unit every 30 minutes. *Id*. He conducted those security checks, but he did not look inside the cells during the checks, notwithstanding the fact that he was trained to do so. *Id*. The district court concluded that the Defendant officer was not deliberately indifferent, and, in any event, he was entitled to qualified immunity. *Id*. This Court affirmed, reasoning that "even if the risk of inmate violence was substantial and [Defendant] knew about it," there was no precedent establishing that the Defendant's "efforts to mitigate that risk (i.e., security checks without looking in cells) were constitutionally deficient." *Id*. at 266.

That analysis makes sense: *Farmer* is clear that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability

if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The Defendant officer's safety checks, though insufficient to prevent King's murder, were not so obviously unreasonable that he could be found liable. This case is not like *King.* Here, Defendants made no effort whatsoever to mitigate the substantial risk of harm they created by choosing to leave the sallyport doors open, not even after being alerted to the imminent arrival of safekeepers. *See supra* Subsection I.A.ii. And Fourth Circuit precedent is clear that prison officials are deliberately indifferent where they know that "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they" fail to take any step to do so. *Brown*, 612 F.3d at 723; *see also Cox*, 828 F.3d at 239; *Makdessi*, 789 F.3d at 133.

As for *Danser*, the Fourth Circuit reversed the denial of qualified immunity to prison officials who failed to protect the prisoner plaintiff from being attacked by another prisoner. 772 F.3d at 348-49. This Court reasoned: "On this record, there is no evidence that" the defendant was," "exposed to information concerning the risk [of attack the plaintiff faced] and thus must have known about it." *Id*. at 348-49 (citation omitted). *Danser* is also readily distinguishable: Unlike in *Danser*, here there is abundant evidence that Defendants were exposed to information about the risk of safekeepers and general population prisoners meeting in the hallways. *See supra* at Subsection I.A.i.

Finally, in *Rich* this Court reversed the district court's conclusion that the Defendant prison officer acted with deliberate indifference towards the prisoner-plaintiff's wellbeing, resulting in the plaintiff being stabbed by a violent prisoner. 129 F.3d at 338-40. The *Rich* Defendant was escorting the plaintiff, who was housed in a secure area of a supermaximum facility, from recreation to his cell. *Id*. at 336-37. To transport the plaintiff, the defendant officer had to bring the plaintiff through a corridor and then through the dayroom. *Id*. at 337. The dayroom, however, was occupied by an extremely violent prisoner for his own recreation period. *Id*. A secured door separated the dayroom from the corridor. The defendant officer approached the secured door with the plaintiff, with the intention of telling the violent prisoner in the dayroom that it was time to return to his cell. *Id*. However, another prison official who was in the control room that oversaw the area opened the secured door, and the violent prisoner jumped through the door and stabbed plaintiff. *Id*. This Court concluded that although it was clear that the Defendant "had actual knowledge of facts from which a reasonable person might have inferred the existence of the substantial and unique risk to plaintiff caused by [the Defendant's] conduct," the district court's own findings made clear that the Defendant "did not draw this inference." *Id*. at 340. Indeed, the findings below indicated that the Defendant "honestly believed that [the secured door] would stay locked, and that this barrier would be sufficient to protect [plaintiff]." *Id*.

*Rich*, too, is readily distinguishable: There is no evidence here that Defendants "honestly believed" that the secured doors over which they had control would protect any general population prisoner as the safekeepers returned from recreation because they had *intentionally* left them open without ensuring that the hallways were clear.

None of the caselaw the district court cited—again, without analysis— supported its erroneous award of a judgment in Defendants' favor.

## II. The District Court Abused Its Discretion In Allowing Custodio To Oppose Case's Motion For Summary Judgment.

Custodio did not meet the legal standard to file a late opposition brief to Plaintiff's summary judgment motion, and the district court's order to the contrary was error. A party seeking an extension of time after missing a filing deadline must demonstrate that failure to act within the specified time was the result of "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B); *Fernandes*, 538 F. App'x at 276. "Excusable neglect is not easily demonstrated." *Thompson*, 76 F.3d at 533 (cleaned up) (interpreting excusable neglect in the context of Federal Rule of Appellate Procedure 4(a)(5)). And "a party that fails to act with diligence will be unable to establish that [her] conduct constituted excusable neglect." *Robinson v. Wix Filtration Corp., LLC*, 599 F.3d 403, 413 (4th Cir. 2010).

Custodio failed as a matter of law to show that excusable neglect explained

his failure to timely respond to Case's motion for partial summary judgment.[3] After

Custodio *twice* missed the deadline to respond to Case's motion without requesting

an extension, he should not have been given a *third* opportunity without showing his

failure was excusable. Fed. R. Civ. P. 6(b)(1)(B). While a district court has discretion

to determine what constitutes excusable neglect, Fourth Circuit law is plain that a

lack of diligence, inadvertence, or other manifestations of carelessness do not

suffice. *See*, *e.g.*, *Robinson*, 599 F.3d at 413. Yet the justification Custodio offered

after blowing his deadline was that defense counsel was very busy in the leadup to

his departure from the DOJ's office. JA146-49. Because it is black letter law in this

Circuit that busyness and lack of diligence does not constitute excusable neglect,

Custodio's excuse fell below the high bar necessary to secure his extension. The

district court abused its discretion in concluding otherwise. *See Westberry*, 178 F.3d

at 261 ("A district court abuses its discretion if its conclusion is guided by erroneous

---

[3] The district court, in its order entering summary judgment for Defendants, simultaneously dismissed Case's motion for partial summary judgment without any reasoning. JA211. If this Court concludes that the district court erred in granting Defendants' summary judgment motion, it should also reverse and remand the district court's dismissal of Case's motion for partial summary judgment for consideration on the merits in the first instance. *See Mallatere v. Town of Boone*, 808 F. App'x 213, 214 (4th Cir. 2020) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.")); *see also Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 515 (4th Cir. 2015) ("The district court is in a better position to consider the parties' arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide.").

legal principles or rests upon a clearly erroneous factual finding.").

That error prejudiced Case. Custodio's excuse for failing to timely file his response was nothing more than a continuation of a pattern of failing to defend the lawsuit[4] and squandering second chances. Case filed his partial motion for summary judgment on August 14, 2023. JA008. Custodio failed to answer that motion and failed to request an extension of time to do so. That failure entitled Case to the presumption that the statements of fact supporting his motion were true. Civ. L.R. 56.1(a)(2). But Case never got the benefit of that presumption because of Defendants' requests to supplement the record to compensate for their earlier litigation failures, including their failures to respond to the complaint, and Custodio's failure to answer requests for admission. *See* ECF No. 57 & 58, Defs. Answer & Mot. to Deem Answer Timely Filed; ECF No. 59, Custodio's Admissions Mot. The district court granted those second chances and consequently ordered Case to re-file his summary judgment motion to account for the supplemented record. ECF No. 73, D. Ct. Order. Case was thus forced to expend resources briefing the summary judgment motion a second time and refiling it in January 2024. JA041-52. And Custodio *again* failed to oppose summary judgment. By improperly granting

---

[4] In the more than two years the case was pending, the Defendants never answered the complaint or asserted affirmative defense; served any written discovery; noticed any depositions, not even Case's; or disclosed any expert witness, despite requesting an extension of time to do so, JA010.

Custodio's—now untimely—request for a third chance to oppose summary judgment, Custodio was allowed to benefit from his litigation failures at Case's expense. The district court's unexplained order finding Custodio met the excusable neglect standard was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand for further proceedings.

Date: January 21, 2025

Respectfully submitted,

 /s/ Rosalind E. Dillon
Rosalind E. Dillon
Alison R. Leff
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

This case presents important issues regarding the evidence needed to establish the elements of an Eighth Amendment failure-to-protect claim and the state of clearly established law in this Circuit on the matter. Such cases are often litigated pro se—both in the district courts and this Court—and so this counseled case provides a good vehicle for this Court to reiterate and clarify the applicable law. Accordingly, Appellant Brandon Case respectfully requests oral argument. See Fed. R. App. P. 34(a)(2); 4th Cir. R. 34(a)(1).

44

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,370 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: January 21, 2025                      /s/ Rosalind E. Dillon
                                            Rosalind E. Dillon

45

**CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2025, I electronically filed the foregoing

Corrected *Opening Brief of Plaintiff-Appellant* with the Clerk of the Court for the

United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I

certify that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

Date: January 21, 2025                     /s/ Rosalind E. Dillon
                                            Rosalind E. Dillon