No. 24-6953

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BRANDON CASE,

*Plaintiff-Appellant,*

v.

BRANDON BEASLEY et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
No. 5:21-CT-03157-D

## CORRECTED JOINT APPENDIX

John Locke Milholland, IV
Special Deputy Attorney General
N.C. Dept. of Justice – Public Safety
P.O. Box 629
Raleigh, NC 27602-0629
(919) 716-6545
jmilholland@ncdoj.gov

*Counsel for Defendants-Appellees*

Rosalind E. Dillon
Alison R. Leff
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

District Court Docket Sheet .................................................................................JA001

Amended Compl., ECF No. 31 ..........................................................................JA014

NCDPS Policies - C.1600 Safekeepers, ECF No. 52-6 ....................................JA022

Brandon Case Witness Statement, ECF No. 52-9 .............................................JA030

Expert Report of Kenya Williams, MD, ECF No. 52-14 ...................................JA031

John Juehrs Mem., ECF No. 68-5.......................................................................JA039

Pls. Mem. in Support of Second Mot. for Partial Summary Judgment,
    ECF No. 79.............................................................................................JA041

Defs. Mem. In Support of Second Mot. for Summary Judgment,
    ECF No. 82.............................................................................................JA053

Opus Report of Case, ECF No. 84-2 ................................................................JA088

Case Infraction History, ECF No. 84-3 ...........................................................JA096

NCDPS Policies - O.0500 Safekeepers, ECF No. 84-4.....................................JA084

Opus Report of Kennion, ECF No. 84-5 ..........................................................JA106

Incident Report, ECF No. 84-6..........................................................................JA111

Decl. of Urieta, ECF No. 84-9 ..........................................................................JA131

Decl. of Custodio, ECF No. 84-10.....................................................................JA134

Decl. of Beasley, ECF No. 84-12 ......................................................................JA137

Defs. Belated Mot. for Extension re Summary Judgment Opp., ECF No. 89......JA141

Defs. Mot. to Deem (89) Belated Extension Mot. Timely Filed, ECF No. 90.....JA146

Pls. Opp. to (89, 90) Defs. Belated Extension Mot., ECF No. 91 ........................JA151

D. Ct. Order Granting (89, 90) Defs. Belated Extension Mot. and Denying (74) Pls.
    Mot. for Reconsideration, ECF No. 92 .............................................JA157

Pls. Opp to (82) Defs. Mot. for Summary Judgment, ECF No. 95 ......................JA160

Def. Custodio Opp. to (78) Pls. Mot. for Partial Summary Judgment,
    ECF No. 101............................................................................................JA182

D. Ct. Order Granting (82) Defs. Mot. for Summary Judgment and Denying (78) Pls.
    Mot. for Partial Summary Judgment, ECF No. 106 .........................JA202

D. Ct. Final Judgment, ECF No. 107.................................................................JA212

Notice of Appeal, ECF No. 108..........................................................................JA213

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
# CIVIL DOCKET FOR CASE #: 5:21-ct-03157-D

Case v. Beasley et al
Assigned to: District Judge James C. Dever, III
Case in other court: 24-06953
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 06/07/2021
Date Terminated: 08/30/2024
Jury Demand: Both
Nature of Suit: 555 Prisoner Petitions
(Prison Condition)
Jurisdiction: Federal Question

**Plaintiff**

**Brandon Case**

represented by **Alison R. Leff**
Loevy & Loevy
311 N Aberdeen St
3rd Fl
Chicago, IL 60607
312-243-5900
Email: alison@loevy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**G. Christopher Olson**
Olson Law, PLLC
514 Daniels St., #136
Raleigh, NC 27605
919-624-3718
Email: chris@olsonlaw-pllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Officer Beasley**
*a correctional officer*

represented by **John Locke Milholland , IV**
NC Department of Justice
114 W Edenton St.
Raleigh, NC 27603
919-716-6500
Fax: 919-716-6761
Email: jmilholland@ncdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan G. Nichols**
North Carolina Department of Justice
114 W. Edenton Street

**JA001**

Raleigh, NC 27602
919-716-6568
Fax: 919-716-6761
Email: bnichols@ncsbi.gov
*TERMINATED: 02/21/2024*

**James B. Trachtman**
Raleigh City Attorney's Office
Public Safety Section
One Exchange Plaza
Suite 1020
Raleigh, NC 27601
919-996-6620
Email: james.trachtman@raleighnc.gov
*TERMINATED: 03/15/2024*

**Norlan Waring Graves**
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
919-716-6535
Fax: 919-716-6761
Email: ngraves@ncdoj.gov
*TERMINATED: 09/29/2021*

<u>**Defendant**</u>

**Officer Urieta**
*a correctional officer*

represented by **John Locke Milholland , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan G. Nichols**
(See above for address)
*TERMINATED: 02/21/2024*

**James B. Trachtman**
(See above for address)
*TERMINATED: 03/15/2024*

**Norlan Waring Graves**
(See above for address)
*TERMINATED: 09/29/2021*

<u>**Defendant**</u>

**Kenny Custodio**

represented by **John Locke Milholland , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bryan G. Nichols**
(See above for address)
*TERMINATED: 02/21/2024*

**James B. Trachtman**

(See above for address)
*TERMINATED: 03/15/2024*

**Defendant**

**Unknown Employees of the State of
North Carolina**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2021 | 1 | COMPLAINT *Plaintiff Brandon Cases* against All Defendants ( Filing fee $ 402 receipt number 0417-6079809.), filed by Brandon Case. (Attachments: # 1 Civil Cover Sheet) (Olson, G.) (Entered: 06/07/2021) |
| 06/07/2021 | 2 | Financial Disclosure Statement by Brandon Case (Olson, G.) (Entered: 06/07/2021) |
| 06/07/2021 | 3 | Notice of Appearance filed by G. Chris Olson on behalf of All Plaintiffs. (Olson, G.) (Entered: 06/07/2021) |
| 06/07/2021 | 4 | Notice of Appearance filed by G. Chris Olson on behalf of All Plaintiffs. (Olson, G.) (Entered: 06/07/2021) |
| 06/08/2021 | 5 | ORDER - At the direction of the Court and for the continued efficient administration of justice, the above captioned case is redesignated as Western Division prisoner civil rights case. All future filings should reflect the revised case number of 5:21-CT-3157-D. Signed by Peter A. Moore, Jr., Clerk of Court on 6/8/2021. (Indig, A.) (Entered: 06/08/2021) |
| 06/08/2021 |  | NOTICE OF DEFICIENCY regarding 3 Notice of Appearance. Counsel should refile this document because currently other users are able to modify the document fields. When using a fillable form, counsel should flatten the document prior to attaching it in accordance with Section B(3) of the CM/ECF Policies and Procedures Manual. (Indig, A.) (Entered: 06/08/2021) |
| 06/08/2021 |  | NOTICE OF DEFICIENCY regarding 4 Notice of Appearance. Each attorney must file his or her own notice of appearance. The CM/ECF electronic filing and docketing system does not recognize filings made on behalf of other attorneys for purposes of appearing on the court's docket. The appropriate form for becoming a registered e-filer in this district is available to out of district counsel on this court's website www.nced.uscourts.gov. (Indig, A.) (Entered: 06/08/2021) |
| 06/08/2021 | 6 | Notice of Appearance filed by G. Chris Olson on behalf of All Plaintiffs. (Olson, G.) (Entered: 06/08/2021) |
| 06/08/2021 | 7 | Notice of Special Appearance for non-district by Alison R. Leff on behalf of Brandon Case. (Leff, Alison) (Entered: 06/08/2021) |
| 06/08/2021 |  | Case Submitted to District Judge James C. Dever III for initial review. (Indig, A.) (Entered: 06/08/2021) |
| 06/09/2021 | 8 | ORDER DIRECTING CLERK TO CONTINUE MANAGEMENT OF CASE. The court DIRECTS counsel for plaintiff to present summonses to the clerk for issuance. Signed by District Judge James C. Dever III on 6/9/2021. (Indig, A.) (Entered: 06/09/2021) |
| 06/16/2021 | 9 | Notice filed by Brandon Case *Proposed Summons - Defendant Beasley*. (Leff, Alison) (Entered: 06/16/2021) |
| 06/16/2021 | 10 | Notice filed by Brandon Case *Proposed Summons - Defendant Urieta*. (Leff, Alison) (Entered: 06/16/2021) |

**JA003**

| 06/16/2021 | 11 | Summons Issued as to Officer Beasley and Officer Urieta. (Indig, A.) (Entered: 06/16/2021) |
|---|---|---|
| 07/09/2021 | 12 | SUMMONS Returned Executed by Brandon Case. Officer Urieta served on 6/30/2021, answer due 7/21/2021. (Leff, Alison) (Entered: 07/09/2021) |
| 07/21/2021 | 13 | First MOTION for Extension of Time to File Answer *Plaintiff's Complaint* filed by Officer Beasley, Officer Urieta. (Attachments: # 1 Text of Proposed Order Proposed Order for MET to File Answer) (Graves, Norlan) (Entered: 07/21/2021) |
| 07/22/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 13 First MOTION for Extension of Time to File Answer *Plaintiff's Complaint*. (Indig, A.) (Entered: 07/22/2021) |
| 07/22/2021 | | TEXT ORDER granting Defendants' Motion for Extension of Time 13 . For good cause shown, it is ordered that Defendants have up to and including September 20, 2021, within which to answer or otherwise respond to the Complaint 1 . Signed by Peter A. Moore, Jr., Clerk of Court on 7/22/2021. (Hockaday, A.) (Entered: 07/22/2021) |
| 07/29/2021 | 14 | Waiver of Service Returned Executed filed by Brandon Case. Officer Beasley waiver sent on 7/22/2021, answer due 9/20/2021. (Leff, Alison) (Entered: 07/29/2021) |
| 09/13/2021 | 15 | ANSWER to 1 Complaint with Jury Demand by Officer Beasley, Officer Urieta. (Graves, Norlan) (Entered: 09/13/2021) |
| 09/13/2021 | 16 | ORDER FOR DISCOVERY PLAN. Signed by Peter A. Moore, Jr., Clerk of Court on 9/13/2021. (Indig, A.) (Entered: 09/13/2021) |
| 09/29/2021 | 17 | Notice of Substitution of Counsel filed by Bryan G. Nichols on behalf of Officer Beasley, Officer Urieta substituting for Norlan Graves. (Nichols, Bryan) (Entered: 09/29/2021) |
| 10/27/2021 | 18 | Rule 26(f) Report (joint) filed by Brandon Case. (Leff, Alison) (Entered: 10/27/2021) |
| 10/28/2021 | | Remark - Rule 26(f) Report (joint) submitted to Magistrate Judge Robert B. Jones, Jr. (Indig, A.) (Entered: 10/28/2021) |
| 11/02/2021 | 19 | SCHEDULING ORDER: Initial disclosures under Rule 26(a)(1) are due no later than November 15, 2021. Amended Pleadings due by 4/27/2022. Fact discovery will be concluded no later than May 27, 2022, and expert discovery will be concluded no later than August 29, 2022. All potentially dispositive motions will be filed no later than September 28, 2022. Signed by Magistrate Judge Robert B. Jones, Jr. on 11/2/2021. **Counsel is reminded to read the entire order for critical dates and deadlines.** (Indig, A.) (Entered: 11/02/2021) |
| 01/18/2022 | 20 | Consent MOTION for Protective Order *regarding Subpoena Production* filed by Brandon Case. (Attachments: # 1 Exhibit Proposed Order, # 2 Exhibit Subpoena) (Leff, Alison) (Entered: 01/18/2022) |
| 01/19/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 20 Consent MOTION for Protective Order *regarding Subpoena Production*. (Indig, A.) (Entered: 01/19/2022) |
| 01/19/2022 | 21 | ORDER regarding 20 Consent MOTION for Protective Order *regarding Subpoena Production* filed by Brandon Case. The proposed protective order [DE-20-1] is deficient. Plaintiff shall correct this deficiency, and refile only the proposed protective order within seven (7) days. Signed by Magistrate Judge Robert B. Jones, Jr. on 1/19/2022. (Indig, A.) (Entered: 01/19/2022) |
| 01/20/2022 | 22 | Proposed Order regarding 20 Consent MOTION for Protective Order *regarding Subpoena Production* filed by Brandon Case. (Leff, Alison) (Entered: 01/20/2022) |

| | | |
|---|---|---|
| 01/20/2022 | | Remark - Proposed Order regarding Consent MOTION for Protective Order regarding Subpoena Production submitted to Magistrate Judge Robert B. Jones, Jr. (Indig, A.) (Entered: 01/20/2022) |
| 01/24/2022 | 23 | PROTECTIVE ORDER. Signed by Magistrate Judge Robert B. Jones, Jr. on 1/24/2022. (Castania, M) (Entered: 01/24/2022) |
| 01/30/2022 | 24 | Notice filed by Brandon Case *of Law Firm Name Change*. (Leff, Alison) (Entered: 01/30/2022) |
| 04/27/2022 | 25 | MOTION for Protective Order filed by Brandon Case. (Attachments: # 1 Exhibit Proposed Order) (Leff, Alison) (Entered: 04/27/2022) |
| 04/27/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 25 MOTION for Protective Order. (Indig, A.) (Entered: 04/27/2022) |
| 05/02/2022 | | Motion No Longer Referred to Magistrate Judge Robert B. Jones, Jr. regarding: 25 MOTION for Protective Order. (Indig, A.) (Entered: 05/02/2022) |
| 05/12/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 25 MOTION for Protective Order. (Indig, A.) (Entered: 05/12/2022) |
| 05/13/2022 | 26 | Protective Order. Signed by Magistrate Judge Robert B. Jones, Jr. on 5/13/2022. (Indig, A.) (Entered: 05/13/2022) |
| 05/27/2022 | 27 | MOTION for Extension of Time to Complete Discovery *and to Amend Scheduling Order* filed by Brandon Case. (Attachments: # 1 Text of Proposed Order) (Leff, Alison) (Entered: 05/27/2022) |
| 05/31/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 27 MOTION for Extension of Time to Complete Discovery *and to Amend Scheduling Order*. (Indig, A.) (Entered: 05/31/2022) |
| 05/31/2022 | 28 | AMENDED SCHEDULING ORDER - GRANTING 27 Motion for Extension of Time to Complete Discovery. Signed by Magistrate Judge Robert B. Jones, Jr. on 5/31/2022. **Counsel is reminded to read the entire order for critical dates and deadlines.** (Indig, A.) (Entered: 05/31/2022) |
| 06/23/2022 | 29 | MOTION to Amend/Correct *Complaint* filed by Brandon Case. (Attachments: # 1 Exhibit Proposed Amended Complaint, # 2 Exhibit Redline showing edits) (Leff, Alison) (Entered: 06/23/2022) |
| 07/15/2022 | | Motion Submitted to District Judge James C. Dever III regarding 29 MOTION to Amend *Complaint*. (Indig, A.) (Entered: 07/15/2022) |
| 08/11/2022 | 30 | ORDER - GRANTING 29 Motion to Amend and the court DIRECTS the clerk to file the proposed amended complaint [D.E. 29-1] and DIRECTS counsel for plaintiff to present summonses to the clerk for issuance. Signed by District Judge James C. Dever III on 8/11/2022. (Indig, A.) (Entered: 08/11/2022) |
| 08/11/2022 | 31 | AMENDED COMPLAINT against Officer Beasley, Officer Urieta, Kenny Custodio and Unknown Employees of the State of North Carolina filed by Brandon Case. (Indig, A.) (Entered: 08/11/2022) |
| 08/25/2022 | 32 | MOTION for Extension of Time to Complete Discovery filed by Brandon Case. (Attachments: # 1 Exhibit Deposition Notice, # 2 Exhibit Am. Deposition Notice) (Leff, Alison) (Entered: 08/25/2022) |
| 08/26/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 32 MOTION for Extension of Time to Complete Discovery. (Indig, A.) (Entered: 08/26/2022) |

**JA005**

| | | |
|---|---|---|
| 08/31/2022 | 33 | ORDER - GRANTING 32 Motion for Extension of Time. Expert discovery will be concluded no later than Friday, January 27, 2023 and all motions, except those relating to the admissibility of evidence at trial, shall be filed by no later than Wednesday, March 8, 2023. Signed by Magistrate Judge Robert B. Jones, Jr. on 8/31/2022. **Counsel is reminded to read the entire order for critical dates and deadlines.** (Indig, A.) (Entered: 08/31/2022) |
| 09/12/2022 | 34 | Waiver of Service Returned Executed filed by Kenny Custodio. Kenny Custodio waiver sent on 8/12/2022, answer due 10/11/2022. (Nichols, Bryan) Modified on 9/13/2022 to correct dates and deadlines. (Indig, A.) (Entered: 09/12/2022) |
| 10/26/2022 | 35 | Consent MOTION for Extension of Time to Complete Discovery filed by Brandon Case. (Leff, Alison) (Entered: 10/26/2022) |
| 10/26/2022 | | NOTICE OF DEFICIENCY regarding 35 Motion for Extension of Time to Complete Discovery. At the direction of the court, counsel shall file a proposed order. The order must be filed electronically using the event PROPOSED ORDER located in the RESPONSES AND REPLIES category. (Indig, A.) (Entered: 10/26/2022) |
| 10/26/2022 | 36 | Proposed Order regarding 35 Consent MOTION for Extension of Time to Complete Discovery filed by Brandon Case. (Leff, Alison) (Entered: 10/26/2022) |
| 10/27/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 35 Consent MOTION for Extension of Time to Complete Discovery. (Indig, A.) (Entered: 10/27/2022) |
| 11/16/2022 | 37 | ORDER - GRANTING 35 Motion for Extension of Time to Complete Discovery. Fact discovery will be concluded no later than Monday, December 26, 2022; expert discovery will be concluded no later than Tuesday, March 28, 2023; and all motions, except those relating to the admissibility of evidence at trial, shall be filed by no later than Monday, May 8, 2023. Signed by Magistrate Judge Robert B. Jones, Jr., on 11/16/2022. Copy of order sent to plaintiff via U.S. Mail. (Poole, A) (Entered: 11/16/2022) |
| 12/26/2022 | 38 | MOTION for Leave to Take Two Depositions After Discovery Close filed by Brandon Case. (Attachments: # 1 Proposed Order) (Leff, Alison) (Entered: 12/26/2022) |
| 12/28/2022 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 38 MOTION for Leave to Take Two Depositions After Discovery Close. (Indig, A.) (Entered: 12/28/2022) |
| 12/28/2022 | 39 | ORDER - GRANTING 38 Motion and Plaintiff may depose Richard Smith and John Juehrs by no later than Tuesday, January 31, 2023. Signed by Magistrate Judge Robert B. Jones, Jr. on 12/28/2022. (Indig, A.) (Entered: 12/28/2022) |
| 01/24/2023 | 40 | MOTION for Extension of Time to Complete Discovery *re Expert Witnesses* filed by Brandon Case. (Attachments: # 1 Proposed Order) (Leff, Alison) (Entered: 01/24/2023) |
| 01/24/2023 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 40 MOTION for Extension of Time to Complete Discovery *re Expert Witnesses*. (Indig, A.) (Entered: 01/24/2023) |
| 01/31/2023 | 41 | ORDER - GRANTING 40 Motion for Extension of Time. Expert discovery will be concluded no later than Friday, April 28, 2023; and all motions, except those relating to the admissibility of evidence at trial, shall be filed by no later than Monday, May 8, 2023. Signed by Magistrate Judge Robert B. Jones, Jr. on 1/31/2023. Counsel is reminded to read the entire order for critical dates and deadlines. (Indig, A.) (Entered: 01/31/2023) |
| 03/28/2023 | 42 | MOTION for Extension of Time *to Extend Expert Disclosure Deadlines* filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order |

**JA006**

| | | |
|---|---|---|
| | | Proposed Order Granting Extension of Case Management Deadlines) (Nichols, Bryan) (Entered: 03/28/2023) |
| 03/31/2023 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 42 MOTION for Extension of Time *to Extend Expert Disclosure Deadlines*. (Indig, A.) (Entered: 03/31/2023) |
| 04/03/2023 | 43 | ORDER - GRANTING 42 Motion for Extension of Time to Extend Expert Disclosure Deadlines. Disclosures and reports from retained experts under Rule 26(a)(2) are due from Defendants no later than Thursday, April 27, 2023, and from rebuttalexperts no later than Friday, May 19, 2023; Expert discovery will be concluded no later than Wednesday, May 31, 2023; and All motions, except those relating to the admissibility of evidence at trial, shall be filed by no later than Friday, June 30, 2023. Signed by Magistrate Judge Robert B. Jones, Jr., on 4/3/2023. (Poole, A) (Entered: 04/03/2023) |
| 05/19/2023 | 44 | MOTION for Extension of Time *to Extend Expert Disclosure Deadlines* filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Extension of Time) (Nichols, Bryan) (Entered: 05/19/2023) |
| 05/22/2023 | 45 | RESPONSE in Opposition regarding 44 MOTION for Extension of Time *to Extend Expert Disclosure Deadlines* filed by Brandon Case. (Leff, Alison) (Entered: 05/22/2023) |
| 05/22/2023 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 44 MOTION for Extension of Time *to Extend Expert Disclosure Deadlines*. (Indig, A.) (Entered: 05/22/2023) |
| 05/25/2023 | 46 | ORDER - DENYING 44 Motion for Extension of Time. Signed by Magistrate Judge Robert B. Jones, Jr. on 5/24/2023. (Indig, A.) (Entered: 05/25/2023) |
| 06/29/2023 | 47 | Consent MOTION for Extension of Time to File *Summary Judgment Motions* filed by Brandon Case. (Attachments: # 1 Text of Proposed Order) (Leff, Alison) (Entered: 06/29/2023) |
| 06/30/2023 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 47 Consent MOTION for Extension of Time to File *Summary Judgment Motions*. (Indig, A.) (Entered: 06/30/2023) |
| 07/05/2023 | 48 | ORDER - GRANTING 47 Motion for Extension of Time and all motions, except those relating to the admissibility of evidence at trial, shall be filed by no later than Monday, August 14, 2023. Signed by Magistrate Judge Robert B. Jones, Jr. on 7/5/2023. (Indig, A.) (Entered: 07/05/2023) |
| 08/14/2023 | 49 | MOTION for Partial Summary Judgment filed by Brandon Case. (Leff, Alison) (Entered: 08/14/2023) |
| 08/14/2023 | 50 | Memorandum in Support regarding 49 MOTION for Partial Summary Judgment filed by Brandon Case. (Leff, Alison) (Entered: 08/14/2023) |
| 08/14/2023 | 51 | Statement of Material Facts regarding 49 MOTION for Partial Summary Judgment filed by Brandon Case. (Leff, Alison) (Entered: 08/14/2023) |
| 08/14/2023 | 52 | Appendix to the Statement of Facts regarding 49 MOTION for Partial Summary Judgment filed by Brandon Case. (Attachments: # 1 Exhibit Leff declaration, # 2 Exhibit Jackson deposition, # 3 Exhibit Custodio deposition, # 4 Exhibit Beasley deposition, # 5 Exhibit Juehrs deposition, # 6 Exhibit Safekeepers policy, # 7 Exhibit Hinton deposition, # 8 Exhibit Wilkins deposition, # 9 Exhibit Case statement, # 10 Exhibit Black deposition, # 11 Exhibit Second floor video, # 12 Exhibit First floor video, # 13 Exhibit Custodio requests for admission, # 14 Exhibit Williams report) (Leff, Alison) (Entered: 08/14/2023) |

**JA007**

| 08/14/2023 | 53 | MOTION for Leave to File *Exhibits Manually* filed by Brandon Case. (Leff, Alison) (Entered: 08/14/2023) |
|---|---|---|
| 08/14/2023 | 54 | MOTION for Extension of Time *To File Dispositive Motions* filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Extension of Time) (Nichols, Bryan) (Entered: 08/14/2023) |
| 08/16/2023 | 55 | Memorandum in Opposition regarding 54 MOTION for Extension of Time *To File Dispositive Motions* filed by Brandon Case. (Leff, Alison) (Entered: 08/16/2023) |
| 08/16/2023 | | Motions Submitted to District Judge James C. Dever III regarding 53 MOTION for Leave to File *Exhibits Manually* and 54 MOTION for Extension of Time *To File Dispositive Motions*. (Indig, A.) (Entered: 08/16/2023) |
| 08/17/2023 | 56 | ORDER - The court GRANTS plaintiff's motion for leave to manually file two video exhibits [D.E. 53], and DIRECTS plaintiff's counsel to manually file the exhibits with the clerk's office on or before August 25, 2023. The court GRANTS defendants' motion for an extension of time [D.E. 54], and defendants shall have until September 5, 2023, to file any dispositive motions. **There will be no further extension of this deadline**. Signed by District Judge James C. Dever III on 8/16/2023. (Indig, A.) (Entered: 08/17/2023) |
| 09/05/2023 | 57 | ANSWER to 31 Amended Complaint by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 58 | MOTION Deem Answer to Amended Complaint Timely Filed regarding 57 Answer to Amended Complaint filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 59 | MOTION Motion for Leave to Withdraw or Amend Admissions and to Deem Responses Timely Filed filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 60 | MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 61 | Memorandum in Support regarding 58 MOTION Deem Answer to Amended Complaint Timely Filed regarding 57 Answer to Amended Complaint filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion Timely Filed) (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 62 | Memorandum in Support regarding 59 MOTION Motion for Leave to Withdraw or Amend Admissions and to Deem Responses Timely Filed filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion for Leave to Withdraw or Amend Admissions) (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 63 | MOTION Manually File Video Exhibits regarding 60 MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion to Manually File Video Exhibits) (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/05/2023 | 64 | Memorandum in Support regarding 60 MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 09/05/2023) |
| 09/26/2023 | 65 | Memorandum in Opposition regarding 59 MOTION Motion for Leave to Withdraw or Amend Admissions and to Deem Responses Timely Filed filed by Brandon Case. (Attachments: # 1 Exhibit Custodio RFA resp.) (Leff, Alison) (Entered: 09/26/2023) |
| 09/26/2023 | 66 | RESPONSE in Opposition regarding 60 MOTION for Summary Judgment filed by Brandon Case. (Leff, Alison) (Entered: 09/26/2023) |

**JA008**

| 09/26/2023 | 67 | RESPONSE *to Defendants' Statement of Facts in Support of Summary Judgment Motion* filed by Brandon Case. (Leff, Alison) (Entered: 09/26/2023) |
| 09/26/2023 | 68 | Appendix to the Statement of Facts regarding 60 MOTION for Summary Judgment *Appx to Statement of Facts Resp* 67 filed by Brandon Case. (Attachments: # 1 Exhibit Leff declaration, # 2 Exhibit Urieta deposition, # 3 Exhibit Extended first floor video, # 4 Exhibit Smith deposition, # 5 Exhibit Juehrs memorandum) (Leff, Alison) (Entered: 09/26/2023) |
| 09/26/2023 | 69 | MOTION for Leave to Manually File Exhibits filed by Brandon Case. (Leff, Alison) (Entered: 09/26/2023) |
| 09/26/2023 | | NOTICE OF DEFICIENCY regarding 69 Motion for Miscellaneous Relief. At the direction of the court, counsel shall file a proposed order. The order must be filed electronically using the event PROPOSED ORDER located in the RESPONSES AND REPLIES category. (Indig, A.) (Entered: 09/26/2023) |
| 09/26/2023 | 70 | RESPONSE **Corrected** *to Defendants' Statement of Facts in Support of Summary Judgment* filed by Brandon Case. (Leff, Alison) Modified on 9/26/2023 to add bold for emphasis. (Indig, A.) (Entered: 09/26/2023) |
| 09/26/2023 | 71 | Proposed Order regarding 69 MOTION for Leave to Manually File Exhibits filed by Brandon Case. (Leff, Alison) (Entered: 09/26/2023) |
| 09/26/2023 | | REMINDER TO COUNSEL as to Brandon Case. Pursuant to Judge Dever's Practice Preferences located on the court's website, counsel shall provide a courtesy copy of motions and memoranda for documents over 20 pages, by mailing or delivering to the clerk's office in Raleigh. (Indig, A.) (Entered: 09/26/2023) |
| 10/12/2023 | | Motions Submitted to District Judge James C. Dever III regarding 49 MOTION for Partial Summary Judgment, 60 MOTION for Summary Judgment, 69 MOTION for Leave to Manually File Exhibits, 58 MOTION Deem Answer to Amended Complaint Timely Filed, 63 MOTION Manually File Video Exhibits and 59 MOTION Motion for Leave to Withdraw or Amend Admissions and to Deem Responses Timely Filed. (Indig, A.) (Entered: 10/12/2023) |
| 12/08/2023 | 72 | ORDER TO SHOW CAUSE. The court DIRECTS Nichols to show cause why the court should not strike defendants' motion for summary judgment. Nichols shall file his response on or before January 5, 2024. Nichols's failure to timely file his response will result in the imposition of sanctions. The court DIRECTS the clerk to serve a copy of this order by email on James Trachtman, Special Deputy Attorney General, Section Head, Public Safety Section, North Carolina Department of Justice. Signed by District Judge James C. Dever III on 12/8/2023. (Indig, A.) (Entered: 12/08/2023) |
| 12/12/2023 | 73 | ORDER - The court GRANTS defendants' motions to deem their answer timely filed and to withdraw or amend Custodio's answers to plaintiffs' request for admissions [D.E. 58, 59]. The court DENIES the parties' motions for summary judgment and to manually file video exhibits [D.E. 49, 60, 63, 69] WITHOUT PREJUDICE. The parties shall have until January 26, 2024, to file renewed motions for summmary judgment which comply with this order and the court's local rules. **There will be no extension of this deadline.** Signed by District Judge James C. Dever III on 12/12/2023. (Indig, A.) (Entered: 12/12/2023) |
| 12/13/2023 | 74 | MOTION for Reconsideration regarding 73 Order on Motion for Partial Summary Judgment,,, Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Summary Judgment,,,,,,,, filed by Brandon Case. (Leff, Alison) (Entered: 12/13/2023) |
| 01/03/2024 | 75 | MOTION for Extension of Time to File Response/Reply as to 74 MOTION for Reconsideration regarding 73 Order on Motion for Partial Summary Judgment,,, Order on |

| | | |
|---|---|---|
| | | Motion for Miscellaneous Relief,,,,,, Order on Motion for Summary Judgment,,,,,,,,, filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Extension of Time) (Nichols, Bryan) (Entered: 01/03/2024) |
| 01/05/2024 | | Motion Submitted to District Judge James C. Dever III regarding 75 MOTION for Extension of Time to File Response as to 74 MOTION for Reconsideration. (Indig, A.) (Entered: 01/05/2024) |
| 01/05/2024 | 76 | RESPONSE to Order regarding 72 Order to Show Cause,, filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 01/05/2024) |
| 01/17/2024 | 77 | RESPONSE in Opposition regarding 74 MOTION for Reconsideration regarding 73 Order on Motion for Partial Summary Judgment,,, Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Summary Judgment,,,,,,,,, filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 01/17/2024) |
| 01/26/2024 | 78 | Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Brandon Case. (Leff, Alison) (Entered: 01/26/2024) |
| 01/26/2024 | 79 | Memorandum in Support regarding 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Brandon Case. (Leff, Alison) (Entered: 01/26/2024) |
| 01/26/2024 | 80 | Statement of Material Facts regarding 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Brandon Case. (Leff, Alison) (Entered: 01/26/2024) |
| 01/26/2024 | 81 | MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 01/26/2024) |
| 01/26/2024 | 82 | Memorandum in Support regarding 81 MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 01/26/2024) |
| 01/26/2024 | 83 | Statement of Material Facts regarding 81 MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Nichols, Bryan) (Entered: 01/26/2024) |
| 01/26/2024 | 84 | Appendix to the Statement of Facts regarding 81 MOTION for Summary Judgment filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Exhibit 1-Delcaration of Counsel, # 2 Exhibit 1.1 Opus Report of Case, # 3 Exhibit 1.2 Infraction History, # 4 Exhibit 1.3 DPS Safekeeper Policy, # 5 Exhibit 1.4 OPUS Report of Kennion, # 6 Exhibit 1.5 - January Incident Report, # 7 Exhibit 1.6 - Placeholder for Video of Incident (Upstairs), # 8 Exhibit 1.7- Placeholder for Video of Incident (Downstairs), # 9 Exhibit 2 - Declaration of Urieta, # 10 Exhibit 3- Declaration of Custodio, # 11 Exhibit 3.1- Transcript of Custodio Deposition, # 12 Exhibit 4-Declaration of Beasley, # 13 Exhibit 4.1- Transcript of Beasley Deposition) (Nichols, Bryan) (Entered: 01/26/2024) |
| 01/26/2024 | 85 | MOTION Manually File Video Exhibits regarding 82 Memorandum in Support, 81 MOTION for Summary Judgment , 84 Appendix to the Statement of Facts,,, filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion to Manually File Video Exhibits) (Nichols, Bryan) (Entered: 01/26/2024) |
| 02/14/2024 | 86 | Consent MOTION for Extension of Time to File Response/Reply as to 81 MOTION for Summary Judgment filed by Brandon Case. (Attachments: # 1 Text of Proposed Order) (Leff, Alison) (Entered: 02/14/2024) |
| 02/14/2024 | | Motion Referred to US Magistrate Judge Robert B. Jones, Jr. regarding 86 Consent MOTION for Extension of Time to File Response as to 81 MOTION for Summary |

| | | |
|---|---|---|
| | | Judgment. (Indig, A.) (Entered: 02/14/2024) |
| 02/15/2024 | 87 | ORDER - GRANTING 86 Consent MOTION for Extension of Time to File Response as to 81 MOTION for Summary Judgment. Responses due by 3/18/2024. Signed by Magistrate Judge Robert B. Jones, Jr. on 2/15/2024. (Indig, A.) (Entered: 02/15/2024) |
| 02/20/2024 | 88 | Notice of Substitution of Counsel filed by James B. Trachtman on behalf of Officer Beasley, Kenny Custodio, Officer Urieta substituting for Bryan Nichols. (Trachtman, James) (Entered: 02/20/2024) |
| 02/20/2024 | 89 | MOTION for Extension of Time to File Response/Reply as to 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion) (Trachtman, James) (Entered: 02/20/2024) |
| 02/20/2024 | 90 | MOTION to Deem Timely Filed Defendants' Motion for Extension of Time to Respond to Plaintiff's Second Motion for Partial Summary Judgment regarding 89 MOTION for Extension of Time to File Response/Reply as to 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order Granting Motion) (Trachtman, James) (Entered: 02/20/2024) |
| 02/21/2024 | 91 | RESPONSE in Opposition regarding 89 MOTION for Extension of Time to File Response/Reply as to 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* , 90 MOTION to Deem Timely Filed Defendants' Motion for Extension of Time to Respond to Plaintiff's Second Motion for Partial Summary Judgment regarding 89 MOTION for Extension of Time to File Response/Reply as to 78 Second MOTION for filed by Brandon Case. (Leff, Alison) (Entered: 02/21/2024) |
| 02/21/2024 | | Motions Submitted to District Judge James C. Dever III regarding 89 MOTION for Extension of Time to File Response as to 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* and 90 MOTION to Deem Timely Filed Defendants' Motion for Extension of Time. (Indig, A.) (Entered: 02/21/2024) |
| 02/23/2024 | 92 | ORDER - The court GRANTS defendants' non-dispositive motions [D.E. 75, 85, 89, 90] and DIRECTS defendants to manually file the video exhibit on or before March 4, 2024. The court DENIES plaintiff's motion for reconsideration [D.E. 74]. The parties' motions for summary judgment [D.E. 78, 81] remain pending, and defendants shall have until March 18, 2024, to file any response in opposition to plaintiff's motion. Signed by District Judge James C. Dever III on 2/23/2024. (Indig, A.) (Entered: 02/23/2024) |
| 03/04/2024 | | Remark - Thumb drive of video exhibit received as ordered in DE 92 . (Hardy, Shari) (Entered: 03/04/2024) |
| 03/15/2024 | 93 | Notice of Substitution of Counsel filed by John Locke Milholland, IV on behalf of Officer Beasley, Kenny Custodio, Officer Urieta substituting for James B. Trachtman. (Milholland, John) (Entered: 03/15/2024) |
| 03/15/2024 | 94 | MOTION for Extension of Time filed by Officer Beasley, Kenny Custodio, Officer Urieta. (Attachments: # 1 Text of Proposed Order) (Milholland, John) (Entered: 03/15/2024) |
| 03/18/2024 | 95 | RESPONSE in Opposition regarding 81 MOTION for Summary Judgment filed by Brandon Case. (Leff, Alison) (Entered: 03/18/2024) |
| 03/18/2024 | 96 | RESPONSE regarding 83 Statement of Material Facts *and Additional Statement of Facts* filed by Brandon Case. (Leff, Alison) (Entered: 03/18/2024) |

| 03/18/2024 | 97 | Appendix to the Statement of Facts regarding 81 MOTION for Summary Judgment filed by Brandon Case. (Attachments: # 1 Exhibit 21 (Leff Decl)) (Leff, Alison) (Entered: 03/18/2024) |
|---|---|---|
| 03/18/2024 | 98 | MOTION for Leave to Manually File Exhibit filed by Brandon Case. (Attachments: # 1 Text of Proposed Order) (Leff, Alison) (Entered: 03/18/2024) |
| 03/20/2024 | 99 | RESPONSE to Motion regarding 94 MOTION for Extension of Time filed by Brandon Case. (Leff, Alison) (Entered: 03/20/2024) |
| 03/20/2024 | | Motions Submitted to District Judge James C. Dever III regarding 94 MOTION for Extension of Time and 98 MOTION for Leave to Manually File Exhibit. (Indig, A.) (Entered: 03/20/2024) |
| 03/25/2024 | 100 | ORDER - GRANTING 94 Motion for Extension of Time and Defendants shall have until April 12, 2024, to file any response in opposition. **There will be no further extension of this deadline**. GRANTING 98 Motion to manually file a video exhibit and DIRECTS counsel for plaintiff to manually file the video exhibit on or before March 29, 2024. Signed by District Judge James C. Dever III on 3/25/2024. (Indig, A.) (Entered: 03/25/2024) |
| 04/12/2024 | 101 | RESPONSE regarding 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Custodio* filed by Kenny Custodio. (Milholland, John) (Entered: 04/12/2024) |
| 04/12/2024 | 102 | RESPONSE regarding 101 Response *Response to Plaintiff's Statement of Material Facts (DE-79)* filed by Kenny Custodio. (Milholland, John) (Entered: 04/12/2024) |
| 04/12/2024 | 103 | RESPONSE regarding 102 Response filed by Kenny Custodio. (Attachments: # 1 Affidavit Response Appendix Exhibit 1, Declaration of Captain John Raymond, # 2 Exhibit Response Appendix Exhibit 2, Defendant Custodio's Answers to Requests for Admission, # 3 Affidavit Response Appendix Exhibit 3, Declaration of Defendant Custodio) (Milholland, John) (Entered: 04/12/2024) |
| 04/26/2024 | 104 | REPLY to Response to Motion regarding 78 Second MOTION for Partial Summary Judgment *against Defendant Kenny Case* filed by Brandon Case. (Leff, Alison) (Entered: 04/26/2024) |
| 08/14/2024 | 105 | Notice of Change of Address filed by Alison R. Leff filed by on behalf of Brandon Case. (Leff, Alison) (Entered: 08/14/2024) |
| 08/15/2024 | | Notice to Counsel regarding: 105 Notice of Change of Address. Counsel should refer to Pages 5 and 6 of the CM/ECF User's Manual for instructions on updating your law firm information. Once updated, your new contact information will be available on the docket of all cases in our Court for which you have entered an appearance. (Indig, A.) (Entered: 08/15/2024) |
| 08/30/2024 | 106 | ORDER - The court GRANTS defendants' motion for summary judgment [D.E. 81] and DENIES plaintiff's second motion for partial summary judgment [D.E. 78]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and his court's local rules. Signed by District Judge James C. Dever III on 8/30/2024. (Indig, A.) (Entered: 08/30/2024) |
| 08/30/2024 | 107 | CLERK'S JUDGMENT - that plaintiff's second motion for partial summary judgment is denied, defendants' motion for summary judgment is granted and this action is hereby dismissed. Signed by Peter A. Moore, Jr., Clerk of Court on 8/30/2024. (Indig, A.) (Entered: 08/30/2024) |

| 09/27/2024 | 108 | Notice of Appeal filed by Brandon Case as to 92 Order on Motion for Reconsideration,,, Order on Motion for Extension of Time to File Response/Reply,,, Order on Motion for Miscellaneous Relief,,,,,,,, 73 Order on Motion for Partial Summary Judgment,,, Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Summary Judgment,,,,,,,, 106 Order on Motion for Partial Summary Judgment,, Order on Motion for Summary Judgment, 100 Order on Motion for Extension of Time,, Order on Motion for Miscellaneous Relief, 48 Order on Motion for Extension of Time to File, 107 Clerk's Judgment,. Filing fee, receipt number ANCEDC-7790925. (Leff, Alison) (Entered: 09/27/2024) |
|---|---|---|
| 09/30/2024 | 109 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 108 Notice of Appeal. (Indig, A.) (Entered: 09/30/2024) |
| 10/03/2024 | 110 | US Court of Appeals Case Number 24-6953 (Anisha Walker, Case Manager) as to 108 Notice of Appeal filed by Brandon Case. (Indig, A.) (Entered: 10/03/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/14/2025 12:15:45 | | | |
| **PACER Login:** | dillonre | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-ct-03157-D |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:21-CT-3157-D**

| | | |
|---|---|---|
| BRANDON CASE, | ) | |
| | ) | |
| Plaintiff, | ) | **AMENDED COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| v. | ) | |
| | ) | |
| BRANDON BEASLEY, ERIC URIETA, | ) | |
| KENNY CUSTODIO, and UNKNOWN | ) | |
| EMPLOYEES OF THE STATE OF | ) | |
| NORTH CAROLINA, | ) | |
| | | |
| Defendants. | | |

## Introduction

1.      When a prison official ignores a serious, known risk to an inmate's safety, that official violates the inmate's rights under the United States Constitution. This rule makes sense. Prisons can be dangerous, and inmates lack the ability to the protect themselves. They have no choice but to rely on prison officials to keep them safe.

2.      One of the principal dangers in a prison is from violent inmates. Keeping inmates with a known propensity to assault their peers separate from vulnerable inmates is part of Central Prison's classification program. But it was not done here.

3.      Correctional Officers Kenny Custodio, Brandon Beasley, and Eric Urieta were supposed to keep so-called "safekeepers," ultra-violent detainees housed in prison, separate from general population inmates like Brandon Case. They failed. And because of that failure, a safekeeper attacked Case, leaving him with dozens of facial fractures, 3 plates and 21 screws in his face, and the possibility of a lifetime of incurable pain from nerve damage.

4.      Case now sues to recover for those injuries.

JA014

**Jurisdiction & Venue**

5.     The Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because Case's claims arise under federal law.

6.     This District is the proper venue for this case because the events giving rise to Case's claims took place in Wake County.

7.     Under Local Civil Rule 40.1(c)(1), the appropriate Division for this case is the Western Division because Case now is resident of Warren County.

**Parties**

8.     Plaintiff Brandon Case is a man living in North Carolina who is currently incarcerated at Eastern Correctional Institution.

9.     Defendant Kenny Custodio was, at the relevant times, a correctional officer at Central Prison in Wake County, North Carolina.

10.     Defendant Brandon Beasley was, at the relevant times, a correctional officer at Central Prison located in Wake County, North Carolina.

11.     Defendant Eric Urieta was, at the relevant times, a correctional officer at Central Prison located in Wake County, North Carolina.

12.     Unknown Employees of the State of North Carolina are employees of the Department of Public Safety whose misconduct resulted in Case's injuries but whose names Case does not yet know.

**Factual Allegations**

<u>Safekeepers</u>

13.     Central Prison in Raleigh houses prisoners with a wide range of security classifications, including "safekeepers."

JA015

14.     Safekeepers include individuals, originally housed in county jails, who are so violent and aggressive that the jails cannot safely house them. *See Policy & Procedures of the State of North Carolina Department of Public Safety, Prisons,* ch. C, § .1601(b)(1), available at https://files.nc.gov/ncdps/C.1600_11_06_17_0.pdf.

15.     Central Prison has many explicit policies designed to protect staff and other inmates from these safekeepers.

16.     For example, safekeepers wear bright, gold-colored jumpsuits, so they are easy to see. *Id*. § C.1604(i).

17.     And safekeepers are always kept separate from general population inmates.

18.     This requires special care when safekeepers and other inmates move from one part of Central to another, as from a dorm to a recreation area.

19.     General population inmates and safekeepers must use common, secure hallways to move around the facility.

20.     But they must never occupy the same secure hallway at the same time.

21.     To ensure they do not, correctional officers occupy control stations throughout Central Prison with window and security camera visibility of the secure hallways and the locked doors leading to them.

22.     When inmates come to a locked door to enter a hallway, the officers are to ensure the hallway is safe before unlocking the door and allowing the inmates in.

23.     These checks are critical to the safe movement of inmates throughout the facility.

Defendants Allow Kenneth Kennion to Attack Brandon Case

24.     On the morning of January 21, 2020, Brandon Case was getting a haircut in Central Prison.

3

JA016

25.     After his haircut, Case left the barbershop and approached a door. The door led to a short staircase that went down into a hallway.

26.     A control room is situated across from the door leading to the staircase into the hallway.

27.     Custodio, Beasley, and Urieta had been working in the control room, and they were responsible for ensuring the door to the hallway was locked.

28.     But Custodio, Beasley, and Urieta failed to lock the door.

29.     As a result, Case opened the door, descended the staircase, and stepped into the hallway.

30.     At the same time, there were safekeepers, including Kenneth Kennion, arriving in the hallway on their way back from recreation.

31.     The imminent arrival of the safekeepers had been announced to Custodio, Beasley, and Urieta by radio.

32.     But Defendants did not secure the door to the hallway in response to the radio call warning of the safekeepers' approach.

33.     When Case entered the hallway, Kennion attacked Case without provocation.

34.     Kennion repeatedly struck Case in the face before a correctional officer intervened.

35.     The attack left Case bleeding and severely injured.

36.     Case stumbled down the hallway, dripping blood, while correctional officers secured his attacker.

## Case's Emergency Treatment

37.     Case received medical treatment within Central Prison before being referred to an

JA017

outside hospital for emergency care.

38.     Hours after the attack, two correctional officers took Case to a hospital affiliated with Duke University, where he was admitted.

39.     Case later underwent plastic surgery.

40.     The surgery involved cutting a nerve in Case's face and implanting 3 plates and 21 screws.

Case's Injuries and Pain

41.     Case has been in constant pain since the attack.

42.     Among other things, Case suffers from pain and tingling in his jaw, eye pain and sensitivity to light, and headaches.

43.     A neurologist who later treated Case told Case that the constant pain he feels is a common result of the nerve damage resulting from Case's emergency surgery.

44.     The neurologist also told Case that he may require additional surgery, and even that may not end the pain or alleviate his other symptoms.

45.     Case's face is permanently, severely disfigured.

Other Attacks

46.     The safekeeper attack on Case was at least the third time in recent months that a safekeeper attacked a general population inmate because of staff's failure to follow protocols to keep general population inmates separated from safekeepers.

47.     In one of those instances, in the same spot where Case was attacked, a safekeeper who should not have been allowed in the secure hallway attacked and knocked out a janitor.

48.     On information and belief, Custodio, Beasley, and Urieta were aware of those attacks when they failed to protect Case.

5

**First Claim for Relief**

*Failure to Protect against Beasley under 42 U.S.C. § 1983*

49.     Case realleges all other allegations here.

50.     Safekeepers like Kennion posed a serious risk to inmates like Case.

51.     Beasley was aware of this risk because he was aware generally of who safekeepers are, the standard procedures designed to secure spaces within the prison, that Kennion was a safekeeper, and that Case was a general population inmate.

52.     Beasley failed to take reasonable measures to protect Case from this risk because he failed to follow the standard procedures for keeping safekeepers and general population inmates separate on the morning Case was attacked.

53.     Because Beasley failed to take these measures, Kennion was able to attack Case, causing him serious injury.

54.     At the time Beasley was acting under color of law.

55.     Case is therefore entitled to compensatory damages, punitive damages, attorneys' fees, litigation costs, and pre- and post-judgment interest.

**Second Claim for Relief**

*Failure to Protect against Urieta under 42 U.S.C. § 1983*

56.     Case realleges all other allegations here.

57.     Safekeepers like Kennion posed a serious risk to inmates like Case.

58.     Urieta was aware of this risk because he was aware generally of who safekeepers are, the standard procedures designed to secure spaces within the prison, that Kennion was a safekeeper, and that Case was a general population inmate.

6

JA019

59.     Urieta failed to take reasonable measures to protect Case from this risk because he failed to follow the standard procedures for keeping safekeepers and general population inmates separate on the morning Case was attacked.

60.     Because Urieta failed to take these measures, Kennion was able to attack Case, causing him serious injury.

61.     At the time Urieta was acting under color of law.

62.     Case is therefore entitled to compensatory damages, punitive damages, attorneys' fees, litigation costs, and pre- and post-judgment interest.

### Third Claim for Relief

*Failure to Protect against Custodio under 42 U.S.C. § 1983*

63.     Case realleges all other allegations here.

64.     Safekeepers like Kennion pose a serious risk to inmates like Case.

65.     Custodio was aware of this risk because he was aware generally of who safekeepers are, the standard procedures designed to secure spaces within the prison, that Kennion was a safekeeper, and that Case was a general population inmate.

66.     Custodio failed to take reasonable measures to protect Case from this risk because he failed to follow the standard procedures for keeping safekeepers and general population inmates separate when Case was attacked.

67.     Because Custodio failed to take those measures, Kennion was able to attack Case, seriously injuring Case.

68.     At the time, Custodio was acting under color of law.

69.     Case is therefore entitled to compensatory damages, punitive damages, attorneys' fees, litigation costs, and pre- and post-judgment interest.

JA020

**Prayer for Relief**

Based upon the foregoing, Case respectfully prays for the following relief:

1.  Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

2.  Punitive damages from each Defendant in an amount to be determined at trial;

3.  Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988;

4.  Costs of court and interest as allowed by law;

5.  A trial by jury on all contested issues of fact; and

6.  Such other and further relief as the Court may deem just and proper.

Dated: June 23, 2022                    Respectfully submitted,

                                        /s/ Alison R. Leff

                                        Alison R. Leff
                                        The Civil Rights Group, LLC
                                        2045 W Grand Ave, Ste B, PMB 62448
                                        Chicago, IL 60612
                                        (708) 722-2242
                                        alison@civilrightsgroup.com
                                        Ill. Bar No. 6296422
                                        Attorneys for Plaintiff

                                        G. Christopher Olson
                                        Olson Law, PLLC
                                        514 Daniels St., #136
                                        Raleigh, NC 27605
                                        (919) 624-3718
                                        chris@olsonlaw-pllc.com
                                        Fax: (919) 834-1071
                                        N.C. State Bar No. 21223
                                        Local Civil Rule 83.1(d) Counsel for Plaintiff

JA021



| | |
|---|---|
| **State of North Carolina** | Chapter:    C |
| **Department of Public Safety** | Section:    .1600 |
| **Prisons** | Title:     **Safekeepers** |
| | Issue Date:   11/06/17 |
| ***POLICY & PROCEDURES*** | Supersedes:   05/04/17 |

## .1601  SCOPE AND DEFINITIONS

(a)     The purpose of this policy is to establish guidelines for the Prisons to cooperate with county jails to assist with the housing of prisoners when necessary for safety and security reasons and to comply with the General Statutes through the safekeeper program.

(b)     The following definitions apply whenever these terms are used:

    (1)     Safekeeper - A prisoner held in any county jail who: poses a serious escape risk; exhibits violently aggressive behavior that cannot be contained and warrants a higher level of supervision; needs to be protected from other prisoners and the county jail facility cannot provide such protection; is a female or a person 18 years of age or younger and the county jail facility does not have adequate housing for such prisoners; is in custody at a time when a fire or other catastrophic event has caused the county jail facility to cease or curtail operations; otherwise poses an imminent danger to the staff of the county jail facility or to other prisoners in the facility; or requires medical or mental health treatment.

    (2)     Offender Population Unified System (OPUS) - The approved computerized system for the Department of Public Safety.

    (3)     Automated Jail Transportation Files - Computerized OPUS screens for scheduling new admissions in the Prisons.

    (4)     Scheduling Authority - Authority designated by the Director of Prisons to the Assistant Director for Auxiliary Services to oversee admission scheduling functions.

    (5)     Offender Assignment System - Computerized OPUS screens for classifying, managing and tracking offenders' progress through the Prisons. This includes custody, security, job/program activities, housing and status assignments.

## .1602  GENERAL PROVISIONS AND NOTIFICATION

(a)     Admission Authority

    (1)     During normal working hours, jail authorities schedule safekeepers by calling the Prisons' transfer offices.  Admission scheduling is accomplished through the automated jail transportation files of OPUS utilized by these offices. Safekeepers are routinely accepted if the safekeeper count is less than the statutory limit of two

hundred (200). Receiving units are notified of scheduled admissions via OPUS screens. The transfer staff may contact the Prisons Administration Medical or Mental Health services staff for recommendation on the appropriate admission site to meet the reported medical or mental health needs.

(2)    During non-working hours, jail authorities schedule safekeepers by calling the Randall Building security officer.

    (A)    If the safekeeper count is two hundred (200) or less, the security officer contacts the receiving unit's officer-in-charge and provides the safekeeper count. The request for admission is routinely authorized if the statewide count is less than the statutory limit.

    (B)    If the total safekeeper count exceeds two hundred (200), the security officer contacts the Prisons Administration duty officer for authorization to accept.

    (C)    The security officer completes the required OPUS screens for all safekeepers scheduled after normal working hours and prints one copy for Transfer Branch staff to review on the next scheduled work day.

(3)    When the safekeeper count reaches the statutory limit of two hundred (200), further safekeeper admissions are authorized only by the Secretary of Public Safety, or his designee, on a case-by-case basis according to the following criteria:

    (A)    The acceptance of safekeepers beyond the statutory limit must be authorized by the Secretary of Public Safety, or his designee, and is limited to acute medical or mental health cases or extraordinary situations where specialized confinement space is not available in local facilities.

    (B)    Requests which fall into the medical and mental health categories are evaluated by the Population Manager or Assistant Director for Auxiliary Services during normal working hours and the Prisons Administration duty officer during nights, weekends and holidays. Additional evaluation by medical or mental health professionals may be required at Central Prison or NCCIW prior to making a decision. Decisions will be made in a timely manner by the reviewing authority. Admission is approved only if it is determined that these cases are valid emergencies based upon the information provided.

    (C)    Local sheriffs shall be requested to exchange safekeepers previously accepted who do not meet the emergency criteria in order to accommodate acceptance as described in paragraphs (A) and (B) above. Release instructions shall be in accordance with C.1608.

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 2 of 8
**JA023**

(4)    The jail is informed if denial of safekeepers is necessary.  Form DC-116 is completed to document the denial.

## .1603  ADMISSION PROCEDURES

(a)    The facilities designated in C.1605 to receive safekeepers will perform the admission processing functions on OPUS as established in the Diagnostic Center Procedure Manual (DCPM).

(b)    Safekeepers will be transported by jail authorities to a Prisons facility. To be accepted, all safekeepers must have an order signed by a superior or district court judge.  When, due to an emergency and it is not feasible to obtain an order signed by a superior or district court judge prior to the transfer, the sheriff is authorized to sign the order and shall, as soon as possible after the emergency, obtain the order signed by the judge.

(c)    Arrival at the designated facility will be documented through the OPUS arrival confirmation files.  Upon admission, intake procedures which include identification, criminal history investigation (DCI), local orientation, and health screening will be conducted.

## .1604  CONDITIONS OF CONFINEMENT

For safekeepers, conditions of confinement must be met as established in C.1200. Additionally,

(a)    Safekeepers must be housed separately from general population offenders, except when admission to a medical or mental health unit is required, or when the offender is convicted on other unrelated charges and has been committed to the Department of Public Safety.

(b)    Safekeepers will normally be transported to and from prison facilities and county jails by the sending sheriff.  However, transportation within the Prisons will be provided by prison staff.  When transporting safekeepers, the same security precautions will be exercised as when transporting convicted offenders.

(c)    Safekeepers shall be required to maintain their living areas in a neat, clean, and sanitary manner.  This includes all tasks necessary to maintain a suitable living environment. This requirement is restricted to their sleeping, dayroom, and bathing areas only. Safekeepers are generally not convicted offenders and, therefore, cannot be required to perform other work assignments.

(d)    Safekeepers will not participate in program activities with the general prison population, except as authorized in .1604 (a). However, they will be provided controlled access to Chaplaincy, library, certain special education services for those under the age of 21, and recreation, consistent with C .1200.  Safekeepers are not eligible for sentence reduction credits.

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 3 of 8
JA024

(e)     Safekeepers shall have access to the Administrative Remedy Procedure the same as convicted offenders and their grievances will be managed through this procedure.

(f)     Safekeepers shall be expected to follow the rules and regulations common to all offenders.  The disciplinary procedures used for offenders are applicable to safekeepers. Safekeepers are subject to the same disciplinary sanctions as general population offenders, except the loss of sentence reduction credits.

(g)     Safekeepers will be provided non-contact visits consistent with C .1215.b.  Safekeeper visiting will be separate from the convicted offenders.

(h)     Safekeeper telephone calls will be consistent with D .0803(b)(3)(B), which controls offender access to telephone privileges.

(i)     Male felon safekeepers will be clothed in a gold color jumpsuit and male misdemeanant safekeepers will be clothed in a green color jumpsuit.  Female safekeepers will be clothed in a yellow color dress for identification purposes.

(j)     Upon completion of initial processing, safekeepers will be assigned to case managers who will monitor their activities through regular contacts.  Case managers will also review the safekeeper files regularly to keep abreast of any housing or custodial changes that may occur.

(k)     Safekeepers shall be provided access to needed medical, dental and mental health services as determined by a qualified medical, dental or mental health professional. Safekeepers will be exempt from medical co-pay.

## .1605  DESIGNATION OF PRISON FACILITIES

(a)     The Director of Prisons will designate authorized facilities for admission and housing safekeepers.  Safekeepers are housed apart from the general population except as noted below when inpatient medical and mental health services are required.

   (1)    Central Prison shall receive all adult male safekeepers committed from the courts requiring immediate medical or mental health care.

   (2)    North Carolina Correctional Institution for Women shall receive and house all female safekeepers committed for safekeeping.

   (3)    Central Prison is designated to receive and house male safekeepers, ages 22 and above.

   (4)    Foothills Correctional Institution shall receive and house male youthful offenders eighteen (18) years of age and under committed for safekeeping.

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 4 of 8

JA025

     (5)    Polk Correctional Institution shall receive male youthful offenders, aged-nineteen (19) through twenty-one (21) charged with felony offenses and committed for safekeeping.

(b)    Safekeepers may be housed with convicted offenders at an inpatient prison medical or mental health unit when such is required to provide services deemed necessary by a health care clinician. Inpatient treatment units designated for safekeepers are as follows:

    Mental Health:    Central Prison Mental Health Unit
                        NCCIW Mental Health Unit

    Medical:         Central Prison Medical Unit
                        NCCIW Medical Infirmary

## .1606 ASSIGNMENT AND TRANSFER

(a)    Following completion of admission processing procedures, safekeepers will be assigned to appropriate prison facilities designated by the Director of Prisons as providing housing and services for the management of safekeepers.

(b)    Following a safekeeper's assignment to a designated facility, the safekeeper will remain at that facility until recalled by the court, unless:

    (1)    the safekeeper requires medical services not available at the designated facility; or

    (2)    the safekeeper's behavior has deteriorated to the point that the staff at the designated facility feels more security is needed.

(c)    Safekeepers requiring medical services shall be transported to Central Prison. Safekeepers with emergency medical needs shall be sent to the nearest medical provider as deemed appropriate by the designated facility's medical staff. Safekeepers requiring additional security shall be referred to the Director's Classification Committee (DCC) for appropriate assignment.

(d)    All transfers of safekeepers for non-medical concerns shall be coordinated through the Population Management Section of the Prisons.

    (1)    Safekeeper Management Authority

        (A)    The designated facility authority is responsible for coordinating and directing the assignment of safekeepers.

        (B)    Facility assignment will be made following record reviews of pending charges, history of predatory behavior, criminal history, physical and mental health status, and any other relevant information provided by the

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 5 of 8
JA026

jail and documented on the OR60 screens or as might otherwise be made available to the record.

(C)     All classification actions for safekeepers will be documented using the appropriate OPUS files.

(D)     The following will be general criteria for housing:

(i)     Male safekeepers requiring inpatient medical, or mental health treatment, regardless of crime categorization, will generally be housed at Central Prison. This may include inmates under twenty-two (22) years of age if inpatient treatment is needed. Inmates identified as pending trial for capital cases, or identified as substantial security or escape risk will be housed at Central Prison.

(ii)    Central Prison will generally house adult males twenty-two (22) years of age and above committed for safekeeping.

(iii)   Female safekeepers will be housed at the North Carolina Correctional Institution for Women; and

(iv)    Male safekeepers eighteen (18) years of age and under will be housed at Foothills Correctional Institution.

(v)     Male safekeepers, ages 19-21, awaiting trial for offenses categorized as felon, will be housed at Polk Correctional Institution.

(E)     In those cases where safekeepers are transferred to another facility, the sending facility shall notify the committing county of the transfer.

## .1607  USE OF FORCE

The Prisons use of force policy applies to safekeepers under the supervision of Prisons.

## .1608  RELEASE

(a)     A copy of the safekeeper release form is required for the release of a safekeeper. The receiving officer shall be required to sign this document, which will be retained by the Prisons.

(b)     Safekeepers are released only to law enforcement officers who present appropriate identification. Generally, these officers will represent the county issuing the safekeeping order. Upon receipt of written authorization from the committing county, the safekeeper may be released to officers from another jurisdiction upon presentation of identification.

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 6 of 8
JA027

(c)     Transportation to and from the local confinement facility is provided by jail authorities.

(d)     The Secretary, or his designee, may refuse to accept any safekeeper and may return any safekeeper transferred under a safekeeping order when the statutory limit is reached. The Secretary, or designee, may, when the statutory limit is reached, require the sheriffs to take custody of any safekeeper in order to accommodate an emergency request.

(e)     When a safekeeper is housed in the Department of Public Safety for medical, dental or mental health treatment and the treatment is complete, the facility officer-in-charge will notify the sending sheriff and request that the safekeeper be returned to the county jail.

(f)     Safekeeper's personal property will be handled consistent with F .0500, Inmate Personal Property, for regular population inmates.  When a safekeeper is transferred from one facility to another or is returned to the county jail, his/her personal property will accompany them the same as any other transfer or release.

(g)     When safekeepers are released from the custody of the Prisons, records will be retained by the releasing facility for five (5) years.

## .1609  FISCAL

(a)     The Department of Public Safety Accounting Office bills the county jails for costs associated with housing safekeepers in the Prisons.

(b)     If a prisoner is transferred to a Prisons facility, the county from which the prisoner is transferred shall pay the Department of Public Safety for maintaining the prisoner for the time designated by the court at the per day, per offender rate at which the Department of Public Safety pays a local jail for maintaining a prisoner; provided, however, that a county is not required to reimburse the state for maintaining a prisoner who was a resident of  another state or county at the time he/she committed the crime for which he is a safekeeper.

(c)     The Department of Public Safety will bill counties for the costs of extraordinary medical care incurred while the prisoner was in the custody of the Department.   Extraordinary medical care is defined as:

(1)     Medical expenses incurred as a result of providing health care to a prisoner as an inpatient (hospitalized);

(2)     Other medical expenses when the total cost exceeds thirty-five dollars ($35.00) per occurrence or illness as a result of providing health care to a prisoner as an outpatient (non-hospitalized); and

(3)     Cost of replacement of eyeglasses and dental prosthetic devices if those eyeglasses or devices are broken while the prisoner is incarcerated, provided the

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 7 of 8
JA028

prisoner was using the eyeglasses or devices at the time of his commitment and then only if prior written consent of the county is obtained by the Department.

(d)     Facilities that have been designated to house safekeepers shall process invoices for medical and mental health services in accordance with C.1609(c) and forward them to the Accounting Office in Raleigh for payment.  The DC-702 shall be completed by listing the appropriate charge code, <mark>safekeeper</mark> name and number, and the county to be billed.

## .1610  DEATH

Once a safekeeper is pronounced as being deceased, the county Sheriff shall be immediately notified.

_____                      November 6, 2017_____

Director of Prisons                                                Date

C.1600_11_06_17.doc

Case 5:21-ct-03157-D   Document 52-6   Filed 08/14/23   Page 8 of 8
JA029

DC-138B
Rev. 1/18

## STATEMENT BY WITNESS

Staff ☐ Offender ☐ Other ☐ Name: Brandon Case          NCDOC: (Offender Only) 0850640

Position or Title of Witness: (Staff Only- Include Staff ID): _____

Name and OPUS Number of Accused Offender(s): _____

Name of Person Obtaining statement: Santita Wilkins

Date: 2-6-20  2/6/20          Time: 13:40  1340

<table>
<tr><td colspan="2">FOR ACCUSED OFFENDER USE ONLY:</td></tr>
<tr><td colspan="2">I Request written statements be gathered in my behalf: ☐ Yes   ☐ No.  If yes, list names: _____</td></tr>
<tr><td colspan="2">_____</td></tr>
<tr><td colspan="2">I request live witness(es) be present at my hearing: ☐ Yes   ☐ No.  If yes, list names: _____</td></tr>
<tr><td colspan="2">_____</td></tr>
<tr><td colspan="2">I request physical evidence be reviewed at my hearing: ☐ Yes   ☐ No</td></tr>
<tr><td>I request staff assistance at my hearing: ☐ Yes ☐ No</td><td>Offender Initials: _____</td></tr>
</table>

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1-21-20 While returning to My assigned housing unit, i was assaulted by Memith Mennion, on 1st floor, unit 2 in front of D-Block. Memith Mennion is a pretrial detainee housed as Safekeeper at C.P. This assoult was a direct result of officers Beasley and officer Urieta's neglecting to secure hall and stairwell doors to separate Safekeepers and reg population inmates. Code was called due to severity of my injurys i was transported to duke Medical for emergency surgery for Multiple facial fractures and breaks!

_____
_____
_____
_____

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness: _____          Date 2/6/20  Time 13:40

**Chicago Oculofacial Consultants**
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

February 27, 2023


Alison R. Leff, Esq.
The Civil Rights Group, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
alison@civilrightsgroup.com

      Re:    Expert Report of Kenya M. Williams, MD
               *Case v. Beasley*, No. 5:12-ct-03157-D (E.D.N.C.)


Dear Ms. Leff,

I was asked by counsel for Mr. Brandon Case to review his medical records and provide my professional medical opinion regarding the events surrounding his alleged assault in the prison, followed by the complications that have ensued since the incident.

In reviewing this case I have considered the following information, provided to me by Mr. Case's counsel:

- Duke University Hospital medical records
- CT images
- Video of the assault
- Medical records from an outpatient visit with Dr. Indravada S. Galiwala, a neurologist at Neurology Center of Lumberton
- Prison medical records
- Plaintiff's counsel's notes regarding interview with Mr. Case


**BACKGROUND AND QUALIFICATIONS**
In reaching my medical opinions in this case, I relied upon my medical education and my clinical experience as a practicing board-certified ophthalmologist and fellowship-trained oculoplastic surgeon. I am currently an Assistant Professor in the Department of Ophthalmology and serve as the Section Director in the Department of Ophthalmology at Rush University Medical Center. I also have appointments as an Assistant Professor in the Department of Surgery, Division of Plastic and Reconstructive Surgery as well as the Department of Otolaryngology at Rush University Medical Center. As noted in my CV (attached), I received my medical school degree from Rosalind Franklin University of Medicine and Science, The Chicago Medical School in 2002. My post-graduate education and training began with an internship at Evanston Northwestern Hospital

**Chicago Oculofacial Consultants**
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

followed by a residency in Ophthalmology at SUNY Downstate Medical Center in Brooklyn, New York. After residency, I completed a fellowship in oculoplastic and orbital surgery at Allegheny General Hospital in Pittsburgh, PA.

In my current clinical practice of oculofacial surgery, I evaluate and treat patients who have sustained orbital trauma and commonly work very closely with craniofacial, oral maxillofacial surgeons as well as otolaryngologists to provide a team approach for our patients.

This report is my first testimony/expert opinion.

I am compensated for expert review work at the following fee schedule:
- Material Review and written reports: $350 per hour
- Deposition: $500/hour
- Testimony: $750/hour (Minimum of 4 hours)

**MEDICAL HISTORY**
Mr. Brandon Case, DOB 5/24/1988, presented to Duke University Hospital (DUH) Emergency Department after an assault at Central Prison in Raleigh, North Carolina on 1/21/2020. He described the incident as being hit by a lock in the face after walking down a stairwell.

At the time of his presentation to the hospital, he complained of facial pain, swelling, a headache, and right sided numbness. He arrived after being evaluated Central Prison Urgent Care with radiologic studies that were performed prior to arrival to DUH. Those images were reviewed however, a CAT scan was also performed at DUH while he was in the Emergency Department. A small lip laceration was noted on exam in addition to bruising and swelling under both eyes. The repeat CAT scan identified a nasal bone fracture and Le Fort II facial fractures on both sides of his face (see diagram). He was subsequently admitted to repair the facial fractures. Other than complaints of pain while awaiting surgery, the remainder of Mr. Case's preoperative course was unremarkable.



LeFort II fracture

The red lines represent the pattern of a Le Fort II fracture.

Chicago Oculofacial Consultants
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

Surgery was performed on 1/23/2020.  During surgery, he underwent treatment of the right nasal bone fracture and fractures of both malar areas with metal implants.  The operative reports reveals that the following procedures were performed:

- Closed treatment of nasal bone fracture with stabilization, bilateral
- Open treatment of complicated fracture of malar area including zygomatic arch and malar tripod with internal fixation and multiple surgical approaches, right
- Stereotactic computer-assisted procedure, bilateral
- Open reduction internal fixation of Le Fort II fracture, bilateral

The details of surgery are outlined below:

- Mr. Case was placed under general anesthesia (a breathing tube placed into his airway and into the lungs).
- Stereotactic computer assisted navigation was set up to assist with verification of anatomical landmarks during surgery.
- A scalpel was used to make an incision in the right upper eyelid to gain access to the eye socket.  Cautery and specialized instruments were used to dissect in order to visualize the broken bones under and around the eye.
- Due to the location of the bones and multiple areas that the bones support, an additional approach from below was undertaken.
- Next, an incision was made in his mouth in the upper gums.
- This area was also dissected with cautery and specialized instruments to visualize the fractured bones.
- During the visualization of the area from below "significant structural injury of the right infraorbital nerve due to compression" was noted.
- Metal plates and screws were placed on both sides to stabilize the bone and repair the fracture. (see blue arrows)
- An additional metal plate was placed on the right side on the area near the right temple.  (see orange arrow)

## Chicago Oculofacial Consultants
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429



These radiological images were taken after surgery and confirm placement of the metal plates and screws.

- The eyelid tissue and skin was sutured closed.
- The nasal bone fracture was repaired without metal hardware. Using specialized instruments through the nose using the "application of force" the broken bones were aligned back in place.
- A stent was placed on the skin nose to stabilize that repair.
- Lastly, the incision in the mouth was closed with sutures.

There were no complications or unexpected events during the surgery. The breathing tube was removed, and Mr. Case went to the recovery room in good condition. There were three surgeons in the team who performed his surgery and the surgery lasted 2 hours and 55 minutes. Mr. Case's hospital postoperative course was unremarkable. He continued to complain of pain despite the administration of multiple analgesics. He was discharged back to Central Prison in Raleigh, North Carolina on 1/24/2020.

After surgery Mr. Case was seen by the prison physician and complained of pain. He also complained of transient photophobia, which is eye irritation from bright lights. He returned to DUH for postoperative follow-up on 2/26/2020, 6/17/2020, and 12/30/2020 with continued, persistent complaints of pain. At the 12/30/2020 visit, the physician recommended continued follow-up with neurology for management of chronic facial pain as well as a follow-up appointment with a dental provider for refabrication of his dentures due to malocclusion. On 10/16/2020, he was evaluated by the neurologist, Dr. Galiwala, for chronic post-operative facial pain, who diagnosed him with trigeminal neuralgia.

Prior to admission to DUH, Mr. Case has a past medical history of back pain, Hepatitis C, post-traumatic stress disorder, overactive bladder, hernia, sciatica, headaches, anxiety, and depression. While he does have multiple preexisting chronic medical conditions,

**Chicago Oculofacial Consultants**
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

there is nothing in Mr. Case's medical history that suggests he would have a shorter than average life expectancy.

**OPINION STATEMENT**
Mr. Case is likely to suffer from some level of chronic facial pain from trigeminal neuralgia for the rest of his life. Pain from trigeminal neuralgia typically lasts seconds to minutes, is intense and commonly described as sharp with shooting and stabbing qualities. Typically, the pain is triggered by innocuous stimuli within the affected trigeminal territory (see diagram).



The trigeminal nerve is seen as it travels from the area in front of the ear and branches out to its target tissue. The area in red labeled "pain" corresponds to the area of pain that Mr. Case is experiencing as well as the branch of the nerve that was damaged and is responsible for the pain.

The pain that he is complaining of is consistent with trigeminal neuralgia due to severe nerve injury from the attack. Nerve damage from facial fractures in the bones below the eye socket often results in injury to the nerve. However, in many cases the nerve recovers and symptoms improve or resolve completely. In some cases, nerve damage is permanent, and the symptoms of pain and abnormal sensations persist. Trigeminal neuralgia is a chronic neurological condition that is characterized by severe intermittent pain that is often triggered by a variety of stimuli. It is a debilitating disease with a high prevalence of depression and anxiety. Nerve damage from facial fractures is common and very consistent with my clinical experience.

Facial fractures are commonly described using the Le Fort classification system. Le Fort fractures most frequently result from high-speed deceleration crashes in which the midface or maxilla strike a stationary object (dashboard, pavement). The fractures may also be produced by striking the face with a blunt, rigid object (tire iron, baseball bat or fist). Based on my review of the video of Mr. Case's attack and the radiologic images, Mr. Case likely suffered the fractures from being struck by his attacker's fist and/or from his

**Chicago Oculofacial Consultants**
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

face striking the wall during the attack. (The video shows that the attacker was empty-handed during the attack, contrary to Mr. Case's impression that he was hit with a lock.) A Le Fort II fracture is a pyramidal shaped fracture along the nose, involving the outer and lower aspect of the eye socket, and causes separation of the bones of the midface from the bone of the skull base.

Vital neurovascular structures traverse through and across the bones of the skull and face as they reach their target muscles and soft tissue.



This diagram demonstrates nerves (seen here in yellow) traveling through *intact* bone to the target tissue.

When the bones of the skull are subjected to trauma from mechanical forces, as seen in the video of Mr. Case's attack, significant tissue damage compromises the neurovascular structure and function. While multiple mechanical forces often contribute to tissue damage, compression forces typically produce the greatest degree of tissue damage which also complicates wound repair and healing. Compression forces occur when a structure is crushed towards a body part. During the repair of Mr. Case's facial fractures, the surgeon visualized and noted evidence of "significant structural injury of the right infraorbital nerve due to compression." (see diagram)

**Chicago Oculofacial Consultants**
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429



This diagram shows a branch of the trigeminal nerve (yellow) traveling through the bones of the eye socket. With a *fracture* as seen here the nerve can easily be injured/compressed from a fracture.

Upon traumatic injury of the nerve, abnormal sensation and pain typically starts. Over the next 6 to 12 months the nerve is expected to heal (regrow/regenerate). In some cases, due to the type and amount of nerve damage that has occurred nerve repair/regeneration is not possible. As a result, even after 6 to 12 months, the pain may never fully resolve. In this subset of patients with chronic, refractory nerve pain, abnormal sensations (numbness and tingling) also persist.

Since Mr. Case is well outside of the expected 1-year timeframe for recovery, it is highly unlikely that his pain will resolve spontaneously. Therefore, medical therapy and/or surgical treatment is required. Mr. Case has tried and failed multiple medications for general pain relief as well as neuropathic pain (Neurontin, Lyrica, Depakote, Amitriptyline, and Tegretol, Ibuprofen, Tylenol). As a result, he has been taking Tramadol, a narcotic, which reduces but does not fully resolve his pain. Therefore, surgery might be the next option to consider. Surgical intervention for trigeminal neuralgia might include percutaneous radiofrequency coagulation, trigeminal rhizotomy and/or microsurgical vascular decompression of the trigeminal root in the brain stem. Surgical treatment for trigeminal neuralgia is normally performed by a neurosurgeon.

Radiosurgery for trigeminal neuralgia is a procedure that delivers precise, controlled beams of radiation to targets inside the skull, including the brain and associated nerves. The treatment does not target the root cause of trigeminal neuralgia, but instead damages the trigeminal nerve to stop the transmission of pain signals. The procedure provides significant pain control or reduction in approximately 80+% of patients. Pain relief can begin as early as 4 to 6 weeks posttreatment; however, some patients require as much as 3 to 8 months for the full response and may need supplemental pain medication.

*Chicago Oculofacial Consultants*
Ophthalmic and Facial Plastic Surgery
Kenya M Williams MD

Millennium Park
30 N. Michigan Ave.
Suite 1429
Chicago, IL 60202
o 312.392.1429

Another option is a trigeminal rhizotomy (can also be called ablation or neurotomy) which is a minimally invasive surgical procedure to remove sensation from a painful nerve by killing nerve fibers responsible for sending pain signals to the brain. The nerve fibers can be destroyed by severing them with a surgical instrument or burning them with a chemical or electrical current. In most cases, rhizotomy provides immediate pain relief that can last up to several years until the nerve recovers and is able to transmit pain again. Finally microvascular decompression was also mentioned as an option. Microvascular decompression is a procedure performed by a neurosurgeon on the trigeminal nerve accessed through a small drill hole in the skull.

Research has shown that pain from trigeminal neuralgia can be reduced by or resolve after surgery. But even with surgery, return of pain is well documented.

Given his previous failure of medical therapy, past medical history of depression, and PTSD, it is unlikely that his pain will ever completely resolve and may actually worsen due to his complex medical history. Mr. Case's pain is located on both sides of his face and is constant but exacerbated by touch, eating, chewing, drinking, and brushing his teeth. Given that his pain is present constantly, and many of his triggers are unavoidable, I expect those triggers to exacerbate the pain an additional 5 to 6 times per day.

In addition, there is a well-recognized and complex relationship between trigeminal neuralgia, chronic pain, and depression that often requires a multidisciplinary approach in order to improve the efficacy of treatment and quality of life. This is because suffering from trigeminal neuralgia and chronic pain often causes patients to become depressed or exacerbates depression and anxiety in patients who suffered from those conditions before the new injury that caused trigeminal neuralgia. As it appears from Mr. Case's medical records that he has a history of anxiety and depression, he may require mental health treatment as part of his recovery.

Lastly, complicating the situation further, the facial fractures resulted in broken dentures creating a subsequent problem. Optimization of oral health is critical to maintaining one's overall health and well-being. In addition to pain with oral intake, poorly fitting or the inability to wear dentures has a large impact on Mr. Case's weight and nutritional status. Accordingly, Mr. Case is facing multiple challenges in the treatment of his trigeminal neuralgia which is another reason that I do not expect his pain to ever resolve fully.

Sincerely,

Kenya M. Williams, MD

EXHIBIT
20



# North Carolina Department of Public Safety
## Prisons

Roy Cooper, Governor
Erik A. Hooks, Secretary

Timothy D. Moose, Chief Deputy Secretary
Todd E. Ishee, Commissioner of Prisons
Brandeshawn Harris, Assistant Commissioner

**TO :** Unit Two Staff

**FROM:** Mr. J. M. Juehrs
Unit Manager, Unit 2

**RE :** Security and Controlled Movement

This memo is to inform you effective immediately all safe-keepers will be escorted by correctional staff anytime they exit the cell block. Safe-keepers will not be allowed to walk without an escort. Safe-keepers are not to come in contact regular population inmates at any time. The only time they will come in contact is, when they are receiving haircuts. Safe-Keepers will be supervised while they are receiving haircuts. Safe Keepers will not be allowed to walk off the block or walk back to the block without an escort.

Also, effective immediately when there is safe-keeper movement we will utilize controlled movement. No population inmate will be allowed to exit the cell blocks while safe keepers are being moved. For example, while Safe-Keepers are going and coming from recreation there will be no population inmates in the area or allowed off the cell blocks. When we receive inmate into the unit and we have safe-keepers and population at the same time, they will be separated. Safe keepers should be on the bench outside the Office with staff observing them. Population inmates will sit on the bench in front of the nurse's station. All movement should be communicated on the radio prior to moving inmates.

The stairwell doors and sally-ports will also be utilized at all times. I have told everyone over and over about the sally-port effect and the back doors being left open. I will not be telling anyone again. If I have to tell you to close the door, the first time will be a Documented Counseling, after that I will recommend disciplinary action.

WRB inmate such as Janitors and Barbers should also be kept from contact with safe-keepers except when giving a haircut. If the safe keepers are in the area the Janitors should be redirected to another area. Haircuts should be supervised by an



MAILING ADDRESS:
4267 Mail Service Center
Raleigh NC 27699-4260

www.ncdps.gov

OFFICE LOCATION:
430 N. Salisbury Street
Raleigh, NC 27699-4267
Telephone: (919) 582-6125
Fax: (919) 715-4179

Officer at all times. If there is a staffing issue and the Haircuts are being done outside of the Sergeant's Office the Sergeant should be monitoring the haircuts.

This directive is due to safe-keepers and population coming in contact too many times when they shouldn't. Staff have become complacent when it comes to security and controlled movement of inmates in Unit Two. I expect everyone's cooperation's in these directives. If you have questions about the this, please let me know so there is no confusion about this directive.

Each Sergeant and Officer will sign this directive acknowledging they have read and understand these directives.

Staff Signature: _B. Brady_____ Date: _1-24-20_

Witness Signature: _Sgt._____ Date: _1/24/2020_

Brandon Cash v. Officer Beasley, et al. - CONFIDENTIAL
USDC-EDNC (File No. 5:21-CT-03157-M) SUBJECT TO PROTECTIVE ORDER

**JA040**

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3157-D

| | | |
|---|---|---|
| BRANDON CASE, | ) | |
| | ) | |
| Plaintiff | ) | **Memorandum in Support of** |
| | ) | **Plaintiff's Second Motion for Partial** |
| v. | ) | **Summary Judgment** |
| | ) | |
| BRANDON BEASLEY et al., | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Central Prison houses more than a thousand men, most of whom are classified as general population prisoners. The prison also houses detainees classified as "safekeepers." Safekeepers are wards of the county jails who are sent to the state prison for a variety of reasons, including because they exhibit violently aggressive behavior that cannot be contained in county facilities. At Central Prison, general population prisoners and safekeepers are kept separate from each other for safety reasons. The prison has protocols to make sure the two populations don't mix. Safekeepers live in separate housing units. And they wear bright yellow uniforms so staff can easily distinguish them from other prisoners. As another precaution, the doors to all the shared hallways at the prison are kept closed and locked to ensure safekeepers and general population prisoners don't walk into the hallways at the same time.

Since 2018, Defendant Kenny Custodio worked as a correctional officer at Central Prison. He knew the protocols to prevent safekeepers and general population prisoners from meeting in the hallways, including the rule that the hallway doors are always to be closed and locked. He knew it was dangerous to leave those doors open and unattended. But on January 21, 2020, Custodio chose to disregard those protocols by leaving the stairwell door open for an

JA041

extended period. This was not a mistake. He made a conscious choice. Knowing the risks, Custodio left the door open because opening it and closing it every few minutes as prisoners moved about—precisely his job—was a hassle.

The consequences of Custodio's choice were dire for plaintiff Brandon Case, then a general population prisoner. Sometime after Custodio opened the hallway door and decided to leave it open, Case passed through, descended a flight of stairs, and emerged one floor below to find the safekeepers coming in from recreation. Unprovoked, a safekeeper attacked Case, shattering the bones in his face. After the attack, Case needed an operation to place metal plates and screws in his skull to repair the injuries to his face. The beating caused nerve damage that will leave Case in severe pain for the rest of his life.

Case sued Custodio under 42 U.S.C. § 1983 for violating his Eighth Amendment rights by failing to protect Case from being attacked by another prisoner. Custodio's liability is beyond dispute. Custodio conceded all the material facts during the prison's internal investigation and at his deposition. Custodio served no discovery and took no depositions in the more than two years this case has been pending. This case thus presents the rare circumstance under which summary judgment for a plaintiff is warranted. Because no reasonable jury could find in his favor, the Court should enter a judgment of liability against Custodio and set a jury trial on damages.

## UNDISPUTED MATERIAL FACTS

On January 21, 2020, Brandon Case went to the second floor of the building where he was housed at Central Prison, D block in Unit 2, to get a haircut. Statement of Undisputed Material Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment (hereafter, "PSOF") ¶¶ 42, 47. After his haircut, Case walked down the hallway toward the stairwell to the first floor, through an open door separating the hallway from the stairwell, down the stairs, and

through another open door into the first-floor hallway. *Id.* at ¶¶ 54–57.

As Case was traveling down the stairs, a group of prisoners classified as safekeepers was entering the first-floor hallway, coming in from recreation. *Id.* at ¶ 58. Safekeepers are detainees who are legally in the county's custody; but they are housed in state custody for several reasons, including because some safekeepers are unusually violent. *Id.* at ¶¶ 5–6. Safekeepers and general population prisoners like Case are supposed to be kept separate. *Id.* at ¶¶ 8, 10–12.

Case emerged through the open door onto the first floor and walked down the last few steps on the other side of the door. *Id.* at ¶¶ 60, 62. At the same time, the group of safekeepers moved toward him, on their way to their cells on the second floor. *Id.* at ¶¶ 58–59. Just after Case descended the last couple stairs into the hallway, a safekeeper named Kenneth Kennion attacked him. *Id.* at ¶¶ 61–63. Kennion punched Case on the right side of the face, causing Case to fly sideways and strike his head hard against the concrete wall before falling to the ground. *Id.* at ¶ 61. Kennion stooped down and punched Case's head with his left fist and then twice more with his right fist. *Id.* A correctional officer standing in the hallway ordered Kennion to stop. *Id.* Kennion then put his hands into the air and backed up. *Id.* While the officer moved to handcuff Kennion, Case struggled to his feet and staggered off down the hallway, a trail of blood dripping from his face *Id.*

Case and Kennion should never have met in the hallway as they did. The hallways at Central Prison are closed off by sliding doors that lock in place and should always remain closed unless opened by an officer to allow a specific person or group of people through. *Id.* at ¶¶ 19–25. Correctional officers sit in control booths on each floor of the cell block. *Id.* at ¶¶ 13–15. Those officers can open and close the hallway doors using buttons on a control panel in their booths. *Id.* at ¶¶ 17–18. Before opening the doors to allow prisoners out of the hallway, the

3

JA043

control booth officers are supposed to check to make sure it is safe to do so. *Id*. at ¶¶ 24–25, 29–30. They can check visually—by looking down the hallway in both directions—or they can make a radio call to ensure the area where the prisoner is headed is safe and clear. *Id*. at ¶¶ 26–27.

That didn't happen on January 21, 2020. *Id*. at ¶¶ 48–52. Defendant Kenny Custodio was in the control booth on the second floor of D block in Unit 2 that day. *Id*. at ¶ 41. He'd left the secure door to the stairwell open for an extended period because there were prisoners coming and going to get haircuts, and he didn't want to be bothered by repeated requests to open the door. *Id*. at ¶¶ 48–49. Custodio did not leave the door open by accident. *Id*. He made a conscious decision, knowing the risks. *Id*. at ¶¶ 33–40, 48–50. Because the door was left open, Case was allowed to walk through the secure door and pass into the stairwell even though safekeepers were moving through the hallway. *Id*. at ¶¶ 52, 55, 58–59.

Case's injuries from the attack were grave. *Id*. at ¶ 76–79. Case was transported to Duke Medical Center where imaging showed a nasal bone fracture and complex fractures on both sides of his face. *Id*. at ¶ 76. He was admitted to the hospital for surgery, which included placing three metal implants secured by screws in the bones of his face. Case will suffer from chronic facial pain for the rest of his life. *Id*. at ¶¶ 77–79.

On June 7, 2021, Case filed this lawsuit alleging that two correctional officers, Brandon Beasley (Count I) and Eric Urieta (Count II), violated his rights under the Eighth Amendment to United States Constitution by failing to protect him from Kennion's attack. *Id*. at ¶ 80. Case filed an Amended Complaint on August 11, 2022, naming Kenny Custodio as an additional defendant and adding an Eighth Amendment claim against Custodio as Count III. *Id*. at ¶ 81. After appearing by counsel, Custodio failed to answer the amended complaint, *id*. at ¶ 86; served no written discovery, *id*. at ¶ 87; noticed no depositions, *id*. at ¶ 88; disclosed no expert witness, *id*.

at ¶ 89; and failed to respond to requests for admission served on him under Federal Rule of Civil Procedure 36, *id.* at ¶¶ 82–85.

## **PROCEDURAL POSTURE**

After the close of discovery, Case filed a motion for summary judgment against Custodio highlighting, among other things, Custodio's failures to act in this lawsuit. ECF Nos. 49 (motion), 50 (supporting memorandum), 51 (statement of material facts), 52 (Appendix). Custodio failed to respond to the motion or statement of facts. After Plaintiff's summary judgment motion was submitted to the Court for resolution on October 12, 2023, the Court allowed Custodio to answer the complaint and respond to the requests for admission. ECF No. 73. The Court also ordered Plaintiff to re-file his summary judgment motion, giving Custodio a fresh chance to oppose it. *Id.*

Plaintiff asked the Court to reconsider the portion of that decision that required Plaintiff to re-file this motion. ECF No. 74. Plaintiff urged the Court to hold that Custodio must show cause why he should be permitted a second opportunity to oppose summary judgment and that, in any event, Custodio should be bound under Local Rule 56.1(a)(2) by his failure to respond to the statement of uncontested material facts. ECF No. 74. Because the deadline for Plaintiff's re-filed summary motion arrived before a ruling on his motion for reconsideration, Plaintiff is filing this second motion for summary judgment. Plaintiff nevertheless stands on his requests in his reconsideration motion, ECF No. 74, including his request that the Court decide the original summary judgment motion as briefed because, under Local Rule 56.1(a)(2), Custodio conceded the facts upon which that motion relied by failing to respond to Plaintiff's statement of uncontested material facts.

This second motion for partial summary judgment relies upon the same appendix of

JA045

exhibits filed in support of the first summary judgment motion, ECF No. 52. The statement of

uncontested material facts supporting this motion is nearly identical to the statement filed with

the first motion, ECF No. 51. This brief, however, does not rely upon any exhibit or fact

statement related to Custodio's failure to answer the complaint or the requests for admission.

## ARGUMENT

### I.  Legal Standards

#### A.  Summary Judgment

Summary judgment is warranted when, viewing the facts in the light most favorable to

the non-moving party, there is no genuine issue of material fact, and the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986); *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). "An issue is

'genuine' if a reasonable jury, based on the evidence, could find in favor of the non-moving

party." *Acosta v. Del Sol P'ship 2, Inc.*, No. 5:16-CV-231-BO, at *2 (E.D.N.C. Feb. 14, 2018)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (other citations omitted). To

prevent summary judgment, nonmoving parties must present "sufficient evidence" to allow

reasonable jurors to find for them. *Jones v. Harrison*, No. 4:12-CV-90-D, at *5 (E.D.N.C. July

21, 2014) (citing *Anderson*, 477 U.S. at 249–50). "Accordingly, a court may grant summary

judgment if the nonmoving party's evidence is merely colorable or not significantly probative."

*Jones*, No. 4:12-CV-90-D, at *5 (cleaned up).

#### B.  Eighth Amendment

"The Eighth Amendment imposes a duty on prison officials to protect prisoners from

violence at the hands of other prisoners. Being violently assaulted in prison is simply not part of

the penalty that criminal offenders pay for their offenses against society." *Danser v. Stansberry*,

6

No. 5:08-CT-3116-BO, at *10 (E.D.N.C. Mar. 21, 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)) (cleaned up). A "prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Danser*, No. 5:08-CT-3116-BO, at *10. The Fourth Circuit recognizes that a prison official can violate a prisoner's Eighth Amendment rights by exhibiting deliberate indifference to a serious risk that the inmate will be attacked by another inmate. *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017). A deliberate indifference claim based on failure to protect a plaintiff from being attacked by another prisoner "may be characterized by three components: (1) the subjective knowledge of a substantial risk of serious harm; (2) the conscious disregard of that risk; and (3) the absence of intent to cause the harm risked." *Anderson*, 877 F.3d at 545. Last, a plaintiff must show the defendant was acting under color of law when the plaintiff's rights were violated. 42 U.S.C. § 1983; *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994). The record in this case establishes each of those elements beyond dispute.

## II. Case Is Entitled To Summary Judgment On Liability Against Custodio

There are no genuine disputes of material fact on the elements of Case's claim against Custodio because Custodio admitted the key facts at his deposition and failed to develop contrary evidence, serving no discovery requests, taking no depositions, and disclosing no experts during this lawsuit. Summary judgment as to liability on Case's claim against Custodio is thus appropriate.

### A. Custodio knew of a substantial risk of serious harm.

First, Case must show that Custodio had "subjective knowledge of a substantial risk of serious harm . . . ." *Anderson*, 877 F.3d at 545. Here, the evidence shows that Custodio knew a safekeeper might attack Plaintiff if permitted to enter a prison hallway at the same time as

7

Plaintiff. By January 2020, Custodio had worked in Unit 2 since 2018. *Id*. at ¶¶ 31–33. With that level of experience, Custodio knew safekeepers posed a special risk, and he knew safekeepers and general population prisoners were not to mix. *Id*. at ¶¶ 35–39. Custodio knew that keeping the sallyport doors to the stairwells closed was a mandatory safety tool to prevent mixing of safekeepers and general population prisoners. *Id*. at ¶¶ 30, 40.

What's more, Custodio knew the safekeepers had gone out to recreation on the morning of January 21, 2020, as he had opened the doors to let them out. *Id*. at ¶¶ 43–44. Custodio knew that recreation lasted an hour, so he knew to expect their return at the same time Case finished his haircut. *Id*. at ¶¶ 43–45. Custodio testified that he knew Case was a general population prisoner; and he could see Case walking unescorted through the hallway to and from the barber. *Id*. at ¶¶ 53–54. Those facts compel the finding that Custodio knew keeping the sallyport door to the stairwell open created a substantial risk that the safekeepers coming in from recreation would mix with general population prisoners in the hall, and someone would thereafter get hurt in exactly the way Case did get hurt. *Id*. at ¶¶ 48–51.

The risk of harm that flowed from Custodio's conduct was also obvious. *Danser*, No. 5:08-CT-3116-BO, at *10-11 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). Understanding, as Custodio did, that the prison is a dangerous place, and the sallyport doors exist to control the movement of prisoners through the halls, it was obvious that leaving the door open created a substantial risk of serious harm. PSOF ¶¶ 22–30, 34–40.

There is also no dispute that the risk of which Custodio was aware was a substantial risk of serious harm. It is well-established that a physical attack by another prisoner constitutes serious harm in the context of a failure to protect claim. *See, e.g.*, *Cox v. Quinn*, 828 F.3d 227,

JA048

234 (4th Cir. 2016) (affirming denial of qualified immunity for defendants on failure to protect claim, recognizing as a serious harm plaintiff's beating by another prisoner that "lasted between 45 and 75 seconds" and caused "broken ribs, a loosened tooth, bruising, swelling, and abrasions"). And Case's unrebutted expert witness, Dr. Kenya Williams, spells out the gravity of Case's injuries in her expert report, noting, among other things, that Case's nose was broken and the bones on both sides of his face were shattered. *Id.* at ¶¶ 76–79. Surgeons implanted three metal plates in Case's face to repair his injuries. *Id*. Given the pain that Case still experiences today, Dr. Williams concludes that he cannot be expected to make a full recovery. *Id*. Those injuries easily meet the bar of seriousness. *See e.g., Cox*, 828 F.3d at 234 (recognizing as serious a beating that caused "broken ribs, a loosened tooth, bruising, swelling, and abrasions").

### B. Custodio consciously disregarded the risk of harm to Case.

Second, Case must show that Custodio consciously disregarded the risk to Case. *Anderson*, 877 F.3d at 545. Conscious disregard means "intentionally refusing or failing to take reasonable measures to deal with the problem." *Anderson*, 877 F.3d at 546 n.* (quoting 3B Kevin F. O'Malley *et al., Federal Jury Practice & Instructions § 166:30*, at 648 (6th ed. 2013)). Custodio was trained on the "sallyport effect"—the safety protocol of controlling prisoner movement by forcing prisoners to gather between locked doors as they move through the prison. *Id*. at ¶ 30. Custodio knew that allowing safekeepers and general population inmates to mix in the hallway posed a serious risk of harm to general population inmates like Case, and he intentionally decided not to take reasonable measures to address that problem by closing the sallyport door. *Id*. at ¶¶ 31–40, 48–51. This was not inadvertence or neglect: Custodio testified that he made a conscious choice to leave the sallyport door open, not for a security-related reason, but rather to avoid the minor inconvenience of having to keep pressing the button to open

**JA049**

the door as prisoners went to and returned from the barber. *Id*. at ¶ 49. Custodio testified that when he made that choice, he *knew* the safekeepers were out for recreation. *Id*. at ¶ 50. And he could plainly see that the prisoners getting their hair cut were general population prisoners. *Id*. at ¶ 8.

Custodio could also have, but failed to, alert the officer working in the first-floor control booth that a general population prisoner was coming, either by using his radio, or by calling down the open staircase within the control booth. *Id*. at ¶¶ 24–27, 71. If he had done so, the first-floor officer could have closed the sallyport door at the bottom of the staircase to stop Case from entering the hallway where the safekeepers were returning from recreation and stop the incoming safekeepers from entering the stairwell while Case was there. *Id.* at ¶ 72. This failure is particularly egregious, as Custodio can be seen leaning over the railing looking down at the first floor of the control booth as Case passes by him on the way down the stairs from the barber, just moments before the attack. *Id.* at ¶ 54. Those facts compel a jury finding that Custodio intentionally failed to take reasonable measures to protect Case from attack. *Anderson*, 877 F.3d at 546 n.* (quoting O'Malley*, Federal Jury Practice & Instructions* § 166:30 at 648) ("Deliberate indifference is established . . . if there is actual knowledge of a substantial risk that plaintiff [may be seriously harmed by another prisoner and] defendant prison officials disregard that risk by intentionally refusing or failing to take reasonable measures to deal with the problem.").

Given the seriousness of the risk Case faced, how simple it would have been for Custodio to press the button and close the door or alert the first-floor officer to Case's presence, and the lack of any security-related reason for leaving the door open, the facts establish the second element of Case's failure to protect claim.

10

### C. Custodio's acts unintentionally harmed Case.

Third, Case must show that the "absence of intent to cause the harm risked." *Anderson*, 877 F.3d at 545. On the question of intent, Custodio testified that he left the door open to make his life easier, not with the intent to cause violence. PSOF ¶ 49. There is no contradictory evidence. The only conclusion a reasonable jury could draw from the evidence is that when he opened the sallyport door and left it open, Custodio intentionally took a risk that he knew might cause harm while lacking any intent to cause such harm. *Anderson*, 877 F.3d at 545.

### D. Custodio acted under color of law.

Fourth, Case must show that Custodio was acting "under color of [law]." 42 U.S.C. § 1983. "State employment is generally sufficient to render the defendant a state actor, and a defendant in a § 1983 suit necessarily acts under color of state law when he abuses the position given to him by the State." *Jennings v. Univ., N.C., at Chapel Hill*, 444 F.3d 255, 293–94 (4th Cir. 2006) (cleaned up). Custodio was admittedly a state employee at work when this incident happened. PSOF ¶¶ 31, 41. He cannot credibly contest this element.

### III. The Court Should Set a Trial on Damages

This motion seeks only summary judgment on liability against Custodio on Count III of the Amended Complaint. A jury still must decide what damages Custodio's misconduct caused. And a jury also must decide liability and damages as to the other two counts of the Amended Complaint.

<u>CONCLUSION</u>

There is no need for a trial on Custodio's liability. The Court should therefore grant Plaintiff summary judgment against Custodio and schedule a trial only on damages against Custodio and Plaintiff's claims against Defendants Beasley and Urieta.

11

Dated: January 26, 2024          Respectfully submitted,

/s/ Alison R. Leff

Alison R. Leff
The Civil Rights Group, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
(708) 722-2241 (phone)
alison@civilrightsgroup.com
Ill. Bar No. 6296422
Attorney for Plaintiff

G. Christopher Olson
Olson Law, PLLC
514 Daniels St., #136
Raleigh, NC 27605
(919) 624-3718
chris@olsonlaw-pllc.com
Fax: (919) 834-1071
N.C. State Bar No. 21223
Local Civil Rule 83.1(d) Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I caused a copy of this document to be

served on counsel of record for all parties by filing it via CM/ECF.

Dated: January 26, 2024                              /s/ Alison R. Leff
                                                     One of Plaintiff's Attorneys

12

JA052

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO. 5:21-CT-03157-D

BRANDON CASE,                          )
                                       )    **MEMORANDUM OF LAW IN**
                    Plaintiff,         )    **SUPPORT OF**
                                       )    **DEFENDANTS' MOTION FOR**
v.                                     )    **SUMMARY JUDGMENT**
                                       )
BRANDON BEASLEY, ERIC                  )
URIETA, KENNY CUSTODIO, and            )
UNKNOWN EMPLOYEES OF THE               )
STATE OF NORTH CAROLINA,               )

                    Defendants.

NOW COME Defendants Bandon Beasley, Eric Urieta and Kenny Custodio
(hereinafter "Defendants"), by and through undersigned counsel pursuant to Rule 56
of the Federal Rules of Civil Procedure, and respectfully submit this memorandum in
support of their motion for summary judgment. In support of the motion for summary
judgment, Defendants state the following:

## NATURE OF THE MATTER BEFORE THE COURT

Plaintiff, Brandon Case is incarcerated by the North Carolina Department of
Adult Correction ("NCDAC" or "NCDPS"). *Exhibit 1.1.* He filed this lawsuit pursuant
to 42 U.S.C. § 1983 alleging that on January 21, 2020 he was punched in the face
and head by another incarcerated person, Inmate Kenneth Kennion(Opus #0981739)
at Central Prison ("Central"), in Raleigh, North Carolina. [D.E. 31]

The Inmate Kennion who attacked Plaintiff is not a defendant in this matter

1

JA053

and the issue before the court is whether the Defendants were deliberately indifferent to the safety of Plaintiff based on their direct actions. [D.E. 31]

At most the actions of Defendants were negligence and do not rise to the high standard required to show a violation of Plaintiff's constitutional rights. Any related state law tort claims involving a lesser standard are not before this court. The two correctional officers manning the upstairs and downstairs control booths who left the stairwell doors open and one officer who was in the bathroom at the time of the attack were not deliberately indifferent to the safety of Plaintiff based on their direct actions. [D.E. 31] For the following reasons, Defendants are entitled to summary judgment.

## STATEMENT OF THE CASE

On June 7, 2021, Plaintiff, a state incarcerated offender, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging his Eighth Amendment rights were violated by Defendants Beasley and Urieta . [D.E. 1] On June 9, 2021, the Court completed its initial frivolity review allowing Plaintiff's Complaint to proceed against Defendants Beasley and Urieta and directed the Clerk to continue management of the case regarding Defendants. [D.E. 8]

On September 13, 2021, Defendants Beasley and Urieta filed an Answer and raised defenses as to plaintiff's Complaint. [D.E. 15] On June 6, 2022, Plaintiff filed a motion to Amend Complaint, which was granted by the Court. [D.E. 29, 30] On August 11, 2022, Plaintiff filed an Amended Complaint against Defendants Beasley, Urieta and Custodio. [D.E. 31]

The parties have conducted substantial written and oral discovery. Plaintiff, having the burden of proof, scheduled the deposition of numerous employees and over a thousand of pages of documents have been collected, reviewed and produced in discovery related to the case. On June 29, 2023, Plaintiff filed a motion for extension of time to file dispositive motions which was granted by the Court. [D.E. 47, 48] On August 14, 2023, Plaintiff filed a partial motion for summary judgment. [D.E. 49] Defendants filed several motions for extension of time to file dispositive motions which were granted by the Court. [D.E. 54, 56] On September 5, 2024, Defendants filed a first motion for summary judgment as well as an Answer to the amended complaint and a motion to deem the Answer timely filed. [D.E. 57, 58, 60] On December 12, 2023 the Court entered an order denying the motions for summary judgment and giving the parties until January 26, 2024 to file renewed motions for summary judgment which comply with the Order and local rules. [D.E. 73] Defendants now file their second motion for summary judgment.

## STATEMENT OF FACTS

On June 7, 2021, Plaintiff, filed a 1983 civil rights complaint in this case alleging that his Eighth Amendment rights were violated by Defendants. [D.E. 1] On August 11, 2022, Plaintiff filed an Amended Complaint. [D.E. 31]   Plaintiff's allegations arise from an incident at Central Prison ("Central")  in Raleigh, North Carolina that occurred on January 21, 2020. [D.E. 31, ¶ 24]

**Plaintiff's Allegations Relative to the Defendants**

Plaintiff alleges that he was the victim of a violent incident at the hands of

3

JA055

another offender at Central Prison on January 21, 2020. [D.E. 31] On January 21, 2020, Plaintiff Case received a haircut on the upstair floor at Central Prison. Plaintiff Case left the haircutting station and proceeded down a hall and down a staircase to another downstairs hall. [D.E. 31, ¶ 24, 29,]

Plaintiff alleges that Defendants failed to lock the doors and "as a result Case opened the door, descended the staircase, and stepped into the hallway" [D.E. 31, ¶ 29] Plaintiff alleges that "at the same time, there were safekeepers, including Kenneth Kennion, arriving in the hallway on their way back from recreation." [D.E. 31, ¶30] Plaintiff alleges that safekeepers "include individuals originally housed in county jails" [D.E. 31, ¶14]

Plaintiff alleges that the imminent arrival of the safekeepers had been announced to Custodio, Beasley and Urieta by radio but Defendants did not secure the door to the hallway in response to the radio call." [D.E. 31, ¶32]

When Plaintiff Case entered the hallway, Kennion attacked Case allegedly without provocation. [D.E. 31, ¶33] Kennion struck Case in the face repeatedly before a correctional officer intervened. [D.E. 31, ¶34] Plaintiff Case was injured as a result of this attack and received treatment at a hospital, including cutting a nerve in Plaintiff's face and implanting 3 plates and 21 screws. [D.E. 31, ¶40]


**Defendants' Summary Judgment Evidence**

Plaintiff Brandon Case (Opus # 0850640) is currently serving a twenty six year sentence for murder second-degree (principal) with a projected release date of

4

March 2037. *See Exhibit 1.1 and available on the NC DAC website.*[1] Since his conviction and sentencing in 2015, Inmate Case has been found guilty after a hearing of committing 30 disciplinary infractions in prison, for multiples offenses of substance possession (7 times), disobeying orders (8 times), involvement with a gang or SRG (2 times), and fighting with weapon or weapons possession (3 times combined). *See List of Offender Disciplinary Report, attached as Exhibit 1.2 and available publicly online on the NC DAC website.*

Unit 2 of Central Prison houses pre-trial detainees called Safekeepers on the second floor of the unit and General Population Inmates on the ground floor. (Exhibit 4.1 Depo of Beasley Pg. 45) In January, 2020, Plaintiff Case was incarcerated in Unit 2 of Central Prison. Case was also serving as a janitor of the Unit and was allowed to move around the facility for cleaning duties. *Id.*

Safekeepers

The Policies and Procedures regarding Safekeepers are outlined in Chapter O, section .0500 of the NCDPS Policy and Procedures Manual. *Exhibit 1.3.* Safekeepers are pre-trial detainees (not convicted offenders) who normally would be housed in a county jail however they either (1) pose a serious escape risk, (2) exhibit violently aggressive behavior that cannot be contained and warrants a higher level of supervision; (3) needs to be protected from other prisoners and the county jail facility

---

[1] *Plaintiffs Offender Information Report, attached as Exhibit A is available publicly online on the NC DAC website.*
https://webapps.doc.state.nc.us/opi/offendersearch.do?method=view

5

JA057

cannot provide such protection; .....or (4) requires medical or mental health treatment. *Id.*

Pursuant to NCDPS Policy .0504(a) Safekeepers must be <u>housed</u> separately from general population offenders. Pursuant to NCDPS Policy .0505(3), Central Prison is designated to receive and house male safekeepers, ages 22 and above. *Id.*

Safekeepers in Central Prison are housed in Unit 2 on the second floor. Unit 2 of Central Prison houses Safekeepers on the second floor and General Population Inmates on the ground floor. (Exhibit Depo of Beasley Pg. 45)

Pursuant to NCDPS Policy .05054(b)(2), a Safekeeper's assignment to the designated facility will remain… unless (2) the safekeeper's behavior has deteriorated to the point that the staff at the designated facility feels more security is needed. *Id.*

<u>The Incident</u>

On the day of the incident, correctional staff were conducting inmate haircuts in the upstairs hallway of Unit 2 outside of the sergeant's office. *Exhibit 1.5* Regular Population Inmates housed on the ground floor of Unit 2 were being sent from their downstairs cells up to the barber upstairs who would proceed to cut their hair and then send them back down to their assigned area on the first floor. *Id.*

To get to the barber located on the second floor, the inmates had to go up one flight of stairs. There is a door at the top and bottom of the stairwell. *Exhibit 3.1 and 4.1 Depositions Custodio and Beasley*

The upstairs stairwell door is controlled by a correctional officer in a control booth on the second floor. *Exhibit 3.1 Deposition of Custodio.* The downstairs

6

stairwell door is controlled by a correctional officer in a control booth on the ground floor. *Exhibit 4.1 Deposition of Custodio.* Because of the number of inmates going up and down the stairwell to get haircuts and return to their cells in a short period of time, the correctional officers in the upstairs and downstairs control booths had left the doors open at the top and bottom of the stairwell. *Exhibit 3.1 and 4.1 Depositions Custodio and Beasley*

Plaintiff Brandon Case received a haircut upstairs. After getting his haircut he began to walk down the stairwell to the ground floor. *Exhibit 1.6 and 1.7 Videos of Incident*

At the exact same time Case was walking down the stairs, a group of safekeeper inmates were returning from their recreation time and were walking down the first-floor hallway to go up the stairwell and return to their second floor cells. *Id.*

Plaintiff Brandon Case and Inmate Kenneth Kenyon met at the bottom of the stairwell. Inmate Kenyon punched Plaintiff Case in the facial area several times. *Id.*

Officer Beasley who was stationed in the downstairs control booth and could observe the attack through a window called a code 4 for assistance via radio. *Exhibit 4 – Declaration of Beasley.* Officer Hinton who was escorting the inmates back from recreation and was in the room where the attack occurred approached Inmate Kenyon who after punching Plaintiff Case several times, immediately turned around and submitted to be restrained by placing his hands behind his back. *Exhibit 1.7 Videos of Incident* Plaintiff Case was escorted to the nurse's station by correctional staff.

7

**JA059**

*Id.*

Correctional Officer Brandon Beasley was in the downstairs control booth when the attack occurred. He was not aware and did not hear a radio call that a group of inmates were returning from recreation and were coming down the hall towards the stairwell. *Exhibit 4.1 – Deposition of Beasley* Furthermore, once he did see the safekeepers, he recognized they were supposed to be coming up the stairwell to go back to their assigned cells. *Id.* He was not aware of Plaintiff Case getting a haircut upstairs because Beasley had not been in the control booth earlier. *Id.*

Correctional Officer Eric Urieta was in the restroom when the attack occurred. Before going to the restroom, Urieta had been stationed in the downstairs control booth and had radioed Officer Beasley to come to the control booth and relieve him for a few minutes so Urieta could go to the bathroom. *Exhibit 2 – Declaration of Urieta* It was during this time that Plaintiff Case walked down the stairwell and walked into the group of inmates returning from recreation and going up the stairwell. *Id.*

At no time was Defendants Beasley, manning the downstairs control booth and the downstairs stairwell door warned of the attack or knew that Kenneth Kennion would punch Plaintiff. *Exhibit 4.1 – Deposition of Beasley.* Furthermore, it was never suspected. *Id.* Defendants supervise hundreds of inmates throughout the day and it was not obvious that Kenneth Kennion would attack Plaintiff. Defendants do not always know which inmates have disputes with what inmates. *Id.*

Defendant Kenny Custodio

8

During the relevant time, Custodio was employed by the North Carolina Department of Public Safety as a Correctional Officer at Central Prison in Raleigh, North Carolina but has since left State Employment. (Custodio Declaration ¶ 3)

On January 21, 2020, Custodio was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion. (Custodio Declaration ¶4 ) On that day, Custodio had been stationed in the upstairs control booth. (Custodio Declaration ¶5 ) Before the fight occurred, inmates had been getting haircuts upstairs in the hallway outside of the sergeant's office. (Custodio Declaration ¶6 ) Because so many inmates were going up and down the stairs to get haircuts, the upstairs door to the stairwell was left open for a period of time. (Custodio Declaration ¶7 )

Inmate Brandon Case got a haircut upstairs and went downstairs to go back to his cell when he apparently encountered Kenneth Kennion in the hallway coming back from recreation. (Custodio Declaration ¶8 ) Custodio was upstairs in his control booth monitoring the cell block when Officer Beasley yelled that Case and Kennion were fighting. (*Exhibit 3.1 Depo of Custodio Pg. 78*)

Defendants knew Plaintiff Case as he was a janitor for the unit. He came out of his cell block very frequently since he was the janitor and was always in the hallways cleaning or waiting for instructions from the unit manager or custody of his next assignments. *Id.*

Custodio did not see Kenneth Kennion punch Brandon Case because it occurred downstairs and Custodio was upstairs in the control booth. (Custodio

9

JA061

Declaration ¶9 ) Custodio did hear the alarm when the fight broke out. (Custodio Declaration ¶10 ) Before the fight, in no way did Custodio know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion. (Custodio Declaration ¶11) Custodio did not know and had no way of knowing that Kenneth Kennion would be walking in the downstairs hall at the exact time that Brandon Cas went down the stairs. (Custodio Declaration ¶12 ) Custodio generally knew of inmate Brandon Case beforehand because he was the janitor. (Custodio Declaration ¶13 )

Custodio did not know Kenneth Kennion and do not think he had ever seen him before. (Custodio Declaration ¶14 ) Prior to the incident, Custodio was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case. (Custodio Declaration ¶15)

Custodio did not know and still does not know if Kenneth Kennion has a history of violence. (Custodio Declaration ¶16 ) (Exhibit Depo of Custodio Pg. 73)

Custodio do not know if Brandon Case has a history of violence. (Custodio Declaration ¶17 ) Custodio would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger. (Custodio Declaration ¶18 )

Custodio also did not hear a radio call announcing that safe keepers were coming in from recreation. (Exhibit Depo of Custodio Pg. 79) Custodio does not know whether there was a radio call saying that inmates were coming in from recreation. (Exhibit Depo of Custodio Pg. 79) Had there been a radio transmission

10

that safekeepers were coming back from recreation, Custodio would not have let Offender Brandon Case down the stairs. (Exhibit Depo of Custodio Pg. 106)

Defendant Eric Urieta

During the relevant time, Urieta was employed by the North Carolina Department of Public Safety as a Correctional Officer at Central Prison in Raleigh, North Carolina. (Urieta Declaration ¶3) On January 21, 2020, Urieta was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion. (Urieta Declaration ¶4 ) On that day, prior to the incident Urieta had been stationed in the downstairs control booth. (Urieta Declaration ¶5 )

Just prior to the fight between inmate Brandon Case and Kenneth Kennion, Urieta had to use the bathroom so he radioed his co-worker Correctional Officer Brandon Beasley to come take my place for a few minutes so he could go to the bathroom. (Urieta Declaration ¶6 )Brandon Beasley took Urieta's place in the downstairs control booth and he went into the bathroom. (Urieta Declaration ¶7 )

While Urieta was in the bathroom, the fight between inmate Brandon Case and Kenneth Kennion occurred. Urieta did not see Kenneth Kennion punch Brandon Case because he was in the bathroom. (Urieta Declaration ¶8 ) Before the fight, in no way did Urieta know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion before in the incident occurred. (Urieta Declaration ¶9 ) Urieta

11

generally knew of inmate Brandon Case beforehand because he was the janitor. (Urieta Declaration ¶10 )

Urieta did not know Kenneth Kennion and does not think he had ever seen him before. (Urieta Declaration ¶11) Prior to the incident, Urieta was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case. (Urieta Declaration ¶12 ) Urieta did not know and still do not know if Kenneth Kennion has a history of violence. (Urieta Declaration ¶13 ) As soon as the incident occurred and the alarm was called, Urieta left the bathroom and helped restore order among the inmates. Urieta responded as quickly as possible once the incident occurred. (Urieta Declaration ¶14 )

After using the bathroom and once the inmates were moving along their way, Urieta went back into the downstairs control booth to relieve Brandon Beasley from the position. (Urieta Declaration ¶15 ) Urieta would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger. (Urieta Declaration ¶16 )

**Brandon Beasley**

During the relevant time, Beasley was employed by the North Carolina Department of Public Safety as a correctional officer at Central Prison in Raleigh, North Carolina but has now since left State Employment. (Beasley Declaration ¶ 3)

**JA064**

On January 21, 2020, Beasley was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion. (Beasley Declaration ¶ 4) On that day, prior to the incident Beasley had been stationed on downstairs patrol. (Beasley Declaration ¶ 5)

Just prior to the fight between inmate Brandon Case and Kenneth Kennion, Beasley's co-worker Eric Urieta (stationed in the downstairs control booth) had to use the bathroom and he radioed for someone to come take his place for a few minutes so he could go to the bathroom. (Beasley Declaration ¶ 6) Beasley took his place in the downstairs control booth and Urieta went into the bathroom. (Beasley Declaration ¶ 7)

When Urieta left to go to the bathroom and Beasley assumed command of the downstairs control booth, he got distracted by inmates up front, and didn't close the stairwell door (Exhibit Depo of Beasley Pg. 71-72) Not long after Beasley got in the in the downstair control booth (and Eric Urieta was in the bathroom), Brandon Case walked down the stairs to the first floor. At the same time Kenneth Kennion was walking down the first-floor hall when the fight occurred. (Beasley Declaration ¶ 8)

Beasley did not hear any radio call that Kenneth Kennion and his group were coming back from Recreation and walking down the downstairs hall. A radio call should have been made by the officers escorting Kenneth Kennion's group down the hall notifying other correctional officers that they were in the hall. (Beasley Declaration ¶ 9)

Before the fight, in no way did Beasley know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion before in the incident occurred. (Beasley Declaration ¶ 10)

Beasley generally knew of inmate Brandon Case beforehand because he was the janitor. Because he was the janitor it was very common to see him walking around and coming up and down the stairs. (Beasley Declaration ¶11) Beasley did not know Kenneth Kennion and do not think Beasley had ever seen him before. (Beasley Declaration ¶ 12) Prior to the incident, Beasley was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case. (Beasley Declaration ¶13) Beasley did not know and still do not know if Kenneth Kennion has a history of violence. (Beasley Declaration ¶ 14) As soon as the incident occurred and Beasley saw Brandon Case get punched in the face by Kenneth Kennion, Beasley called an alarm over the radio and several staff members rushed to the area and immediately took charge of the situation. (Beasley Declaration ¶ 15)

Prior to the incident occurring and when Beasley relieved Urieta so he could go to the bathroom, Beasley believe the door to the stairs was open because inmates were coming up and down the stairs for haircuts. (Beasley Declaration ¶ 16) The incident occurred very shortly after Beasley relieved Urieta and there were inmates banging on the back window and a lot was going on. (Beasley Declaration ¶ 17)

After Urieta used the bathroom and once the inmates were moving along their way after the incident, Beasley was relieved from the downstairs control booth by

14

Urieta so Beasley could go back to my patrol position. (Beasley Declaration ¶ 18) Beasley would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger. (Beasley Declaration ¶ 19) (Exhibit 4.1 Depo of Beasley Pg. 79) Defendant Beasley never had any negative interactions with Plaintiff Case and they had respect for each other. (Exhibit 4.1 Depo of Beasley Pg. 65)

## LEGAL ARGUMENT

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the moving party has the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[M]ere

15

speculation, however, cannot create a genuine factual dispute, nor can the building of one inference upon another." *DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*, 268 F. App'x 236, 242 (4th Cir. 2008) (internal quotations omitted). Courts considering dispositive motions "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP*, 213 F. 3d 175, 180 (4th Cir. 2000). "It is the duty of the court to withdraw the case from the factfinder when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 2005).

The "opponent [to a proper summary judgment motion] must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may utilize various accepted evidentiary tools to oppose a proper motion for summary judgment. *Celotex Corp.*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## <u>LEGAL ARGUMENT</u>

For the below reasons, Defendants should be granted summary judgment.

**THE ALLEGATIONS IN THE COMPLAINT AND DEFENDANTS FORECAST OF EVIDENCE DEMONSTRATE THAT DEFENDANTS DID NOT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS. PLAINTIFF HAS FAILED TO ESTABLISH A VIOLATION OF THE EIGHTH AMENDMENT BY DEFENDANTS**

16

## The Defendants are Entitled to Summary Judgment on Plaintiff's Deliberate Indifference Claim.

Plaintiff's allegations in this case, at most, amounts to mere negligence, not deliberate indifference. There is no evidence that Defendants actions or inaction rise to a level of a constitutional violation or from which a jury could find Defendants were deliberately indifferent to an obvious risk of substantial harm to the Plaintiff. The alleged negligent failure to protect Plaintiff Case from an assaults by Inmate Kenneth Kennion, does not rise to the level of an unconstitutional violation. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

There were a lot of things going on the day of in the incident, with lots of movement of offenders and correctional officers switching places. Defendants did have the doors to the upstairs and downstairs stairwell open. However, even if there was a policy violation regarding the way Defendants operated the control booth a jury could not reasonably conclude that this rose above negligence to the level of a constitutional violation.

The actions of each Defendants and the Plaintiff should be analyzed separately. Defendant Urieta was in the bathroom when the incident occurred. Defendant Custodio was upstairs and did not witness the incident or know that the safekeepers were coming in from recreation. Defendant Beasley also did not know until he saw the safekeeper they were coming in from recreation and did not know that Plaintiff Case would be walking down the stairs because he had recently relieved

17

Defendant Urieta from the downstairs control booth assignment so Urieta could go to the bathroom.

Furthermore, Defendants did not know Kenneth Kennion and that he would attack Plaintiff Case.

There is no evidence that Defendant Custodio, Defendant Beasley or Defendant Urieta had actual knowledge of a substantial risk of harm to satisfy the requirements of a 1983 claim. To show deliberate indifference, a plaintiff must show that the prison official had actual knowledge of an excessive risk to the plaintiff's safety. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014) Defendants would be entitled to qualified immunity. As shown below the Fourth Circuit Court of Appeals has recently addressed a similar fact pattern in their decision in *King v. Riley,* 76 F.4th 259, 263 (4th Cir. 2023) Summary judgment was granted on behalf of the prison officials and that decision was affirmed. Applying the same analysis in the instant case, Defendants Custodio, Beasley and Urieta are entitled to summary judgment because they were not deliberately indifferent to an obvious risk of harm to the Plaintiff.

Components of a Deliberate Indifference Claim.

The United States Supreme Court has found that the Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments" on a prisoner and requires that prison officials "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

JA070

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834; *see also Madkessi v. Fields,* 789 F.3d 126, 133 (4th Cir. 2015). The negligent failure to protect an inmate from assaults by other prisoners, or by other prison guards, does not rise to the level of an unconstitutional violation. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

While "[t]he government and its officials are not free to let the state of nature take its course," *Farmer,* 511 U.S. at 833, "[t]he burden is on the prisoner to demonstrate that the prison official violated the Eighth Amendment, and that burden is a heavy one." *Strickland v. Halsey,* 638 Fed. Appx. 179, 184 (4th Cir. 2015)(quoting *Pyles v. Fahim,* 771 F.3d 403, 408-09 (7th Cir. 2014)).


Two-Part Test – Objective and Subjective Inquiry

In order to prevail on such a claim, Plaintiff "must satisfy a two-part test, consisting of both an objective and subjective inquiry, for liability to attach." *Raynor v. Pugh,* 817 F.3d 123, 127 (4th Cir. 2016).

The objective inquiry requires that the individual prisoner to "establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury, or a substantial risk thereof." *Id.* (*quoting Danser v. Stansberry,* 772 F.3d 340, 346-47 (4th Cir. 2014)).

The subjective inquiry requires the individual prisoner to "show that the prison official had a 'sufficiently culpable state of mind,' which, in this context, consists of

19

'deliberate indifference to inmate health or safety.'" *Raynor,* 817 F.3d at 127-28 (quoting *Farmer,* 511 U.S. at 834). "This subjective inquiry requires 'evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety.' *Id.* at 128 (quoting *Danser,* 772 F.3d at 347).

Thus, "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

"Importantly, deliberate indifference is 'a very high standard.'" *Danser,* 772 F.3d at 347 (quoting *Grayson v. Peed,*195 F.3d 693, 695 (4th Cir. 1999)). Evidence tending to establish "mere negligence" will not suffice. *Grayson,* 195 F.3d at 695.

Violation of a prison policy by prison officials, however, does not establish a constitutional violation. *See Riccio v. Cty of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights that the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

In the context of a claim based on a failure to prevent harm, the objective prong requires a plaintiff to show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 843; *see also Makdessi*, 789 F.3d at 133.

The subjective prong, on the other hand, requires the plaintiff to show that prison officials acted with deliberate indifference to inmate health or safety. *Farmer,* 511 U.S. at 834; *see also Makdessi,* 789 F.3d at 133. In other words, the official must

20

"consciously disregard" a known risk of serious harm. *Anderson,* 877 F.3d at 544 (quoting *Farmer,* 511 U.S. at 839). "[D]eliberate indifference entails more than ordinary lack of due care for the prisoner's interest of safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Makdessi,* 789 F.3d at 133 (quoting *Farmer,* 511 U.S. at 835)

Scope of Liability Under Section 1983

Defendants can only be held liable for their own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009). Since vicarious liability does not apply to lawsuits brought under § 1983, the plaintiff must allege "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*, 556 U.S. at 676. Therefore, to be liable under § 1983, a plaintiff must affirmatively show that the subject official "acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). In the instant case, Defendant Custodio was upstairs manning the upstairs control booth, Defendant Beasley was downstairs manning the downstairs control booth and Defendant Urieta was in the bathroom.

Plaintiff's Claims Against Defendants Beasley, Urieta and Custodio Fail Because He Cannot Present Evidence of Deliberate Indifference.

There is no forecast of evidence that Kennion had a history of violence. (Exhibit Depo of Custodio Pg. 73) Furthermore at no time was Defendants Beasley

21

JA073

who was manning the downstairs control booth and the downstairs stairwell door warned of the attack or knew that Kenneth Kennion would punch Plaintiff. *Exhibit 4.1 – Deposition of Beasley.*

Moreover, Plaintiff fails to present a forecast of evidence that Defendants knew Plaintiff and Kennion were at odds, or that Kennion posed a threat to Plaintiff's safety. Since the forecast of evidence fails to include anything tending to prove this essential element of Plaintiff's claim, the Defendants are entitled to summary judgment on the claim that they were deliberately indifferent to an excessive risk to Plaintiff's safety.

While the Fourth Circuit has held that this "actual knowledge" can be proven through circumstantial evidence, that evidence must be such that "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

In *Makdessi*, the Fourth Circuit considered an appeal from a Virginia inmate challenging the dismissal of his deliberate indifference claims against prison officials. *Makdessi*, 789 F.3d at 129. The plaintiff had personally complained about threats from other inmates to one prison official for a period of approximately three years, yet his complaints garnered no response. *Id*. Those complaints eventually became more specific in nature, as Makdessi complained about his cellmate, whom he identified as an aggressive gang member, and requested a new assignment or

22

**JA074**

movement to protective custody. *Id*. at 130. Again, the complaints were met with no response and, over a period of four months, Makdessi suffered physical and sexual assault at the hands of his cellmate and his gang affiliates, ending only when staff finally intervened. *Id*.

Reversing the district court, the Fourth Circuit concluded that Makdessi was "vulnerable to harassment and attacks by other inmates" due to physical and mental health conditions and that his history of complaints was so well documented that prison officials should have detected the risk posed to him. *Id*. at 135. The Court expressly noted "that actual knowledge can be shown by circumstantial evidence that the risk was so obvious that the Defendants had to know it." *Id*. at 133. As the court concluded, a plaintiff's failure to give advance notice of the risk was not dispositive "if it can be shown that the circumstances made it reasonable to believe that the defendants were aware of a serious risk to the plaintiff but took no protective action." *Id*. (citing *Farmer,* 511 U.S. at 848-9).

However, this "circumstantial evidence" cannot consist of only unsupported speculation, however. *Danser*, 772 F.3d at 344. Nor can a disputed issue of fact be created by relying upon the same. *Id*. (citing *Othentec Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008) (defendants' mere access to information insufficient to demonstrate that they actually used that information)); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (conclusory assertions about defendant's motivation and state of mind not sufficient to withstand summary judgment)). In *Danser*, the Fourth Circuit reversed a denial of qualified immunity by the district court, characterizing the record

23

as "devoid" of any evidence aside from the inmate's assertions to support his claims, rendering it insufficient as a matter of law to create a genuine issue of material fact to withstand summary judgment. *Id*. at 344.

Similarly, in *Wilkins v. Upton*, 2016 U.S. App. LEXIS 3873, 4-5 (4th Cir. 2016) (unpublished), the Fourth Circuit reversed and remanded the district court's denial of qualified immunity to supervisory officials in a claim regarding sexual assault allegations. The Fourth Circuit held, as in *Danser*, that the record was devoid of any evidence which supported the assertion that the defendants had any knowledge whatsoever of their subordinate's alleged actions or that they had a reason to know of such a risk posed by the subordinate officer. *Id*. That absence of evidence was "fatal" to the plaintiff's claims. *Id*.

In the instant case, Plaintiff alleges that Defendants failed to protect him against an alleged danger posed to him by Kenneth Kennion. Yet, in the instant case, there is no evidence that Defendants "actually knew of and disregarded a substantial risk of serious injury" posed to Plaintiff by Kenneth Kennion. *Parrish*, 372 F.3d at 302. Prison can be a dangerous place with inmate on inmate violence occurring, however, nowhere does Plaintiff allege that he informed any of the Defendants of a threat to his safety posed by Kenneth Kennion. Accordingly, Plaintiff cannot even satisfy the first prong of the *Farmer* deliberate indifference analysis.

Even if he could satisfy the first prong of *Farmer*, however, Plaintiff has not shown that Defendants "possessed a sufficiently culpable state of mind" of deliberate indifference to his safety. *Farmer*, 511 U.S. at 824, 840-45. The contours of the

24

Eighth Amendment do not require Defendants to predict Kennion's assault and prevent it from occurring, especially when they had no prior knowledge of Kennion's intentions or any reason to suspect it. The conduct which Plaintiff attributes to Defendants simply cannot be reconciled with the record.

<u>Plaintiff Cannot Establish the Subjective Component of a Deliberate Indifference Claim.</u>

The subjective prong, requires the Plaintiff to show that Defendants Beasley, Urieta and Custodio "consciously disregarded" a known risk of serious harm. *Anderson,* 877 F.3d at 544 (quoting *Farmer,* 511 U.S. at 839). [D]eliberate indifference entails more than ordinary lack of due care for the prisoner's interest of safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Makdessi,* 789 F.3d at 133 (quoting *Farmer,* 511 U.S. at 835)

Courts have recognized that knowledge of an inmate's past violence does not, on its own, rise to the level of deliberate indifference. *See Taylor v. Little,* 58 F. App'x 66, 68 (6th Cir. 2003) (finding evidence that an inmate had recently attacked someone, had been hostile to staff or another correctional facility, had been incarcerated for violent felonies, merely suggested, at most, that "[the inmate], *not unlike many inmates in our prison system* is prone to antisocial and sometimes violent behavior" and did not "suggest that prison officials should have been aware that he might randomly attack a fellow inmate") *see also Street v. Corr. Corp. of Am.,* 102

25

F.3d 810 (6th Cir. 1996)(finding that incarcerating a prisoner in the same unit of the prison as the victim was not deliberate indifference where both inmates had a history of violence).

There is no evidence that a substantial risk of serious harm was longstanding, pervasive, and well-documented before Plaintiff was attacked by the Inmate Kennion or that Defendants had been "exposed to information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. 842.

The fact that prison is a dangerous place that houses violent inmates or that this unit 2 at Central Prison housed all types of offenders including safekeepers and regular population inmates is not enough to show an obvious risk. *See Rich v. Bruce,* 129 F.3d 336, 339-40 (4th Cir. 1997)

Further the fact that the Inmate was a safekeeper does not rise to the level of imparting knowledge on Defendants that this inmate would attack Plaintiff. *See, e.g., Strickland,* 638 Fed. Appx. At 185-86. The relevant question is whether Defendants subjectively believed the assailant Kenneth Kennion posed a substantial risk of serious harm to other inmates.

Evidence that the inmate was a safekeeper is not enough to establish actual knowledge of a substantial threat of harm. This is not enough to infer knowledge to the Defendants.

Even if a Defendant did violated policy by leaving the stairwell doors open and the top and bottom of the stairs, the law is clear that violation of a policy does not, in

and of itself, rise to the level of a constitutional violation. *See United States v. Caceres,* 440 U.S. 741 (1978); *Riccio v. Cty. Of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990)

Any deficiencies in Defendant's actions would amount, at most, to negligence which does not rise to the level of deliberate indifference. *See Grayson v. Peed,* 195 F.3d 693, 695 (4th Cir. 1999). Plaintiff cannot create a dispute of fact by pointing to the absence of evidence in the record. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985)

Inmate Kennion made a deliberate decision to attack Plaintiff Case. There is not evidence that the attack was foreseeable by Defendants as there is no evidence in the record that anyone knew Inmate Kennion would attack Plaintiff.

## DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

The Defendants Would Be Entitled to Qualified Immunity.

The United States Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), set forth objective standards for the utilization of the qualified immunity defense and gave specific benchmarks to the judiciary in determining when to protect public officials from undue interference with the exercise of their official duties. In setting forth the guidelines, the Supreme Court ruled that "government officials performing discretionary functions are shielded from liability and civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person should have known." *Id.* at 818.

The Court further held that "[r]eliance on the objective reasonableness of an

27

official's conduct is measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

Subsequently, the Supreme Court held in *Anderson v. Creighton,* 483 U.S. 635 (1987), that a court must look for the "'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' a the time it was taken." *Id.* at 639. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right …[This] is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* at 640.

In determining whether an individual defendant is entitled to qualified immunity, this Court engages in a two-step process as set forth in *Saucier v. Katz,* 533 U.S. 194 (2001). The Court must first determine "whether a constitutional right would have been violated on the facts alleged." *Id.* at 200. If the facts viewed in a light most favorable to the plaintiff do not establish a constitutional violation, the inquiry ends and the plaintiff cannot prevail. *Parrish,* 372 F.3d at 301. "Next, assuming that the violation of the right is established, the courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy,* 349 F.3d 731, 739 (4th Cir. 2003).

King v. Riley

The Fourth Circuit Court of Appeals has recently addressed a similar fact

28

pattern in their decision in *King v. Riley,* 76 F.4th 259, 263 (4th Cir. 2023)

In *King v. Riley,* a South Carolina inmate named King was murdered by another inmate. The estate of the deceased inmate sued pursuant to 1983 alleging that correctional staff were deliberately indifferent to King's safety and therefore responsible for his death. Summary Judgment was granted at the district court level and the estate appealed to the Fourth Circuit. The Fourth Circuit affirmed the district court decision, finding no error and that the prison guards on duty failed to violate a clearly established right therefore defendants were entitled to qualified immunity.

In the opinion the Court focused on the fact that there is not a clearly established right to properly conducted security checks. However, the Court noted that qualified immunity does not protect officials who knowingly disregard the law and that officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly established prong. If an official did not know their actions violated the Eighth Amendment, they are entitled to the same two-pronged qualified immunity approach as every government official.

Defendants Beasley, Custodio and Urieta are entitled to the two prong approach because they were aware of the risk of harm related to inmate-on-inmate violence, however the Constitution does not "obviously" require Defendants to keep safekeepers and regular population inmates away from each other at all times or keep stairway doors closed at all times.

In establishing if a right is clearly established, the right at issue must first be

29

**JA081**

defined. The Court should "pinpoint the precise constitutional right at issue." *King* (quoting, *Pfaller,* 55 F.4th at 445.) The unlawfulness must be "apparent" based on pre-existing law. *King (*quoting *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

The right at issue is Case's right to have correctional officers keep him separate from safekeepers, given a known and substantial potential risk of inmate-on-inmate violence in the Unit.

The undisputed evidence demonstrates that Defendants are entitled to qualified immunity because their alleged individual conduct was objectively reasonable in light of constitutional requirements. The Eighth Amendment does not command that Defendants predict an assault by Kennion which, if undertaken, would pose a risk of harm to Plaintiff.

There is no evidence in the record which suggests, let alone proves, that Defendants had any reason to believe Kennion himself specifically posed a threat to Plaintiff's safety. As a result, Defendants are entitled to qualified immunity and Plaintiff's claims against them should be dismissed.

Plaintiff has also failed to demonstrate that Defendants ever had any subjective or objective reason to believe that Kennion specifically posed an unreasonable risk of harm to him. In the absence of any specific knowledge of a specific risk posed to Plaintiff by Kennion, Defendants could not have understood that their failure to take action to protect Plaintiff from Kennion – whatever that action might be – exposed Defendants to liability or jeopardized Plaintiff's constitutional

30

**JA082**

rights.

Moreover, whatever level of knowledge Defendants may have had about risks to inmates at Central Prison generally due to previously reported assaults, the fact that Plaintiff was subsequently injured in an assault hardly provides notice, imputable to Defendants before the assault, that any inaction by Defendants was unlawful. Accordingly, Defendants are entitled to qualified immunity and Plaintiff's claims must be dismissed.

The qualified immunity inquire must focus on the specific factual situation in this case to determine whether Defendants enjoy immunity. *See Parrish,* 372 F.3d at 301. "If the right was not clearly established in the specific context of the case-that is, if it was not clear to a reasonable officer that the conduct in which the allegedly engaged was unlawful in the situation he confronted-then the law affords immunity from suit." *Clem v. Corbeau,* 284 F.3d 543, 549 (4th Cir. 2002).

This Court has explained that the nature of the right violated must be defined "at a high level of particularity." *Edwards v. City of Goldsboro,* 178 F.3d 231, 250-51 (4th Cir. 1999). "[W]hen the legality of a particular course of action is open to reasonable dispute, an officer will not be subjected to trial and liability." *Figg v. Schroeder,* 312 F.3d 625, 636 (4th Cir. 2002).

In other words, as the Supreme Court has phrased the standard, the unlawfulness of the conduct must be "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

The evidence in the record shows that even if it were determined that

31

**JA083**

Defendants acted with negligence or deliberate indifference, that was no clearly established law putting them on notice that a constitutional violation occurs when the control booth is operated in a deficient manner.

The record also shows that Defendant Urieta was in the bathroom when the attack occurred and was not physically present in the control booth. The record also shows that Defendant Custodio was upstairs in the control booth operating the slider door at the top of the stairs and that there was another slide door at the bottom of the stairs.

The Supreme Court has found that qualified immunity protects all but the plainly incompetent or those who knowingly violated the law. *Malley v. Briggs,* 475 U.S. 335, 341 (1986), Therefore, the Court must determine whether Defendants were either plainly incompetent or that each defendant knowingly violated Plaintiff's constitutional rights, and if it does not find this, Defendants are entitled to qualified immunity.

No bright line was transgressed by Defendants. Even if the court finds that there is evidence of a constitutional violation, there is not evidence such a violation was clearly established.

For the foregoing reasons, Defendants respectfully request the Court grant summary judgment because no constitutional violations occurred in this case and, even if there were constitutional violations, Defendants were entitled to qualified immunity.

JA084

<u>Defendants Are Entitled to Summary Judgment as to Any Official Capacity Claims
Against Them.</u>

Plaintiff does not specify whether he is suing Defendants in their individual or
official capacities. [D.E. 31]. Any official capacity claims fail as a matter of law. A
lawsuit filed against a state official in his or her official capacity is essentially an
action against the state. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).
The law is clear, neither a state nor an official acting in an official capacity is a
"person" subject to suit under 42 U.S.C. § 1983. Furthermore, the Eleventh
Amendment generally bars claims against states in state or federal courts. *Alden v.
Maine*, 527 U.S. 706, 712-13 (1999). While Congress can abrogate the states'
sovereign immunity, it has not done so with regard to claims under 42 U.S.C. § 1983.
*See Quern v. Jordan*, 440 U.S. 332, 343 (1979). Moreover, "[t]he State of North
Carolina has not waived its sovereign immunity for suit under § 1983[.]" *Frazier v.
Murray*, No. 4:96-CV-168-BO(1), 1997 U.S. Dist. LEXIS 22039, at *9 (E.D.N.C. Dec.
15, 1997) Accordingly, Plaintiff cannot maintain this Section 1983 action against
Defendants in their official capacities. Therefore, Defendants are entitled to summary
judgment as to Plaintiff's claims against them in their official capacities.

## CONCLUSION

Plaintiff cannot establish that Defendants knew or should have known of a risk
of harm posed to him such that Defendants could reasonably be found deliberately
indifferent in violation of the Eighth Amendment.  Plaintiff simply cannot establish

a constitutional violation. In addition, Defendants are entitled to qualified immunity which shields them from Plaintiff's claims against them for monetary damages, as there was no basis upon which Defendants could have reasonably known that, on the record before this Court, the law required them to do more to protect Plaintiff from Kennion specifically. For the foregoing reasons, this Court should grant summary judgment in favor of Defendants.

This the 26th day of January, 2024.

JOSHUA H. STEIN
ATTORNEY GENERAL


/s/Bryan G. Nichols
Bryan G. Nichols
Special Deputy Attorney General
N.C. State Bar No. 42008
N.C. Department of Justice
Public Safety Section
9001 Mail Service Center
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-6568
Facsimile: (919) 716-6761
E-Mail:    bnichols@ncdoj.gov


**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system.

34

Alison R. Leff, Esq.
Law Office of Thomas R. Kayes, LLC
2045 W Grand Ave., Suite B, PMB 62448
Chicago, IL 60612
*Attorneys for Plaintiff*

G. Christopher Olson
Olson Law, PLLC
514 Daniels Street, #136
Raleigh, NC 27605
*Attorneys for Plaintiff*

This the 26th day of January, 2024.

/s/Bryan Nichols
Bryan Nichols
Special Deputy Attorney General

JA087



**BRANDON C CASE**
**Offender ID:** 0850640
**Inmate Status:** ACTIVE
**Probation/Parole/Post Release Status:** INACTIVE
**Gender:** MALE
**Race:** WHITE
**Ethnic Group:** NOT HISPANIC/LATINO
**Birth Date:** 05/24/1988
**Age:** 35
**Current Location:** HARNETT CI

## Name(s) Of Record

| Last Name | Suffix | First Name | Middle Name | Name Type |
|---|---|---|---|---|
| CASE | | BRANDON | CODY | COMMITTED |
| CASE | | BRANDON | CODY LEE | COMMITTED |
| CASE | | BRANDON COD | | COMMITTED |
| CASE | | BRANDON | CODY | ALIAS |
| BUCKSHOT | | | | NICKNAME |

## Most Recent Incarceration Summary

| | |
|---|---|
| **Incarceration Status:** ACTIVE | **Total Incarceration Term:** 26 YEARS 10 MONTHS |
| **Conviction Date:** 05/05/2015 | **Projected Release Date:** 03/31/2037 |
| **Primary Crime:** MURDER SECOND DEGREE (PRINCIPAL) | **Primary Crime Type:** FELON |
| **Special Characteristics:** REGULAR | **Current Status:** FELON |
| **Admission Date:** 05/06/2015 | **Admission Facility:** CENTRAL PRISON |
| **Control Status:** REGULAR POPULATION | **Next Control Review:** UNKNOWN |
| **Custody Classification:** MEDIUM | **Next Custody Review:** UNKNOWN |
| **Number Of Infractions:** 30 | **Last Infraction Date:** 10/18/2023 |
| **Current Location:** HARNETT CI | **Previous Location:** NEUSE CI |
| **Last Movement :** RECEIVED FROM NEUSE CI | **Last Movement Date:** 10/31/2023 |

Escapes?: N

| Most Recent Period of Incarceration Record | | | | | |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Sentence Number:** BB-001 | | | **Commitment Type:** INMATE | | |
| **Conviction Date:** 05/05/2015 | | | **County Of Conviction:** HENDERSON | | |
| **Service Status:** ACTIVE | | | **Sentence Begin Date:** 05/05/2015 | | |
| **Sentence Status:** ACTIVE | | | **Actual Release Date:** | | |
| **Punishment Type:** ACTIVE SS | | | **Projected Release Date:** 03/31/2037 | | |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | | | | | |
| **Minimum Term:** 21 YEARS 6 MONTHS | | | **Maximum Term:** 26 YEARS 10 MONTHS | | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 12050766 | MURDER SECOND DEGREE (PRINCIPAL) | 02/22/2012 | FELON | CLASS B2 SS |

| Most Recent Period of Supervision Record | | | | | |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Sentence Number:** 09-001 | | | **Commitment Type:** PROBATION/PAROLE | | |
| **Conviction Date:** 07/27/2007 | | | **County Of Conviction:** POLK | | |
| **Punishment Type:** INTERMEDIATE SS | | | | | |
| **Sentence Type 1:** PROBATION | | | | | |
| **Sentence Type 2:** SUSPENDED SENTENCE | | | | | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 05051224 | POSSESSION OF FIREARM BY FELON (ATTEMPTED) | 12/11/2005 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 05051225 | DRUG PARA - USE/POSSESS (ATTEMPTED) | 12/11/2005 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 06050428 | POSSESS SCHEDULE II (ATTEMPTED) | 04/04/2006 | FELON | CLASS I |

| Previous Period of Incarceration Record | | | | | |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Sentence Number:** BA-001 | | | **Commitment Type:** INMATE | | |
| **Conviction Date:** 04/18/2005 | | | **County Of Conviction:** POLK | | |
| **Service Status:** EXPIRED | | | **Sentence Begin Date:** 06/19/2006 | | |
| | | | **Actual Release Date:** 02/08/2007 | | |
| **Punishment Type:** ACTIVE SS | | | **Projected Release Date:** 02/08/2007 | | |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | | | | | |
| **Sentence Type 2:** PROBATION REVOCATION | | | | | |
| **Minimum Term:** 6 MONTHS | | | **Maximum Term:** 8 MONTHS | | |

Case 5:21-ct-03157-D   Document 84-2   Filed 01/26/24   Page 2 of 8

**JA089**

## Offender Sentence History

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 04001797 | FELONY B&E (PRINCIPAL) | 06/24/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001797 | LARCENY OVER $1000 (PRINCIPAL) | 06/24/2004 | FELON | CLASS H |

| | |
|---|---|
| **Sentence Number:** BA-002 | **Commitment Type:** INMATE |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 06/19/2006 |
| | **Actual Release Date:** 02/08/2007 |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 02/08/2007 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 2:** PROBATION REVOCATION | |
| **Minimum Term:** 6 MONTHS | **Maximum Term:** 8 MONTHS |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 04001798 | FELONY B&E (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001798 | LARCENY OVER $1000 (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |

| | |
|---|---|
| **Sentence Number:** BA-003 | **Commitment Type:** INMATE |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 06/19/2006 |
| | **Actual Release Date:** 02/08/2007 |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 02/08/2007 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 2:** PROBATION REVOCATION | |
| **Minimum Term:** 6 MONTHS | **Maximum Term:** 8 MONTHS |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 04001799 | FELONY B&E (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001799 | LARCENY OVER $1000 (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |

| | |
|---|---|
| **Sentence Number:** BA-004 | **Commitment Type:** INMATE |
| **Conviction Date:** 09/01/2004 | **County Of Conviction:** POLK |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 06/19/2006 |

**Report Name: Offender Information**

Case 5:21-ct-03157-D   Document 84-2   Filed 01/26/24   Page 3 of 8

JA090

# Offender Sentence History

| | | |
|---|---|---|
| **Punishment Type:** ACTIVE SS | **Actual Release Date:** 07/24/2006 | |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | **Projected Release Date:** 07/24/2006 | |
| **Sentence Type 2:** PROBATION REVOCATION | | |
| **Minimum Term:** | **Maximum Term:** 1 MONTH 15 DAYS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 04050501 | MISD B&E (PRINCIPAL) | 06/26/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001087 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 07/10/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001088 | POSSESS SCHEDULE VI (PRINCIPAL) | 07/10/2004 | MISD. | CLASS 3 MISDEMEANOR SS |

| | | |
|---|---|---|
| **Sentence Number:** BA-005 | **Commitment Type:** INMATE | |
| **Conviction Date:** 09/01/2004 | **County Of Conviction:** POLK | |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 07/24/2006 | |
| | **Actual Release Date:** 09/07/2006 | |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 09/07/2006 | |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | | |
| **Sentence Type 2:** PROBATION REVOCATION | | |
| **Minimum Term:** | **Maximum Term:** 1 MONTH 15 DAYS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER BA*004 | 04050502 | LARCENY (PRINCIPAL) | 06/26/2004 | MISD. | CLASS 1 MISDEMEANOR SS |

| | | |
|---|---|---|
| **Sentence Number:** BA-006 | **Commitment Type:** INMATE | |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK | |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 09/07/2006 | |
| | **Actual Release Date:** 05/05/2007 | |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 05/05/2007 | |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | | |
| **Sentence Type 2:** PROBATION REVOCATION | | |
| **Minimum Term:** 6 MONTHS | **Maximum Term:** 8 MONTHS | |

# Offender Sentence History

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER BA*005 | 04001796 | FELONY B&E (PRINCIPAL) | 06/12/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001796 | LARCENY OVER $1000 (PRINCIPAL) | 06/12/2004 | FELON | CLASS H |

**Sentence Number:** BA-007    **Commitment Type:** INMATE
**Conviction Date:** 02/09/2005    **County Of Conviction:** POLK
**Service Status:** EXPIRED    **Sentence Begin Date:** 06/19/2006
    **Actual Release Date:** 07/31/2006
**Punishment Type:** ACTIVE SS    **Projected Release Date:** 07/31/2006
**Sentence Type 1:** DEPT OF CORR DIV OF PRISONS
**Sentence Type 2:** PROBATION REVOCATION
**Minimum Term:**    **Maximum Term:** 1 MONTH 15 DAYS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 04051115 | SPEEDING ELUDE ARREST OR/ATTEM (PRINCIPAL) | 11/18/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001841 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 10/29/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04051087 | WILL/WANT INJ REAL PROPERTY (PRINCIPAL) | 11/08/2004 | MISD. | CLASS 1 MISDEMEANOR SS |

**Sentence Number:** BA-008    **Commitment Type:** INMATE
**Conviction Date:** 02/09/2005    **County Of Conviction:** POLK
**Service Status:** EXPIRED    **Sentence Begin Date:** 06/19/2006
    **Actual Release Date:** 07/31/2006
**Punishment Type:** ACTIVE SS    **Projected Release Date:** 07/31/2006
**Sentence Type 1:** DEPT OF CORR DIV OF PRISONS
**Sentence Type 2:** PROBATION REVOCATION
**Minimum Term:**    **Maximum Term:** 1 MONTH 15 DAYS

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 04001998 | DRIVING < 21 CONSUME CONTR SUB (PRINCIPAL) | 11/18/2004 | MISD. | CLASS 2 MISDEMEANOR SS |

**Report Name: Offender Information**    Case 5:21-ct-03157-D   Document 84-2   Filed 01/26/24   Page 5 of 8    JA092

# Offender Sentence History

| Previous Period of Supervision Record |
|---|

| | |
|---|---|
| **Sentence Number:** 08-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK |
| **Punishment Type:** INTERMEDIATE SS | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 07-001 | 04001799 | MISD B&E (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001799 | LARCENY (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |

| | |
|---|---|
| **Sentence Number:** 07-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK |
| **Punishment Type:** INTERMEDIATE SS | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 06-001 | 04001798 | MISD B&E (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001798 | LARCENY (PRINCIPAL) | 06/10/2004 | FELON | CLASS H |

| | |
|---|---|
| **Sentence Number:** 06-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 04/18/2005 | **County Of Conviction:** POLK |
| **Punishment Type:** INTERMEDIATE SS | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 05-001 | 04001797 | MISD B&E (PRINCIPAL) | 06/24/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001797 | LARCENY (PRINCIPAL) | 06/24/2004 | FELON | CLASS H |

*Report Name: Offender Information*

Case 5:21-ct-03157-D   Document 84-2   Filed 01/26/24   Page 6 of 8

JA093

**Sentence Number:** 05-001
**Conviction Date:** 04/18/2005
**Punishment Type:** INTERMEDIATE SS
**Sentence Type 1:** PROBATION
**Sentence Type 2:** SUSPENDED SENTENCE
**Sentence Type 3:** DEPT OF CORR DIV OF PRISONS

**Commitment Type:** PROBATION/PAROLE
**County Of Conviction:** POLK

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 01-001 | 04001796 | MISD B&E (PRINCIPAL) | 06/12/2004 | FELON | CLASS H |
| CONSOLIDATED FOR JUDGMENT | 04001796 | LARCENY (PRINCIPAL) | 06/12/2004 | FELON | CLASS H |

**Sentence Number:** 04-001
**Conviction Date:** 02/09/2005
**Punishment Type:** COMMUNITY SS (DCC)
**Sentence Type 1:** PROBATION
**Sentence Type 2:** SUSPENDED SENTENCE
**Sentence Type 3:** COUNTY JAIL

**Commitment Type:** PROBATION/PAROLE
**County Of Conviction:** POLK

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 01-001 | 04001998 | DRIVING < 21 CONSUME CONTR SUB (PRINCIPAL) | 11/18/2004 | MISD. | CLASS 2 MISDEMEANOR SS |

**Sentence Number:** 03-001
**Conviction Date:** 02/09/2005
**Punishment Type:** COMMUNITY SS (DCC)
**Sentence Type 1:** PROBATION
**Sentence Type 2:** SUSPENDED SENTENCE
**Sentence Type 3:** COUNTY JAIL

**Commitment Type:** PROBATION/PAROLE
**County Of Conviction:** POLK

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 01-001 | 04051115 | SPEEDING ELUDE ARREST OR/ATTEM (PRINCIPAL) | 11/18/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001841 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 10/29/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04051087 | DAMAGE TO PROPERTY (PRINCIPAL) | 11/08/2004 | MISD. | CLASS 1 MISDEMEANOR |

*Report Name: Offender Information*

Case 5:21-ct-03157-D   Document 84-2   Filed 01/26/24   Page 7 of 8

JA094

# Offender Sentence History

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| | | | | | SS |

**Sentence Number:** 02-001  
**Conviction Date:** 09/01/2004  
**Punishment Type:** COMMUNITY SS (DCC)  
**Sentence Type 1:** PROBATION  
**Sentence Type 2:** SUSPENDED SENTENCE  
**Sentence Type 3:** COUNTY JAIL

**Commitment Type:** PROBATION/PAROLE  
**County Of Conviction:** POLK

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 01-001 | 04050502 | LARCENY (PRINCIPAL) | 06/26/2004 | MISD. | CLASS 1 MISDEMEANOR SS |

**Sentence Number:** 01-001  
**Conviction Date:** 09/01/2004  
**Punishment Type:** COMMUNITY SS (DCC)  
**Sentence Type 1:** PROBATION  
**Sentence Type 2:** SUSPENDED SENTENCE  
**Sentence Type 3:** COUNTY JAIL

**Commitment Type:** PROBATION/PAROLE  
**County Of Conviction:** POLK

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 04050501 | MISD B&E (PRINCIPAL) | 06/26/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001087 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 07/10/2004 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 04001088 | POSSESS WITS SCHEDULE VI (PRINCIPAL) | 07/10/2004 | MISD. | CLASS 3 MISDEMEANOR SS |

Offender Search    Escapes/Captures    Absconders    Inmate Releases    Downloads    

Back To Offender Information

**Offender Infractions**

**Offender Number: 0850640    Offender Name: BRANDON C CASE**

| Infraction Date | Infraction Type |
|---|---|
| 10/18/2023 | DISOBEY ORDER |
| 07/02/2023 | SUBSTANCE POSSESSION |
| 04/02/2023 | DISOBEY ORDER |
| 04/02/2023 | HIGH RISK ACT |
| 04/02/2023 | SUBSTANCE POSSESSION |
| 03/13/2023 | DISOBEY ORDER |
| 07/09/2022 | BARTER/TRADE/LOAN MONEY |
| 06/16/2022 | HIGH RISK ACT |
| 12/03/2021 | SUBSTANCE POSSESSION |
| 10/27/2021 | ATTEMPT CLASS A OFFENSE |
| 12/12/2019 | SUBSTANCE POSSESSION |
| 12/12/2019 | DISOBEY ORDER |
| 05/31/2019 | INVOLVEMENT W/GANG OR SRG |
| 05/31/2019 | DISOBEY ORDER |
| 05/31/2019 | FIGHT W/WEAPON OR REQ.OUT.MED |
| 02/03/2019 | DISOBEY ORDER |
| 08/03/2018 | DISOBEY ORDER |
| 08/03/2018 | INVOLVEMENT W/GANG OR SRG |
| 08/03/2018 | SUBSTANCE POSSESSION |

| 07/25/2018 | SUBSTANCE POSSESSION |
| 07/22/2018 | SELL/MISUSE MEDICATION |
| 10/31/2017 | DISOBEY ORDER |
| 10/31/2017 | PROFANE LANGUAGE |
| 06/20/2017 | SUBSTANCE POSSESSION |
| 08/07/2016 | HIGH RISK ACT |
| 08/07/2016 | WEAPON POSSESSION |
| 04/15/2016 | ATTEMPT CLASS B OFFENSE |
| 04/14/2016 | WEAPON POSSESSION |
| 04/14/2016 | HIGH RISK ACT |
| 12/22/2015 | MISUSE/UNAUTH-USE PHONE/MAIL |



**Privacy Policy    Disclaimer    Contact Us    Help Using This Site**
**© 2012 North Carolina Department Of Adult Correction. All rights reserved.**



| | |
|---|---|
| Chapter: | O |
| Section: | .0500 |
| Title: | **Safekeepers** |
| Issue Date: | 11/06/17 |
| Supersedes: | 05/04/17 |

**State of North Carolina**
**Department of Public Safety**
**Prisons**

**POLICY & PROCEDURES**

**.0501  SCOPE AND DEFINITIONS**

(a)  The purpose of this policy is to establish guidelines for the Prisons to cooperate with county jails to assist with the housing of prisoners when necessary for safety and security reasons and to comply with the General Statutes through the safekeeper program.

(b)  The following definitions apply whenever these terms are used:

    (1)  Safekeeper - A prisoner held in any county jail who: poses a serious escape risk; exhibits violently aggressive behavior that cannot be contained and warrants a higher level of supervision; needs to be protected from other prisoners and the county jail facility cannot provide such protection; is a female or a person 18 years of age or younger and the county jail facility does not have adequate housing for such prisoners; is in custody at a time when a fire or other catastrophic event has caused the county jail facility to cease or curtail operations; otherwise poses an imminent danger to the staff of the county jail facility or to other prisoners in the facility or to other prisoners in the facility; or requires medical or mental health treatment.

    (2)  Offender Population Unified System (OPUS) - The approved computerized system for the Department of Public Safety.

    (3)  Automated Jail Transportation Files - Computerized OPUS screens for scheduling new admissions in the Prisons.

    (4)  Scheduling Authority - Authority designated by the Director of Prisons to the Assistant Director for Auxiliary Services to oversee admission scheduling functions.

    (5)  Offender Assignment System - Computerized OPUS screens for classifying, managing and tracking offenders' progress through the Prisons. This includes custody, security, job/program activities, housing and status assignments.

**.0502  GENERAL PROVISIONS AND NOTIFICATION**

(a)  Admission Authority

    (1)  During normal working hours, jail authorities schedule safekeepers by calling the Prisons' transfer offices.  Admission scheduling is accomplished through the automated jail transportation files of OPUS utilized by these offices. Safekeepers

are routinely accepted if the safekeeper count is less than the statutory limit of two hundred (200). Receiving units are notified of scheduled admissions via OPUS screens. The transfer staff may contact the Prisons Administration Medical or Mental Health services staff for recommendation on the appropriate admission site to meet the reported medical or mental health needs.

(2)     During non-working hours, jail authorities schedule safekeepers by calling the Randall Building security officer.

    (A)     If the safekeeper count is two hundred (200) or less, the security officer contacts the receiving unit's officer-in-charge and provides the safekeeper count. The request for admission is routinely authorized if the statewide count is less than the statutory limit.

    (B)     If the total safekeeper count exceeds two hundred (200), the security officer contacts the Prisons Administration duty officer for authorization to accept.

    (C)     The security officer completes the required OPUS screens for all safekeepers scheduled after normal working hours and prints one copy for Transfer Branch staff to review on the next scheduled work day.

(3)     When the safekeeper count reaches the statutory limit of two hundred (200), further safekeeper admissions are authorized only by the Secretary of Public Safety, or his designee, on a case-by-case basis according to the following criteria:

    (A)     The acceptance of safekeepers beyond the statutory limit must be authorized by the Secretary of Public Safety, or his designee, and is limited to acute medical or mental health cases or extraordinary situations where specialized confinement space is not available in local facilities.

    (B)     Requests which fall into the medical and mental health categories are evaluated by the Population Manager or Assistant Director for Auxiliary Services during normal working hours and the Prisons Administration duty officer during nights, weekends and holidays. Additional evaluation by medical or mental health professionals may be required at Central Prison or NCCIW prior to making a decision. Decisions will be made in a timely manner by the reviewing authority. Admission is approved only if it is determined that these cases are valid emergencies based upon the information provided.

    (C)     Local sheriffs shall be requested to exchange safekeepers previously accepted who do not meet the emergency criteria in order to accommodate acceptance as described in paragraphs (A) and (B) above. Release instructions shall be in accordance with C.1608.

Case 5:21-ct-03157-D   Document 84-4   Filed 01/26/24   Page 2 of 8

**JA099**

(4)     The jail is informed if denial of safekeepers is necessary.   Form DC-116 is completed to document the denial.

## .0503   ADMISSION PROCEDURES

(a)     The facilities designated in C.1605 to receive safekeepers will perform the admission processing functions on OPUS as established in the Diagnostic Center Procedure Manual (DCPM).

(b)     Safekeepers will be transported by jail authorities to a Prisons facility. To be accepted, all safekeepers must have an order signed by a superior or district court judge.  When, due to an emergency and it is not feasible to obtain an order signed by a superior or district court judge prior to the transfer, the sheriff is authorized to sign the order and shall, as soon as possible after the emergency, obtain the order signed by the judge.

(c)     Arrival at the designated facility will be documented through the OPUS arrival confirmation files.  Upon admission, intake procedures which include identification, criminal history investigation (DCI), local orientation, and health screening will be conducted.

## .0504   CONDITIONS OF CONFINEMENT

For safekeepers, conditions of confinement must be met as established in C.1200. Additionally,

(a)     Safekeepers must be housed separately from general population offenders, except when admission to a medical or mental health unit is required, or when the offender is convicted on other unrelated charges and has been committed to the Department of Public Safety.

(b)     Safekeepers will normally be transported to and from prison facilities and county jails by the sending sheriff.  However, transportation within the Prisons will be provided by prison staff.  When transporting safekeepers, the same security precautions will be exercised as when transporting convicted offenders.

(c)     Safekeepers shall be required to maintain their living areas in a neat, clean, and sanitary manner.  This includes all tasks necessary to maintain a suitable living environment. This requirement is restricted to their sleeping, dayroom, and bathing areas only. Safekeepers are generally not convicted offenders and, therefore, cannot be required to perform other work assignments.

(d)     Safekeepers will not participate in program activities with the general prison population, except as authorized in .1604 (a).  However, they will be provided controlled  access  to Chaplaincy, library, certain special education services for those under the age of 21, and

Case 5:21-ct-03157-D    Document 84-4    Filed 01/26/24    Page 3 of 8

JA100

recreation, consistent with C .1200.  Safekeepers are not eligible for sentence reduction credits.

(e)        Safekeepers shall have access to the Administrative Remedy Procedure the same as convicted offenders and their grievances will be managed through this procedure.

(f)        Safekeepers shall be expected to follow the rules and regulations common to all offenders.  The disciplinary procedures used for offenders are applicable to safekeepers. Safekeepers are subject to the same disciplinary sanctions as general population offenders, except the loss of sentence reduction credits.

(g)        Safekeepers will be provided non-contact visits consistent with C .1215.b.  Safekeeper visiting will be separate from the convicted offenders.

(h)        Safekeeper telephone calls will be consistent with D .0803(b)(3)(B), which controls offender access to telephone privileges.

(i)        Male felon safekeepers will be clothed in a gold color jumpsuit and male misdemeanant safekeepers will be clothed in a green color jumpsuit.  Female safekeepers will be clothed in a yellow color dress for identification purposes.

(j)        Upon completion of initial processing, safekeepers will be assigned to case managers who will monitor their activities through regular contacts.  Case managers will also review the safekeeper files regularly to keep abreast of any housing or custodial changes that may occur.

(k)        Safekeepers shall be provided access to needed medical, dental and mental health services as determined by a qualified medical, dental or mental health professional. Safekeepers will be exempt from medical co-pay.

## .0505  DESIGNATION OF PRISON FACILITIES

(a)        The Director of Prisons will designate authorized facilities for admission and housing safekeepers.  Safekeepers are housed apart from the general population except as noted below when inpatient medical and mental health services are required.

(1)        Central Prison shall receive all adult male safekeepers committed from the courts requiring immediate medical or mental health care.

(2)        North Carolina Correctional Institution for Women shall receive and house all female safekeepers committed for safekeeping.

(3)        Central Prison is designated to receive and house male safekeepers, ages 22 and above.

JA101

(4)    Foothills Correctional Institution shall receive and house male youthful offenders eighteen (18) years of age and under committed for safekeeping.

(5)    Polk Correctional Institution shall receive male youthful offenders, aged-nineteen (19) through twenty-one (21) charged with felony offenses and committed for safekeeping.

(b)    Safekeepers may be housed with convicted offenders at an inpatient prison medical or mental health unit when such is required to provide services deemed necessary by a health care clinician. Inpatient treatment units designated for safekeepers are as follows:

Mental Health:    Central Prison Mental Health Unit
                           NCCIW Mental Health Unit

Medical:             Central Prison Medical Unit
                           NCCIW Medical Infirmary

## .0506 ASSIGNMENT AND TRANSFER

(a)    Following completion of admission processing procedures, safekeepers will be assigned to appropriate prison facilities designated by the Director of Prisons as providing housing and services for the management of safekeepers.

(b)    Following a safekeeper's assignment to a designated facility, the safekeeper will remain at that facility until recalled by the court, unless:

(1)    the safekeeper requires medical services not available at the designated facility; or

(2)    the safekeeper's behavior has deteriorated to the point that the staff at the designated facility feels more security is needed.

(c)    Safekeepers requiring medical services shall be transported to Central Prison. Safekeepers with emergency medical needs shall be sent to the nearest medical provider as deemed appropriate by the designated facility's medical staff. Safekeepers requiring additional security shall be referred to the Director's Classification Committee (DCC) for appropriate assignment.

(d)    All transfers of safekeepers for non-medical concerns shall be coordinated through the Population Management Section of the Prisons.

(1)    Safekeeper Management Authority

(A)    The designated facility authority is responsible for coordinating and directing the assignment of safekeepers.

Case 5:21-ct-03157-D   Document 84-4   Filed 01/26/24   Page 5 of 8

JA102

(B)     Facility assignment will be made following record reviews of pending charges, history of predatory behavior, criminal history, physical and mental health status, and any other relevant information provided by the jail and documented on the OR60 screens or as might otherwise be made available to the record.

(C)     All classification actions for safekeepers will be documented using the appropriate OPUS files.

(D)     The following will be general criteria for housing:

        (i)     Male safekeepers requiring inpatient medical, or mental health treatment, regardless of crime categorization, will generally be housed at Central Prison.  This may include inmates under twenty-two (22) years of age if inpatient treatment is needed.  Inmates identified as pending trial for capital cases, or identified as substantial security or escape risk will be housed at Central Prison.

        (ii)    Central Prison will generally house adult males twenty-two (22) years of age and above committed for safekeeping.

        (iii)   Female safekeepers will be housed at the North Carolina Correctional Institution for Women; and

        (iv)    Male safekeepers eighteen (18) years of age and under will be housed at Foothills Correctional Institution.

        (v)     Male safekeepers, ages 19-21, awaiting trial for offenses categorized as felon, will be housed at Polk Correctional Institution.

(E)     In those cases where safekeepers are transferred to another facility, the sending facility shall notify the committing county of the transfer.

## .0507  USE OF FORCE

The Prisons use of force policy applies to safekeepers under the supervision of Prisons.

## .0508  RELEASE

(a)     A copy of the safekeeper release form is required for the release of a safekeeper.  The receiving officer shall be required to sign this document, which will be retained by the Prisons.

Case 5:21-ct-03157-D   Document 84-4   Filed 01/26/24   Page 6 of 8
JA103

(b)     Safekeepers are released only to law enforcement officers who present appropriate identification. Generally, these officers will represent the county issuing the safekeeping order. Upon receipt of written authorization from the committing county, the safekeeper may be released to officers from another jurisdiction upon presentation of identification.

(c)     Transportation to and from the local confinement facility is provided by jail authorities.

(d)     The Secretary, or his designee, may refuse to accept any safekeeper and may return any safekeeper transferred under a safekeeping order when the statutory limit is reached. The Secretary, or designee, may, when the statutory limit is reached, require the sheriffs to take custody of any safekeeper in order to accommodate an emergency request.

(e)     When a safekeeper is housed in the Department of Public Safety for medical, dental or mental health treatment and the treatment is complete, the facility officer-in-charge will notify the sending sheriff and request that the safekeeper be returned to the county jail.

(f)     Safekeeper's personal property will be handled consistent with F .0500, Inmate Personal Property, for regular population inmates. When a safekeeper is transferred from one facility to another or is returned to the county jail, his/her personal property will accompany them the same as any other transfer or release.

(g)     When safekeepers are released from the custody of the Prisons, records will be retained by the releasing facility for five (5) years.

## .0509   FISCAL

(a)     The Department of Public Safety Accounting Office bills the county jails for costs associated with housing safekeepers in the Prisons.

(b)     If a prisoner is transferred to a Prisons facility, the county from which the prisoner is transferred shall pay the Department of Public Safety for maintaining the prisoner for the time designated by the court at the per day, per offender rate at which the Department of Public Safety pays a local jail for maintaining a prisoner; provided, however, that a county is not required to reimburse the state for maintaining a prisoner who was a resident of another state or county at the time he/she committed the crime for which he is a safekeeper.

(c)     The Department of Public Safety will bill counties for the costs of extraordinary medical care incurred while the prisoner was in the custody of the Department. Extraordinary medical care is defined as:

     (1)     Medical expenses incurred as a result of providing health care to a prisoner as an inpatient (hospitalized);

Case 5:21-ct-03157-D   Document 84-4   Filed 01/26/24   Page 7 of 8
JA104

(2)     Other medical expenses when the total cost exceeds thirty-five dollars ($35.00) per occurrence or illness as a result of providing health care to a prisoner as an outpatient (non-hospitalized); and

(3)     Cost of replacement of eyeglasses and dental prosthetic devices if those eyeglasses or devices are broken while the prisoner is incarcerated, provided the prisoner was using the eyeglasses or devices at the time of his commitment and then only if prior written consent of the county is obtained by the Department.

(d)     Facilities that have been designated to house safekeepers shall process invoices for medical and mental health services in accordance with C.1609(c) and forward them to the Accounting Office in Raleigh for payment.  The DC-702 shall be completed by listing the appropriate charge code, safekeeper name and number, and the county to be billed.

**.0510  DEATH**

Once a safekeeper is pronounced as being deceased, the county Sheriff shall be immediately notified.

_____                    November 6, 2017_____

Director of Prisons                                                Date

O.0500_11_06_17.doc

Case 5:21-ct-03157-D   Document 84-4   Filed 01/26/24   Page 8 of 8
JA105



**KENNETH J KENNION**
**Offender ID:** 0981739
**Inmate Status:** POST RELEASE
**Probation/Parole/Post Release Status:** ACTIVE
**Gender:** MALE
**Race:** BLACK/AFRICAN AMERICAN
**Ethnic Group:** NOT HISPANIC/LATINO
**Birth Date:** 04/02/1989
**Age:** 34
**Probation/Parole Office:** DISTRICT 04 UNIT C

## Name(s) Of Record

| Last Name | Suffix | First Name | Middle Name | Name Type |
|-----------|--------|------------|-------------|-----------|
| KENNION | | JASON | KENNETH | COMMITTED |
| KENNION | | KENNETH | JASON | COMMITTED |

## Most Recent Incarceration Summary

| | |
|---|---|
| **Incarceration Status:** INACTIVE | **Total Incarceration Term:** 4 YEARS 10 MONTHS |
| **Conviction Date:** 01/22/2021 | **Projected Release Date:** 02/20/2023 |
| **Primary Crime:** AWDWISI (PRINCIPAL) | **Primary Crime Type:** FELON |
| **Special Characteristics:** REGULAR | **Current Status:** FELON |
| **Admission Date:** 02/11/2021 | **Admission Facility:** GRANVILLE CI |
| **Control Status:** REGULAR POPULATION | **Next Control Review:** UNKNOWN |
| **Custody Classification:** CLOSE | **Next Custody Review:** UNKNOWN |
| **Current Location:** DUPLIN COUNTY | **Previous Location:** MAURY C.I. |
| **Last Movement :** PAROLE/RETURN TO PAR | **Last Movement Date:** 02/20/2023 |
| | **Escapes?:** N |

## Offender Sentence History

| Most Recent Period of Incarceration Record | |
|---|---|
| **Sentence Number:** BF-001 | **Commitment Type:** INMATE |
| **Conviction Date:** 01/22/2021 | **County Of Conviction:** DUPLIN |
| **Service Status:** POST REL | **Sentence Begin Date:** 01/22/2021 |

Case 5:21-ct-03157-D   Document 84-5   Filed 01/26/24   Page 1 of 5

JA106

## Offender Sentence History

| | |
|---|---|
| **Sentence Status:** ACTIVE | **Actual Release Date:** 02/20/2023 |
| **Punishment Type:** POST RELEASE | **Projected Release Date:** 02/20/2023 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 3:** POST RELEASE SENTENCE | |
| **Minimum Term:** 3 YEARS 2 MONTHS | **Maximum Term:** 4 YEARS 10 MONTHS |
| **Parole Begin Date:** 02/20/2023 | **Parole End Date:** 02/20/2024 |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 19050874 | AWDWISI (PRINCIPAL) | 05/12/2019 | FELON | CLASS E |

### Most Recent Period of Supervision Record

| | |
|---|---|
| **Sentence Number:** 05-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 01/22/2021 | **County Of Conviction:** DUPLIN |
| **Punishment Type:** COMMUNITY SS (DCC) | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 4:** CONTINGENT PROBATION | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 18052158 | ASSAULT EMERGENCY PERSONNEL (PRINCIPAL) | 10/04/2018 | FELON | CLASS I |

### Previous Period of Supervision Record

| | |
|---|---|
| **Sentence Number:** 04-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 10/05/2017 | **County Of Conviction:** DUPLIN |
| **Punishment Type:** COMMUNITY SS (DCC) | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 17051501 | ASSAULT ON OFFICER/ST EMPLOYEE (PRINCIPAL) | 06/05/2017 | FELON | CLASS I |

**Report Name: Offender Information**

Case 5:21-ct-03157-D   Document 84-5   Filed 01/26/24   Page 2 of 5

# JA107

**Offender Sentence History**

| Previous Period of Incarceration Record |
|---|

| | |
|---|---|
| **Sentence Number:** BC-001 | **Commitment Type:** INMATE |
| **Conviction Date:** 08/01/2017 | **County Of Conviction:** DUPLIN |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 08/01/2017 |
| | **Actual Release Date:** 08/31/2017 |
| **Punishment Type:** DWI | **Projected Release Date:** 08/31/2017 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 2:** MISDEMEANOR CONFINEMENT PROG | |
| **Minimum Term:** 2 MONTHS | **Maximum Term:** 2 MONTHS |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 16051653 | DWI LEVEL 5 (PRINCIPAL) | 08/14/2016 | MISD. | NON CLASS CODE |

| Previous Period of Incarceration Record |
|---|

| | |
|---|---|
| **Sentence Number:** BA-001 | **Commitment Type:** INMATE |
| **Conviction Date:** 08/22/2013 | **County Of Conviction:** DUPLIN |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 08/22/2013 |
| | **Actual Release Date:** 11/03/2013 |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 11/03/2013 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Minimum Term:** | **Maximum Term:** 2 MONTHS 15 DAYS |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 12052755 | ASSAULT ON OFFICER/ST EMPLOYEE (PRINCIPAL) | 12/15/2012 | MISD. | CLASS A1 MISDEMEAN-OR SS |

| | |
|---|---|
| **Sentence Number:** BA-002 | **Commitment Type:** INMATE |
| **Conviction Date:** 08/22/2013 | **County Of Conviction:** DUPLIN |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 11/03/2013 |
| | **Actual Release Date:** 12/01/2013 |
| **Punishment Type:** ACTIVE SS | **Projected Release Date:** 12/01/2013 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Minimum Term:** | **Maximum Term:** 1 MONTH |

Case 5:21-ct-03157-D   Document 84-5   Filed 01/26/24   Page 3 of 5

JA108

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONSECUTIV TO SENTENCE NUMBER BA*001 | 12052756 | RESISTING OFFICER (PRINCIPAL) | 12/15/2012 | MISD. | CLASS 2 MISDEMEANOR SS |

| | |
|---|---|
| **Sentence Number:** BA-003 | **Commitment Type:** INMATE |
| **Conviction Date:** 02/25/2013 | **County Of Conviction:** DUPLIN |
| **Revocation Docket#:** 12052757 | **County Of Revocation:** DUPLIN |
| **Service Status:** EXPIRED | **Sentence Begin Date:** 08/28/2013 |
| | **Actual Release Date:** 11/26/2013 |
| **Punishment Type:** INTERMEDIATE SS | **Projected Release Date:** 11/26/2013 |
| **Sentence Type 1:** DEPT OF CORR DIV OF PRISONS | |
| **Sentence Type 2:** CRV/3M | |
| **Sentence Type 3:** PROBATION REVOCATION | |
| **Split Sentence Active Term:** 3 MONTHS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER BA*001 | 12052757 | TRAFFICKING SCHEDULE I (ATTEMPTED) | 12/15/2012 | FELON | CRV |
| CONSOLIDATED FOR JUDGMENT | 12052757 | POSSESS WITS SCHEDULE VI (PRINCIPAL) | 12/15/2012 | FELON | CLASS I |

| Previous Period of Supervision Record |
|---|

| | |
|---|---|
| **Sentence Number:** 03-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 02/25/2013 | **County Of Conviction:** DUPLIN |
| **Punishment Type:** COMMUNITY SS (DCC) | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** DEPT OF CORR DIV OF PRISONS | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 12052757 | TRAFFICKING SCHEDULE II (ATTEMPTED) | 12/15/2012 | FELON | CLASS F |
| CONSOLIDATED FOR JUDGMENT | 12052757 | DEL/SELL SCHEDULE VI (PRINCIPAL) | 12/15/2012 | FELON | CLASS I |

| Previous Period of Supervision Record |
|---|

| | |
|---|---|
| **Sentence Number:** 02-001 | **Commitment Type:** PROBATION/PAROLE |

Case 5:21-ct-03157-D   Document 84-5   Filed 01/26/24   Page 4 of 5

JA109

| | County Of Conviction: PITT |
|---|---|
| **Conviction Date:** 11/18/2009 | **County Of Conviction:** PITT |
| **Punishment Type:** INTERMEDIATE SS | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** COUNTY JAIL | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| CONCURRENT TO SENTENCE NUMBER 01-001 | 09058433 | ASSAULT ON FEMALE (PRINCIPAL) | 09/05/2009 | MISD. | CLASS A1 MISDEMEAN-OR SS |

| | |
|---|---|
| **Sentence Number:** 01-001 | **Commitment Type:** PROBATION/PAROLE |
| **Conviction Date:** 10/09/2008 | **County Of Conviction:** DUPLIN |
| **Punishment Type:** COMMUNITY SS (DCC) | |
| **Sentence Type 1:** PROBATION | |
| **Sentence Type 2:** SUSPENDED SENTENCE | |
| **Sentence Type 3:** COUNTY JAIL | |

| Commitment | Docket# | Offense (Qualifier) | Offense Date | Type | Sentencing Penalty Class Code |
|---|---|---|---|---|---|
| INITIAL | 08051909 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 11/11/2007 | MISD. | CLASS 1 MISDEMEANOR SS |
| CONSOLIDATED FOR JUDGMENT | 07004298 | DRUG PARA - USE/POSSESS (PRINCIPAL) | 11/11/2007 | MISD. | CLASS 1 MISDEMEANOR SS |

Case 5:21-ct-03157-D   Document 84-5   Filed 01/26/24   Page 5 of 5

JA110

# NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY

## Incident Report

February 19, 2020 09:11

**Incident No:** 3100-20-96

**Facility:** CENTRAL PRISON

**Investigating Officer:** WILKINS, SANTITA L.

**SRG Related:** No

**Law Enforcement:** LAW ENFORCEMENT NOT INVOLVED

**Incident Time:** 01/21/20 09:05 AM

**Reported By:** HINTON, LAQUETTA

**Reported By Time:** 01/21/20 09:05 AM

**Status:** UNDER INVESTIGATION

| Seq | Event Type | Time | Location |
|-----|-----------|------|----------|
| 10 | Assault | 01/21/20 09:05 AM | CORRIDOR 1D LOBBY |

### Investigator Comments

All reporting party statements have been read and verified. On 1/21/20 at
approximately 09:05 hours Correctional Officer L. Hinton walking towards
the stairwell behind BC1D when she observed safekeepers returning from
unit II gym from OC-2 entrance. She then observed inmate Brandon Case
#0850640 was coming down 2d/ 1D stairway. As safekeepers returned they
approached the stairwell at the same time inmate Case was walking down the
stairs. Inmate Case walked through the crowd of safekeepers when inmate
Kenneth Kennion #0981739 approached inmate Case and stuck him in the
facial area several times. Officer Beasley who was assigned to BC1D
control called a code 4 via radio. Inmate Case fell to the floor. Inmate
Case attempted to stand up and was struck again with a left hand and
Officer Hinton attempted to assist him to his feet and he crawled down the
hallway towards 1E. Officer Hinton then approached inmate Kennion and he
turned around and submitted to be restrained by placing his hands behind
his back. Officer Hinton then applied the restraints and directed all
other inmates to back up. Additional staff responded of Officers K.
Brummell, R. Smith, Sgts. L. Lee, and J. Jones. Inmate Case got up and
wondered down the hall towards 1E control during the confusion. Officer
Brumell and Sgt. Lee ordered all other noninvolved inmates to return to
their housing location. Sgt. McCarty heard the call and responded noticed
inmate Case standing halfway between 1D control booth and 1E control
booth. Sgt. McCarty and Officer Smith escorted inmate Case to the unit 2
nurses' station. Inmate Case was medically screened by Nurse Onuocha who
noted "Inmate Case, Brandon #0850640 was presented to the unit medical
office for medical treatment and restrictive housing screening. Inmate was
bleeding through is nostrils. No wound observed in any other parts of his
body. Inmate States "he punched me at my right side of the face and I did
not see it coming. My face is so painful". Cleansed inmate from blood
stains ands send him to urgent care for further evaluation and treatment.
Inmate is alert and oriented x4. Able to make needs known to staff. Denies
any respiratory distress. Gait is firm. Refused vital signs". Inmate Case
was sent to urgent care for further evaluation. In Urgent care inmate Case
was medically screened by nurse Upchurch who noted "offender Brandon Case

**JA111**

## Investigator Comments

was seen in urgent care for assessment and treatment after being
assaulted. Offender states, "I don?t know who did it. I got hit when I was
coming down the stairs." Offender assessed by medical staff. CT scan shows
several facial fractures. He is being sent to UNC for further evaluation
and higher level of care". Inmate Kennion was medically screened in unit 2
by nurse Onuoha who noted ?inmate Kennion, Kenneth #0981739 was presented
to unit medical office for restrictive housing screening. No bleeding,
bruising or wound observed. Treatment. Inmate is alert and oriented x4.
Able to make needs known to staff. Denies any respiratory distress. Gait
is firm. Refused vital signs. Inmate denies suicidal, homicidal ideation
and pain. Inmate is cleared. I spoke with inmate Case who was assaulted
and he provided the following statement "on 1/21/20 while returning to my
assigned housing unit, I was assaulted by Kenneth Kennion on the 1st
floor, unit 2 in front of d block. Kenneth Kennion is a pretrial detainee
housed as a safekeeper at CP this assault was a direct result of officer
Beasley and Officer Urieta's neglecting to secure hall and stairwell doors
to separate safekeepers and regular population inmates. Code was called
due to severity of my injuries I was transported to Duke medical for
emergency surgery for multiple facial fractures and breaks". I spoke with
inmate Kennion concerning this incident and informed him of his rights in
regards to the disciplinary process. Inmate Kennion stated that he
understood his rights and signed the DC-138a and received his yellow copy.
Inmate Kennion was given the opportunity to make a written statement on
his behalf, which he stated "The reason that I was involved in this
altercation was because Brandon Case poured piss on my trap prior to me
getting into a fight with him. Sgt. Hoover was the officer who gave me
cleaning supplies to clean it up". Kennion did request to have statements
gathered on his behalf but failed to list from who. He did request live
witnesses to be present at the hearing but failed to list who he wanted.
Inmate Kennion did he request to have physical evidence at the hearing but
failed to list what type of evidence. He also requested staff assistance.
It is the recommendation of this investigator that inmate Kennion charged
with articles A-04 of the classification of offense. Sgt. Hoover provided
a statement to this investigator in which he stated "I have no knowledge
of the incident or any of the allegations made by Kenneth Kennion
#0981739". Inmate Case responded to inmate Kennion allegations and stated
"Based upon the allegations that Kenneth Kennion has made pertaining to
the unprovoked assault of me on unit 2, I can state that at no time have I
ever ?poured piss on his trap" or any other liquids for that matter.
Kenneth Kennion is a safe keeper, which means we are not housed together
so me provoking this assault is entirely impossible". Photos of both
inmates are attached. Video evidence was reviewed by this investigator and
inmate Case was coming down 2d/1d stairwell, when he reached the bottom
landing inmate Kennion approached him and punched him multiple times in
the facial area. Inmate Case fell to the floor holding his face. A code
was called and additional staff responded. Inmate Kennion put his hands in

## Investigator Comments

the air and turn around to be restrained.

### Participants

| Name | Type | Title | Additional Information |
|---|---|---|---|
| CASE, BRANDON (0850640) | OFFENDER | | Participant was Assaulted |
| | | | Participant was Injured |
| STG Inmate | | | |
| KENNION, KENNETH (0981739) | OFFENDER | | |
| ABUHASSAN, AHMED A. (AAA05) | STAFF | NURSE SUPERVISOR I | |
| BEASLEY, BRANDON A. (BBA26) | STAFF | CORR OFFICER III | |
| BRUMELL-SAMUELS, KASSEY M. (BKM44) | STAFF | CORR OFFICER III | |
| HINTON, LAQUETTA (HLX47) | STAFF | CORR OFFICER III | |
| JONES, JOHNNIE A. (JAJ09) | STAFF | CORR SERGEANT III | |
| LEE, LORRAINE M. (MLX36) | STAFF | CORR SERGEANT III | |
| MCCARTY, JESSIE J. (MJJ31) | STAFF | CORR SERGEANT III | |
| ONUOHA, IKECHI M. (OIM01) | STAFF | REGISTERED NURSE | |
| SMITH, RICHARD A. (SRA70) | STAFF | CORR OFFICER III | |
| UPCHURCH, PATTIE R (CPR09) | STAFF | CHARGE NURSE | |
| URIETA, ERIC (UEX03) | STAFF | CORR OFFICER III | |

### Notifications

| Notification | Who was Notified | Date / Time |
|---|---|---|
| OFFICER IN CHARGE ( 13 ) | LT. MURRAY | 01/21/20 10:43 AM |

## Medical Comments

Inmate Brandon Case was seen by unit two medical staff. Inmate Case was
assessed by nurse Ikechi Onouha, Nurse Onouha  states the inmate Case was
bleeding through his nostrils, No wound observed in any other part of his
body. He states that inmate Case stated, "He punched me at my right side
of the face and I did not see it coming. my face is so painful." He states
he cleansed the inmate from blood stains and send him to Urgent Care for
further evaluation.   and treatment. He noted inmate alert and orientated
X4. He states he is able to make needs known to staff, denies respiratory
distress. He notes inmate Case denied vital signs to be checked. Inmate
Case was seen in Urgent care by nurse Upchurch. She notes that inmate Case
was seen in Urgent care for assessment and treatment after being
assaulted. He noted that inmate Case stated, :I don't know who did it, I
got hit when I was coming down the stairs." She noted inmate assessed by
medical staff, CT scan shows several facial fractures. Inmate Case was
sent to UNC hospital for further evaluation and a higher level of care.

Inmate Case ended up being sent to duke hospital to fix facial fractures.
Fractures repaired and he was sent back to CP urgent care.

Inmate Kenneth Kennion was seen by Nurse Onuoha and he noted no bleeding,
bruising or wound observed. He noted inmate alert and orientated x4 and
able to make needs known to staff, denies any respiratory distress. Gait
is firm and refused vital signs. Inmates was cleared for restrictive
housing.

**Reviewing Auth:**

**Superintendent:**

**Regional Director:**

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☑  Offender ☐  Other ☐ Name: LAQUETTA HINTON _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID)  CORRECTIONAL OFFICER III  (HLX49)

Name and OPUS Number of Accused Offender(s):  BRANDON CASE #0850640/KENNETH KENNION #0981739

Name of Person Obtaining statement: _Scintita     Wilkins_

Date: _2/7/20_                    Time: _7:36_

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes   ☐ No. If yes, list names: _____

_____

I request live witness(es) be present at my hearing: ☐ Yes   ☐ No. If yes, list names: _____

_____

I request physical evidence be reviewed at my hearing: ☐ Yes   ☐ No

I request staff assistance at my hearing: ☐ Yes   ☐ No                    Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1/21/2020 at approximately 0905 I was walking towards the stairwell behind BC-1D when I observed the SafeKeepers returning from the Unit II gym from OC-2 entrance. I then observed Offender Brandon Case # 0850640 walking through the lower back door of BC-1D.  As the Safekeepers returned they approached the stairwell at the same time offender Case was walking down the stairs. Offender Case walked through the crowd of Safekeepers offender Kenneth Kennion #0981739 approached him and hit him with a right and left combination of punches to the facial area.  Offender Case fell to the floor. Offender Case attempted to stand up and was struck again with left hand and I attempted to assist him to his feet and he crawled away down the hallway towards 1-E. I then approached Offender Kennion and he turned around and submitted to be restrained by placing his hands behind his back. I then applied mechanical restraints. I then directed the remaining safekeepers to "back up".  Additional staff arrived and secured the area. I then escorted offender Kennion to the 1st floor holding cells to await medical screening. No further incident occured.

_____

_____

_____

_____

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _Laquetta Hinton_                Date _2/7/20_ Time _5:00pm_

DC-138B
Rev. 1/18

## STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other ☐ Name: Brandon Beasley NCDPS: (Offender Only)

Position or Title of Witness: (Staff Only- Include Staff ID) Correctional Officer #BBA 26

Name and OPUS Number of Accused Offender(s): Kenneth Kennion # 0981739

Name of Person obtaining statement: Santita Wilkins    Brandon Case #0850640

Date: 1/21/20    Time: 7:00 pm

### FOR ACCUSED OFFENDER USE ONLY:

I request written statements be gathered in my behalf: ☐ Yes    ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes    ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes    ☐ No

I request staff assistance at my hearing: ☐ Yes    ☐ No        Offender Initials _____

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1-21-20 at approximately 9:05a.m, I
Officer Brandon Beasley was in Bct 1D. I never
recall hearing VIA Radio the safekeeper's
returning from recreation, I would have
secured the population Inmate behind the door.
I witnessed safekeeper Kenneth Kennion #
0981739 strike Brandon Case #0850640 several
times in the facial area. I immediately called
for a code 4 for behind 1-D.

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____    Date 1-21-20 Time 6:02p.m

# STATEMENT BY WITNESS

Staff ☑ Inmate ☐ Other ☐ Name: _P. Urute_     NCDOC: (Inmate Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) _Correctional Officer III Urute03_

Name and OPUS Number of Accused Inmate(s): _Brandon Case (0850640)_

Name of Person Obtaining statement: _Sandra Willems_

Date: _1/22/20_      Time: _naa_

---

**FOR ACCUSED INMATE USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes    ☐ No. If yes, list names: _____

_____

I request live witness(es) be present at my hearing: ☐ Yes    ☐ No. If yes, list names: _____

_____

I request physical evidence be reviewed at my hearing: ☐ Yes    ☐ No

I request staff assistance at my hearing: ☐ Yes    ☐ No      Inmate Initials _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1/21/2020 at approximately 905am I officer P. Urute was in the restroom behind 1D control station. I heard a commotion and step out the restroom. As I came out I saw inmate Brandon Case (0850640) walking away toward BC/E station. I then helped direct safekeepers back to their blocks.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _Urute_      Date _1/21/2020_ Time _11am_

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Kassey Brumell          NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID): COIII (BKM44)

Name and OPUS Number of Accused Offender(s): _____

Name of Person Obtaining statement: Sentile Wilkins

Date: 1/21/20          Time: 7:00 pm

## FOR ACCUSED OFFENDER USE ONLY:

I Request written statements be gathered in my behalf: ☐ Yes   ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes   ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes   ☐ No

I request staff assistance at my hearing: ☐ Yes   ☐ No          Offender Initials: _____

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

At approximately 0905 on 01/21/2020. I heard a code 4 called by officer Hinton (H1X47) as I was escorting the remainding offenders back in the unit from recreation. When I arrived to ID control booth, the only signs of a fight I seen was blood splattered on the ground. I immediately directed all remaining safe keepers to go return to their blocks using 1E back door.

nothing follows

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness K Brumell          Date 1/21/20 Time 6:06pm

DC-138B
Rev. 1/18

## STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: JOHNNIE JONES _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID)    CORRECTIONAL SERGEANT III    (JAJ09) _____

Name and OPUS Number of Accused Offender(s):    BRANDON CASE #085064/KENNETH KENNION #0981739

Name of Person Obtaining statement: _Sandita Wilkins_____

Date: _1/22/20_____    Time: _1110_____

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes    ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes    ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes    ☐ No

I request staff assistance at my hearing: ☐ Yes    ☐ No    Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

ON 01/21/2020 AT APPROXIMATELY 0905HOURS RESPONDED THE LOBBY AREA OF BC-1D DUE TO A CODE FOUR CALLED BY OFFICER BRANDON BEASLEY. WHEN I ARRIVED I OBSERVED OFFICER LAQUETTA HINTON PLACING OFFENDER KENNETH KENNION# 0981739 IN MECHANICAL RESTRAINTS. I WAS ALERTED THAT AN ALTERCATION HAD TAKEN PLACE. I SCANNED THE HALLWAY AND WALKED TOWRDS BC-1E AND NOTICED OFFENDER BRANDON CASE # 0850640 STANDING BEHIND A VENTILATION PIPE BLEEDING FROM THE FACIAL AREA. OFFICER BEASLEY ALONG WITH MYSELF AND SERGEANT McCARTY ESCORTED OFFENDER CASE TO THE UNIT II NURSES STATION TO ASSESS HIS INJURIES. NO FURTHER INCIDENT OCCURED.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____    Date _1/21/2020_ Time _1100_

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: **Richard Smith**  NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) **Correctional Officer II**

Name and OPUS Number of Accused Offender(s): **Brandon Case (0850640) Kenneth Keelons (0981739)**

Name of Person Obtaining statement: **Santita Wilkins**

Date: **1/21/20**  Time: **300 pm**

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes  ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes  ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes  ☐ No

I request staff assistance at my hearing: ☐ Yes  ☐ No  Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1/21/20 at approximately 9:05 am I ~~witnessed~~ Correctional Officer Richard Smith witnessed Offender Kenneth Keelons (0981739) Physically Assulted Offender Brandon Case (0850640) by punching him in the Head three times. I escorted offender Brandon Case to the Unit 2 Nurses station where he was Medically Screened.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____  Date 1/21/20 Time 2:55

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Lorraine Lee _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) _____ Correctional Sergeant III _____

Name and OPUS Number of Accused Offender(s): _____ Brandon Case 0850640 _____ Kenneth Kennion 0981739

Name of Person Obtaining statement: _____ Sandra Wilkins _____

Date: __2/3/20__  Time: __10 00 am__

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes  ☐ No. If yes, list names: _____

_____

I request live witness(es) be present at my hearing: ☐ Yes  ☐ No. If yes, list names: _____

_____

I request physical evidence be reviewed at my hearing: ☐ Yes  ☐ No

I request staff assistance at my hearing: ☐ Yes  ☐ No      Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On January 21, 2020 at approximately 9:05a.m., I Correctional Sergeant III responded to a code 4 that was call via radio. Upon my arrival the situation was under control. I assisted in securing the first floor with ordering all offenders to return to their cells. Offender Kenneth Kennion was placed in the holding cell located by 1D while Offender Brandon Case was escorted to the sergeant's office. No further incident to report.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____ Date 2/3/20 Time 9:50 am

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Jessie McCarty                    NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID)    SGT. III SRGO / MJJ31 _____

Name and OPUS Number of Accused Offender(s):    Brandon Case (0850640) / Kenneth Jason Kennion (0981739)

Name of Person Obtaining statement: _____ San tite Wilkins _____

Date: __ 1/31/20 __                    Time: __ 0800 __

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes    ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes    ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes    ☐ No

I request staff assistance at my hearing: ☐ Yes    ☐ No                    Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 012120 at approximately 0905 I, Correctional Sergeant III J. McCarty responded to a call for assistance to an assault on the first floor of Unit-2. On arriving to the first floor I noticed Inmate Brandon Case (0850640) standing half way between 1D control booth and 1E control booth along the wall. I took control by using the soft hand escort, and escorted Inmate Case to the Nurses station on the second floor behind 2D control booth. On arriving to the nurses station I turn Inmate Case over to Unit staff and exited the area.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____ Sgt. J. McCarty _____ Date 013120 Time 0800

## STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Ikechi Onuoha _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) ___Registered Nurse # OIM01_____

Name and OPUS Number of Accused Offender(s): ___Case, Brandon # 0850640_____

Name of Person Obtaining statement: Santite Wilkins

Date: ___1/22/20_____ Time: 11⁰⁰ am

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes ☐ No

I request staff assistance at my hearing: ☐ Yes ☐ No           Offender Initials: _____

---

(Note: This statement must give a factu al account of the ev ents witnessed. Of particular importance is inform ation as to what was observed, where and when it o ccurred, who was involv ed, names of other witnesses to the event, and if possible, any factual informati on re lative to possible reasons for the misconduct. )

On 01/21/2020 at about 0930 hours, Inmate case, Brandon #0850640 was prsented to the unit medical office for

medical treatment and restrictive housing screening. Inmate was bleeding through is nostrils. No wound observed

in any other parts of his body. Inmate states " He punched me at my right side of the face and I did not see it coming.

My face is so painful" Cleansed inmate from blood stains and send him to urgent care for further evaluation and

treatment. inmate is alert and oriented x 4. Able to make needs known to staff. Denies any respiratory distress.

Gait is firm. Refused vital signs.

_____

_____

_____

_____

_____

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____ Date 1/21/20 Time 1012

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Ikechi Onuoha _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) _____ Registered Nurse # OIM01 _____

Name and OPUS Number of Accused Offender(s): _____ Kennion, Kenneth #0981739 _____

Name of Person Obtaining statement: _____ Sartita Wilkins _____

Date: _____ 1/22/20 _____ Time: _____ 11:00 am _____

### FOR ACCUSED OFFENDER USE ONLY:

I Request written statements be gathered in my behalf: ☐ Yes ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes ☐ No

I request staff assistance at my hearing: ☐ Yes ☐ No       Offender Initials: _____

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 01/21/2020 at about 0940 hours, Inmate Kennion, Kenneth #0981739 was presented to the unit medical office for

restrictive housing screening. No bleeding, bruising or wound observed. treatment. inmate is alert and oriented x 4.

Able to make needs known to staff. Denies any respiratory distress. Gait is firm. Refused vital signs. Inmate

denies suicidal, homicidal ideation and pain. Inmate is cleared.

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____ Date 1/21/20 Time 1012

JA124

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other ☐ Name: Patty Upchurch     NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID)    RN Lead Nurse CPR 09

Name and OPUS Number of Accused Offender(s):    CASE, BRANDON C 0850640

Name of Person Obtaining statement:    Sanitta Wilkins

Date:    1/22/20      Time:    1105 am

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes    ☐ No. If yes, list names: _____

_____

I request live witness(es) be present at my hearing: ☐ Yes    ☐ No. If yes, list names: _____

_____

I request physical evidence be reviewed at my hearing: ☐ Yes    ☐ No

I request staff assistance at my hearing: ☐ Yes    ☐ No      Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

01-21-2020 at approximately 09:30 offender CASE, BRANDON C 0850640 was seen in Urgent Care for assessment and treatment after being assaulted. Offender states, "I don't know who did it. I got hit when I was coming down the stairs." Offender assessed by medical staff. CT scan shows several facial fractures. He is being sent to UNC for further evaluation and a higher level of care.

_____

_____

_____

_____

_____

_____

_____

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness: Patty Upchurch RN    Date 1-21-2020    Time 12:22

## STATEMENT BY WITNESS

Staff ☑ Inmate ☐ Other ☐ Name: Ahmadola (on Hassan) NCDPS: (Inmate Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) AAA 05

Name and OPUS Number of Accused Inmate(s): Branton, Case 0856640

Name of Person obtaining statement: Santita Wilkins

Date: 2/19/20    Time: 8:15 am

---

**FOR ACCUSED INMATE USE ONLY:**

I request written statements be gathered in my behalf: ☐ Yes   ☐ No. If yes, list names: _____

_____

I request live witness(es) be present at my hearing: ☐ Yes   ☐ No. If yes, list names: _____

_____

I request physical evidence be reviewed at my hearing: ☐ Yes   ☐ No

I request staff assistance at my hearing: ☐ Yes   ☐ No        Inmate Initials _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

on 1.21.20 around 0905 inmate complin
of facial trauma. Seen in Urgent Care. CT Scan was done
sent out to Dulce Hospital
was admitted to Plastic Surgery
to fix the facial fracture
treated, repair was done
and return to Urgent Care

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness Ahmadola Hassan   Date 2-19-2020   Time 8700

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☑ Offender ☐ Other☐ Name: Kyle T. Hoover _____ NCDOC: (Offender Only) _____

Position or Title of Witness: (Staff Only- Include Staff ID) _____ Correctional Sergeant III (HKT07) _____

Name and OPUS Number of Accused Offender(s): _____ Kenneth Kennion #0981739 _____

Name of Person Obtaining statement: _____ Samhte Wilkur _____

Date: ___2/7/20___ Time: ___2:10 pm___

<table>
<tr><td>

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes ☐ No

I request staff assistance at my hearing: ☐ Yes ☐ No      Offender Initials: _____

</td></tr>
</table>

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

<u>I have no knowledge of the incident or any of the allegations made by inmate Kenneth Kennion #0981739.</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness ___Hoover___ _____ Date 2/7/20 Time 2:10 PM

**JA127**

DC-138B
Rev. 1/18

# STATEMENT BY WITNESS

Staff ☐ Offender ☐ Other ☐ Name: Brandon Case    NCDOC: (Offender Only) 0850640

Position or Title of Witness: (Staff Only- Include Staff ID) _____

Name and OPUS Number of Accused Offender(s): _____

Name of Person Obtaining statement: Santita Wilkins

Date: 2-6-20   2/6/20    Time: 13:40   1340

## FOR ACCUSED OFFENDER USE ONLY:

I Request written statements be gathered in my behalf: ☐ Yes   ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes   ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes   ☐ No

I request staff assistance at my hearing: ☐ Yes   ☐ No     Offender Initials: _____

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

On 1-21-20 While returning to my assigned housing unit, i was assaulted by Memith Mennion, on 1st floor, unit-2 in front of D-Block. Memith Mennion is a pretrial detainee housed as Safekeeper at C.P. This assault was a direct result of Officer Beasley and officer Urieta's neglecting to secure hall and stairwell doors to Seagrade Safekeepers and reg population inmates. Code was called, due to Severity of my injurys i was transpated to duke Medical for emergency surgery for Multiple facial fractures and breaks!

(Statement may be continued on an attached sheet.)

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _____    Date 2-6-20   Time 13:40

## STATEMENT BY WITNESS

Staff ☐ Offender ☑ Other ☐ Name: Kenneth Kennion    NCDOC: (Offender Only) 0981739

Position or Title of Witness: (Staff Only- Include Staff ID) _____

Name and OPUS Number of Accused Offender(s): Kenneth Kennion 0981739

Name of Person Obtaining statement: Scantta Wilkins

Date: 2/6/20    Time: 2:44 pm

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☑ Yes   ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☑ Yes   ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☑ Yes   ☐ No

I request staff assistance at my hearing ☑ Yes   ☐ No                Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

The reason that I was involved in this altercation
was because Bradon Case poured piss on my trap
prior to me getting into a fight with him. Sgt. Hoover
was the office who gave me cleaning supplies to clean
it up.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness: Kenneth Kennion    Date 2/6/20 Time 2:44

# STATEMENT BY WITNESS

Staff ☐ Offender ☑ Other☐ Name: _Brandon Case_  NCDOC: (Offender Only) _0850640_

Position or Title of Witness: (Staff Only- Include Staff ID) _____

Name and OPUS Number of Accused Offender(s): _____

Name of Person Obtaining statement: _Santita Wilkins_

Date: _2-7-20_  Time: _18:07_

---

**FOR ACCUSED OFFENDER USE ONLY:**

I Request written statements be gathered in my behalf: ☐ Yes  ☐ No. If yes, list names: _____

I request live witness(es) be present at my hearing: ☐ Yes  ☐ No. If yes, list names: _____

I request physical evidence be reviewed at my hearing: ☐ Yes  ☐ No

I request staff assistance at my hearing: ☐ Yes  ☐ No  Offender Initials: _____

---

(Note: This statement must give a factual account of the events witnessed. Of particular importance is information as to what was observed, where and when it occurred, who was involved, names of other witnesses to the event, and if possible, any factual information relative to possible reasons for the misconduct.)

Based upon the allegations that Kennith Kinion has made pertaining to the unprovoked assault of me on unit 2, i can state that at no time have i ever "poured piss on his trap" or any other liquids for that matter. Kennith Kinion is a Safekeeper, which means we are not housed together so me provoking this assault is entirely impossible.

(Statement may be continued on an attached sheet.)

---

I have read the above statement and affirm that it is based on personal observation of the events described and that it is, to the best of my knowledge, a true and accurate statement of fact.

Signature of witness _[signature]_  Date _2-7-20_ Time _18:07_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO. 5:21-CT-03157-D

BRANDON CASE,                          )
                                       )
                   Plaintiff,          )          **DECLARATION**
                                       )          **OF ERIC URIETA**
v.                                     )
                                       )
BRANDON BEASLEY, ERIC                  )
URIETA, KENNY CUSTODIO, and            )
UNKNOWN EMPLOYEES OF THE               )
STATE OF NORTH CAROLINA,               )

                   Defendants.

I, Eric Urieta, being competent to testify, and having personal knowledge of the matters herein, hereby state:

1.      I am an adult over the age of 18, have never been adjudged incompetent, suffer from no mental or emotional illness, and make this declaration of my own free will, stating facts of which I have personal knowledge.

2.      I have reviewed the Complaint filed by Plaintiff including any allegations he makes against me.

3.      During the relevant time, I was employed by the North Carolina Department of Public Safety as a Correctional Officer at Central Prison in Raleigh, North Carolina.

1

JA131

4. On January 21, 2020, I was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion.

5. On that day, prior to the incident I had been stationed in the downstairs control booth.

6. Just prior to the fight between inmate Brandon Case and Kenneth Kennion, I had to use the bathroom so I radioed my co-worker Correctional Officer Brandon Beasley to come take my place for a few minutes so I could go to the bathroom.

7. Brandon Beasley took my place in the downstairs control booth and I went into the bathroom.

8. While I was in the bathroom, the fight between inmate Brandon Case and Kenneth Kennion occurred. I did not see Kenneth Kennion punch Brandon Case because I was in the bathroom.

9. Before the fight, in no way did I know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion before in the incident occurred.

10. I generally knew of inmate Brandon Case beforehand because he was the janitor.

11. I did not know Kenneth Kennion and do not think I had ever seen him before.

12. Prior to the incident, I was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case.

2

**JA132**

13. I did not know and still do not know if Kenneth Kennion has a history of violence.

14. As soon as the incident occurred and the alarm was called, I left the bathroom and helped restore order among the inmates. I responded as quickly as possible once the incident occurred.

15. After using the bathroom and once the inmates were moving along their way, I went back into the downstairs control booth to relieve Brandon Beasley from the position.

16. I would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger.

FURTHER THE DECLARANT SAYETH NOT.

Pursuant to 28 U.S.C. § 1746(2), I verify under penalty of perjury that the foregoing Declaration is true and correct in substance and in fact to the best of my knowledge and belief.

Respectfully submitted this the 5th day of September, 2023.

Eric Urieta

JA133

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO.  5:21-CT-03157-D

BRANDON CASE,                          )
                                       )
                    Plaintiff,         )          **DECLARATION**
                                       )          **OF KENNY CUSTODIO**
v.                                     )
                                       )
BRANDON BEASLEY, ERIC                  )
URIETA, KENNY CUSTODIO, and            )
UNKNOWN EMPLOYEES OF THE               )
STATE OF NORTH CAROLINA,               )

                    Defendants.

I, Kenny Custodio, being competent to testify, and having personal knowledge of the matters herein, hereby state:

1.      I am an adult over the age of 18, have never been adjudged incompetent, suffer from no mental or emotional illness, and make this declaration of my own free will, stating facts of which I have personal knowledge.

2.      I have reviewed the Complaint filed by Plaintiff including any allegations he makes against me.

3.      During the relevant time, I was employed by the North Carolina Department of Public Safety as a Correctional Officer at Central Prison in Raleigh, North Carolina  but have now since left State Employment.

1

JA134

4. On January 21, 2020, I was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion.

5. On that day, I had been stationed in the upstairs control booth.

6. Before the fight occurred, inmates had been getting haircuts upstairs in the hallway outside of the sergeants office.

7. Because so many inmates were going up and down the stairs to get haircuts, the upstairs door to the stairwell was left open for a period of time.

8. Inmate Brandon Case got a haircut upstairs and went downstairs to go back to his cell when he apparently encountered Kenneth Kennion in the hallway coming back from recreation.

9. I did not see Kenneth Kennion punch Brandon Case because it occurred downstairs and I was upstairs in the control booth.

10. I did hear the alarm when the fight broke out.

11. Before the fight, in no way did I know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion.

12. I did not know and had no way of knowing that Kenneth Kennion would be walking in the downstairs hall at the exact time that Brandon Cas went down the stairs.

13. I generally knew of inmate Brandon Case beforehand because he was the janitor.

14. I did not know Kenneth Kennion and do not think I had ever seen him before.

2

JA135

15. Prior to the incident, I was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case.

16. I did not know and still do not know if Kenneth Kennion has a history of violence.

17. I do not know if Brandon Case has a history of violence.

18. I would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger.


FURTHER THE DECLARANT SAYETH NOT.


Pursuant to 28 U.S.C. § 1746(2), I verify under penalty of perjury that the foregoing Declaration is true and correct in substance and in fact to the best of my knowledge and belief.


Respectfully submitted this the 5th day of September, 2023.

*Kenny Custodio*

**Kenny Custodio**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO. 5:21-CT-03157-D

BRANDON CASE,                        )
                                     )
                    Plaintiff,       )          **DECLARATION**
                                     )          **OF BRANDON BEASLEY**
v.                                   )
                                     )
BRANDON BEASLEY, ERIC                )
URIETA, KENNY CUSTODIO, and          )
UNKNOWN EMPLOYEES OF THE             )
STATE OF NORTH CAROLINA,             )

                    Defendants.

I, Brandon Beasley, being competent to testify, and having personal knowledge of the matters herein, hereby state:

1.      I am an adult over the age of 18, have never been adjudged incompetent, suffer from no mental or emotional illness, and make this declaration of my own free will, stating facts of which I have personal knowledge.

2.      I have reviewed the Complaint filed by Plaintiff including any allegations he makes against me.

3.      During the relevant time, I was employed by the North Carolina Department of Public Safety as a correctional officer at Central Prison in Raleigh, North Carolina but have now since left State Employment.

1

JA137

4.      On January 21, 2020, I was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion.

5.      On that day, prior to the incident I had been stationed on downstairs patrol.

6.      Just prior to the fight between inmate Brandon Case and Kenneth Kennion, my co-worker Eric Urieta (stationed in the downstairs control booth) had to use the bathroom  and he radioed for someone to come take his place for a few minutes so he could go to the bathroom.

7.      I took his place in the downstairs control booth and Urieta went into the bathroom.

8.      Right when I got in the in the downstair control booth (and Eric Urieta was in the bathroom), Brandon Case walked down the stairs to the first floor.

9.      At the same time Kenneth Kennion was walking down the first floor hall when the fight occurred.

10.     I did not hear any radio call that Kenneth Kennion and his group were coming back from Recreation and walking down the downstairs hall. A radio call should have been made by the officers escorting Kenneth Kennion's group down the hall notifying other correctional officers that they were in the hall.

11.  Before the fight, in no way did I know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion before in the incident occurred.

**JA138**

12. I generally knew of inmate Brandon Case beforehand because he was the janitor. Because he was the janitor it was very common to see him walking around and coming up and down the stairs.

13. I did not know Kenneth Kennion and do not think I had ever seen him before.

14. Prior to the incident, I was not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case.

15. I did not know and still do not know if Kenneth Kennion has a history of violence.

16. As soon as the incident occurred and I saw Brandon Case get punched in the face by Kenneth Kennion, I called an alarm over the radio and several staff members rushed to the area and immediately took charge of the situation.

17. Prior to the incident occurring and when I relieved Urieta so he could go to the bathroom, I believe the door to the stairs was open because inmates were coming up and down the stairs for haircuts.

18. The incident occurred very shortly after I relieved Urieta and there were inmates banging on the back window and a lot was going on.

19. After Urieta used the bathroom and once the inmates were moving along their way after the incident, I was relieved from the downstairs control booth by Urieta so I could go back to my patrol position.

20. I would never do anything intentional that would have caused any harm to inmate Brandon Case to put him in danger.

3

JA139

FURTHER THE DECLARANT SAYETH NOT.

Pursuant to 28 U.S.C. § 1746(2), I verify under penalty of perjury that the foregoing Declaration is true and correct in substance and in fact to the best of my knowledge and belief.

Respectfully submitted this the 5th day of September, 2023.

Brandon Beasley

4

JA140

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO.  5:21-CT-03157-D

BRANDON CASE,                               )
                                            )
              Plaintiff,                    )    **DEFENDANTS' MOTION FOR**
                                            )    **EXTENSION OF TIME TO**
v.                                          )    **RESPOND TO PLAINTIFF'S**
                                            )    **SECOND MOTION FOR PARTIAL**
BRANDON BEASLEY, ERIC URIETA,               )    **SUMMARY JUDGMENT**
KENNY CUSTODIO, and UNKNOWN                 )
EMPLOYEES OF THE STATE OF                   )
NORTH CAROLINA,                             )
                                            )
              Defendants.                   )

NOW COME Defendants, Brandon Beasley, Eric Urieta, and Kenny Custodio ("Moving Defendants"), by and through undersigned counsel, and hereby move for an extension of time to respond to Plaintiff's Second Motion for Partial Summary Judgment until through and including March 18, 2024.  In support of this Motion, Moving Defendants state as follows:

1. Plaintiff, a state inmate, filed this action pursuant to 42 U.S.C § 1983 alleging that Moving Defendants failed to protect him from another inmate's assault.  [D.E. 1, 31]

2. On January 26, 2024, Plaintiff filed his Second Motion for Partial Summary Judgment, thus making a response thereto due on February 16, 2024.  [D.E. 78]

3. Also on January 26, 2024, Moving Defendants filed their Motion for Summary Judgment, thus making a response thereto due on February 16, 2024.  [D.E. 81]

4. On February 14, 2024, Plaintiff filed a Motion to Extend Summary Judgment Opposition Deadline, to which Moving Defendants consented.  [D.E. 86]

1

JA141

5. On February 15, 2024, the Court granted Plaintiff's Motion [86], thus making Plaintiff's response deadline March 18, 2024. [D.E. 87]

6. On February 16, 2024, previous counsel for Moving Defendants left the employ of the North Carolina Department of Justice ("NCDOJ").

7. On the first federal business day following Mr. Nichols' departure from NCDOJ, February 20, 2024, undersigned counsel filed his Notice of Substitution of Counsel on behalf of Moving Defendants. [D.E. 88]

**Grounds for Relief**

8. Rule 6(b) of the Federal Rules of Civil Procedure provides that "when an act may or must be done within a specified time, the court may, for good cause, extend the time...on motion made after the time has expired if the party failed to act because of excusable neglect." Whether neglect is excusable "is at bottom an equitable [determination], taking account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice to the [nonmoving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993).

9. In the weeks leading up to Mr. Nichols' departure from NCDOJ, he was required by his supervisor (that is, undersigned counsel) to complete a number of outstanding case-related tasks in a shorter-than-normal timeframe, as well as the typical administrative tasks associated with offboarding a NCDOJ employee.

2

JA142

10. These additional and hastened tasks resulted in Mr. Nichols' being unable to respond to Plaintiff's Second Partial Motion for Summary Judgment by the due date (and his departure date) of February 16, 2024.

11. These additional and hastened tasks also resulted in Mr. Nichols' failing to file the present Motion on or before February 16, 2024.

12. The delay in filing the present Motion was excusable in light of (i) Mr. Nichols' impending departure from NCDOJ and the tasks associated therewith, (ii) the present Motion being filed only one federal business day after the due date, (iii) the fact that Plaintiff's response deadline has already been extended to the date requested herein, namely, March 18, 2024 (which Mr. Nichols consented to), (iv) the fact that the proceedings will not be impacted by this request since Plaintiff's own response deadline has already been extended to March 18, 2024, and (v) the fact that Plaintiff will not be prejudiced by allowing Defendants to have the same response deadline as Plaintiff, given that all parties filed their summary judgment motions on the same date, January 26, 2024.

13. The length of this requested extension is based upon the fact that undersigned counsel will need to continue to perform two jobs, Section Head and line attorney, for an unknown number of weeks while he continues his protracted efforts to find, hire, and on-board experienced litigators into the Public Safety Section. In the last few months, four attorneys in the Public Safety Section, including Mr. Nichols, resigned.

14. The length of this requested extension is also based upon the fact that undersigned counsel has, among other deadlines, 18 dispositive motions currently due in the next 30 days, 17 responses to complaints due in the next 30 days, three sets of responses to

3

JA143

discovery requests due in the next 30 days, and one mediation in February, 2024.

15. Moving Defendants are filing this motion in good faith and not for any improper purpose.

16. Undersigned counsel emailed Plaintiff's counsel on February 18, 2024 to obtain Plaintiff's position on this Motion. On February 19, 2024, Plaintiff's counsel informed undersigned counsel that Plaintiff does not consent to this Motion.

WHEREFORE, for the reasons set forth above, and in the interests of justice, efficiency, and judicial economy, Moving Defendants respectfully request that the Court grant them an enlargement of time up to and including March 18, 2024 within which to respond to Plaintiff's Second Motion for Partial Summary Judgment.

This the 20th day of February, 2024.

**JOSHUA H. STEIN**
**Attorney General**

/s/ James B. Trachtman
James B. Trachtman
Special Deputy Attorney General
N.C. State Bar No. 22360
N.C. Department of Justice
Public Safety Section
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone:    (919) 716-6943
Facsimile:    (919) 716-6761
E-Mail:       jtrachtman@ncdoj.gov

4

JA144

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed this document with the Clerk of the

Court using the CM/ECF system, which will provide notice to counsel as follows:

Alison R. Leff, Esq.                          G. Christopher Olson
The Civil Rights Group, LLC                   Olson Law, PLLC
2045 W Grand Ave., Suite B, PMB 62448         514 Daniels Street, #136
Chicago, IL 60612                             Raleigh, NC 27605
*Attorneys for Plaintiff*                     *Attorneys for Plaintiff*

This the 20th day of February, 2024.

/s/ James B. Trachtman
James B. Trachtman
Special Deputy Attorney General

JA145

| | | |
|---|---|---|
| BRANDON CASE, | ) | |
| | ) | **MOTION TO DEEM** |
| Plaintiff, | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **EXTENSION OF TIME TO** |
| v. | ) | **RESPOND TO PLAINTIFF'S** |
| | ) | **SECOND MOTION FOR PARTIAL** |
| BRANDON BEASLEY, ERIC URIETA, | ) | **SUMMARY JUDGMENT** |
| KENNY CUSTODIO, and UNKNOWN | ) | **TIMELY FILED** |
| EMPLOYEES OF THE STATE OF | ) | |
| NORTH CAROLINA, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME Defendants, Brandon Beasley, Eric Urieta, and Kenny Custodio ("Moving Defendants"), by and through undersigned counsel, and move to have their contemporaneously filed Motion for Extension of Time to Respond to Plaintiff's Second Motion for Partial Summary Judgment deemed timely filed.  In support of this Motion, Moving Defendants state as follows:

1. Plaintiff, a state inmate, filed this action pursuant to 42 U.S.C § 1983 alleging that Moving Defendants failed to protect him from another inmate's assault.  [D.E. 1, 31]

2. On January 26, 2024, Plaintiff filed his Second Motion for Partial Summary Judgment, thus making a response thereto due on February 16, 2024.  [D.E. 78]

3. Also on January 26, 2024, Moving Defendants filed their Motion for Summary Judgment, thus making a response thereto due on February 16, 2024.  [D.E. 81]

4. On February 14, 2024, Plaintiff filed a Motion to Extend Summary Judgment

1

JA146

Opposition Deadline, to which Moving Defendants consented. [D.E. 86]

5. On February 15, 2024, the Court granted Plaintiff's Motion [86], thus making Plaintiff's response deadline March 18, 2024. [D.E. 87]

6. On February 16, 2024, previous counsel for Moving Defendants left the employ of the North Carolina Department of Justice ("NCDOJ").

7. On the first federal business day following Mr. Nichols' departure from NCDOJ, February 20, 2024, undersigned counsel filed his Notice of Substitution of Counsel on behalf of Moving Defendants. [D.E. 88]

8. Also on February 20, 2024, contemporaneously with the filing of this Motion, Moving Defendants filed their Motion for Extension of Time to Respond to Plaintiff's Second Motion for Partial Summary Judgment.

**Grounds for Relief**

9. Rule 6(b) of the Federal Rules of Civil Procedure provides that "when an act may or must be done within a specified time, the court may, for good cause, extend the time...on motion made after the time has expired if the party failed to act because of excusable neglect." Whether neglect is excusable "is at bottom an equitable [determination], taking account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice to the [nonmoving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993).

2

**JA147**

10. Here, the failure of Moving Defendants to file a timely response, or a timely motion for extension of time related thereto, is the result of excusable neglect. The deadline was missed because the originally assigned attorney was preparing for his departure from NCDOJ.

11. Specifically, in the weeks leading up to Mr. Nichols' departure from NCDOJ, he was required by his supervisor (that is, undersigned counsel) to complete a number of outstanding case-related tasks in a shorter-than-normal timeframe, as well as the typical administrative tasks associated with offboarding a NCDOJ employee.

12. These additional and hastened tasks resulted in Mr. Nichols' being unable to respond to Plaintiff's Second Partial Motion for Summary Judgment by the due date (and his departure date) of February 16, 2024.

13. These additional and hastened tasks also resulted in Mr. Nichols' failing to file a Motion for Extension of Time on or before February 16, 2024.

14. The delay in filing the Motion for Extension of Time was excusable in light of (i) Mr. Nichols' impending departure from NCDOJ and the tasks associated therewith, (ii) the present Motion being filed only one federal business day after the due date, (iii) the fact that Plaintiff's response deadline has already been extended to the date requested herein, namely, March 18, 2024 (which Mr. Nichols consented to), (iv) the fact that the proceedings will not be impacted by this request since Plaintiff's own response deadline has already been extended to March 18, 2024, and (v) the fact that Plaintiff will not be prejudiced by allowing Defendants to have the same response deadline as Plaintiff, given that all parties filed their summary judgment motions on the same date, January 26, 2024.

3

JA148

15. Moving Defendants are filing this Motion in good faith and not for any improper purpose.

16. Undersigned counsel emailed Plaintiff's counsel on February 18, 2024 to obtain Plaintiff's position on this Motion. On February 19, 2024, Plaintiff's counsel informed undersigned counsel that Plaintiff does not consent to this Motion.

WHEREFORE, for the reasons set forth above, for good cause shown, and in the interests of justice, Moving Defendants respectfully request that the Court grant this Motion to Deem Timely Filed and consider Defendants' contemporaneously filed Motion for Extension of Time to Respond to Plaintiff's Second Motion for Partial Summary Judgment timely filed.

This the 20th day of February, 2024.

**JOSHUA H. STEIN**
**Attorney General**

/s/ James B. Trachtman
James B. Trachtman
Special Deputy Attorney General
N.C. State Bar No. 22360
N.C. Department of Justice
Public Safety Section
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone:      (919) 716-6943
Facsimile:      (919) 716-6761
E-Mail:         jtrachtman@ncdoj.gov

4

JA149

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed this document with the Clerk of the

Court using the CM/ECF system, which will provide notice to counsel as follows:

Alison R. Leff, Esq.                          G. Christopher Olson
The Civil Rights Group, LLC                   Olson Law, PLLC
2045 W Grand Ave., Suite B, PMB 62448         514 Daniels Street, #136
Chicago, IL 60612                             Raleigh, NC 27605
*Attorneys for Plaintiff*                     *Attorneys for Plaintiff*

This the 20th day of February, 2024.

/s/ James B. Trachtman
James B. Trachtman
Special Deputy Attorney General

JA150

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:21-CT-3157-D

BRANDON CASE,                )
                              )
         Plaintiff        )    **Plaintiff's Response in Opposition to**
                              )    **Defendants' Motions for More Time**
     v.                    )    **to Oppose Plaintiff's Partial**
                              )    **Summary Judgment Motion**
BRANDON BEASLEY et al.,   )
                              )
        Defendants.   )

The Court should deny Defendants' motions for an extension of time to respond to Plaintiff's second partial summary judgment motion, ECF Nos. 89 and 90, because they have failed to demonstrate that excusable neglect justifies giving them a third opportunity.

### <u>Background</u>

Defendants' failure to respond to Plaintiff's partial summary judgment motion or to timely ask for an extension was not an anomaly that can be explained by defense counsel's workload, as the motions suggest. ECF Nos. 89, 90. Rather, it was an extension of a consistent pattern of the delinquently defending this case and squandering second chances. Before this most recent failure:

- Defendants failed to answer the complaint or assert affirmative defenses;

- Defendant Kenny Custodio failed to respond to requests for admission;

- Defendants failed to serve any written discovery requests;

- Defendants failed to take any depositions;

- Defendants failed to timely disclose an expert witness, despite filing a motion requesting—and receiving—an extension of their deadline to do so;

JA151

- Defendants failed to respond to or request an extension of their deadline to oppose Plaintiff's first partial summary judgment motion; and

- Defendants failed to file a summary judgment motion compliant with local rules, federal rules, or this court's order directing them to address recent qualified immunity law.

When forced to confront the implications of those failures—through Plaintiff's motion practice—Defendants have requested and received second chances in every instance. They were given a second chance to disclose an expert witness (which they wasted), ECF No. 43; they were allowed to file an answer to the complaint asserting affirmative defenses *after* Plaintiff expended significant resources briefing summary judgment against Custodio, ECF No. 73; Custodio was allowed to respond to requests for admission more than a year after they were served, also after Plaintiff had briefed summary judgment in reliance on the deemed admissions, *id.*; Defendants were given a second chance to file a summary judgment motion, ECF No. 56, and then a third chance when the motion they filed failed to comply with the rules or the court's order, ECF No. 73; and Defendants were given a second chance to respond to Plaintiff's partial summary judgment motion, *id*. Defendants have, once again, taken the Court's generosity for granted. There is simply no justification to excuse this most recent failure.

## Legal Standard

Because Defendants—*for the second time*—missed the deadline to respond to Plaintiff's motion for partial summary judgment without requesting an extension, to get a third chance, they must show they failed to act "because of excusable neglect." Fed. R. Civ. P. 6(b). "'Excusable neglect' is not easily demonstrated, nor was it intended to be." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996). "The burden of showing excusable neglect

2

JA152

rests with the party asserting it. While the court has discretion in determining what constitutes excusable neglect, ignorance of when a time period expires does not qualify as excusable neglect, nor does a busy schedule, lack of diligence, inadvertence, or other manifestations of carelessness and laxity." *Jumas Food Mart v. Chubb Ins.*, No. 1:22-cv-1137, at *7-8 (M.D.N.C. June 28, 2023) (cleaned up; citing *Thompson*, 76 F.3d at 543; *In re O.P.M. Leasing Serv., Inc.*, 769 F.2d 911, 917 (2d Cir. 1985); *Key v. Robertson*, 626 F. Supp. 2d 566, 577 (E.D. Va. 2009); *Eagle Fire, Inc. v. Eagle Integrated Controls, Inc.*, No. 3:06-cv-264, at *4 (E.D. Va. June 20, 2006)); *see also Williams v. Shinseki*, 373 Fed. Appx. 611, 614-15 (7th Cir. 2010) (an attorney's "busy case schedule" not excusable neglect); *Harrington v. City of Chicago*, 433 F.3d 542, 548 (7th Cir. 2006) (same, and collecting cases).

<u>**Argument**</u>

None of the bases Defendants offer to justify their request for more time to respond to the partial summary judgment motion meets the excusable neglect standard. First, Defendants claim their failure to file a timely extension motion or opposition brief was excusable because defense counsel was very busy in the leadup to his departure from the DOJ's office. ECF No. 89 ¶¶ 9–12; ECF No. 90 ¶¶ 11–14. But busyness does not satisfy the excusable neglect standard. *Long v. M&M Transp., LLC*, No. 3:13-cv-65, at *2 (N.D.W. Va. Dec. 27, 2013) ("Courts in the Fourth Circuit have found that a busy schedule does not justify finding excusable neglect.") (citing *Key*, 626 F. Supp. 2d at 577; *Eagle Fire* No. 3:06-cv-264, at *4-5).

Second, Defendants argue there is no prejudice to Plaintiff from granting the extension because Defendants were only "one federal business day" late in requesting it and the extension won't delay the case since Plaintiff's response to Defendants' motion is not due until March 18. ECF No. 89 ¶ 12; ECF No. 90 ¶ 14. On the contrary: Plaintiff has been deeply prejudiced by

JA153

Defendants' litigation conduct, of which this extension motion is a part. Plaintiff filed his summary judgment motion on August 14, 2023. ECF No. 49. Defendants failed to answer that motion and they failed to request an extension of time to do so. That failure entitled Plaintiff to the presumption that the statements of fact supporting his motion are true. Civ. L.R. 56.1(a)(2). But Plaintiff never got the benefit of that presumption because of Defendants' requests to supplement the record to compensate for their earlier litigation failures, including their failures to respond to the complaint, ECF No. 58, and answer requests for admission, ECF No. 59. Those requests—which were granted, ECF No. 73—caused the Court to order Plaintiff to re-file his summary judgment motion to account for the supplemented record, *id*. Plaintiff was thus forced to expend resources briefing the summary judgment motion a second time and refiling it in January 2024. ECF No. 78. Defendants have now failed to respond *again*. Plaintiff is prejudiced by their request for another chance to respond because he is entitled to reap the benefits of an unopposed motion, including the benefit of having the contents of his statement of facts deemed admitted.

Also, Defendants' requested extensions related to summary judgment have greatly drawn out the case timeline. If Defendants had not asked for a third chance to brief their summary judgment motion and a second chance to respond to Plaintiff's motion, summary judgment in this case may have been resolved months ago, and the case could be set for trial. It has been more than four years since Brandon Case's attack at Central Prison, and he is entitled to a resolution without further delay. An imminent decision on Plaintiff's summary judgment motion is a benefit to him, regardless of whether Defendants' motion is still pending.

What's more, Plaintiff has asked the Court to reconsider its order allowing Defendants a third opportunity to move for summary judgment. ECF No. 74. That motion remains pending. If

4

JA154

that motion were granted before March 18, 2024, there would be no need for Plaintiff to file a second opposition brief. *See* ECF No. 66 (Plaintiff's response in opposition to Defendants' first, deficient summary judgment motion); ECF No. 67 (Plaintiff's response to Defendants' statement of facts in support of their first summary judgment motion).

<u>Conclusion</u>

Plaintiff is not unsympathetic to the challenge of transitioning cases from departing lawyers, new defense counsel's workload, or the need for counsel to seek extensions to balance competing case demands. But even under circumstances far less extreme than those here, those challenges do not excuse neglect. For that reason, and given the history in this case, Plaintiff must oppose Defendants' most recent motions.

Dated: February 21, 2024          Respectfully submitted,

/s/ Alison R. Leff

Alison R. Leff
The Civil Rights Group, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
(708) 722-2241 (phone)
alison@civilrightsgroup.com
Ill. Bar No. 6296422
Attorney for Plaintiff

G. Christopher Olson
Olson Law, PLLC
514 Daniels St., #136
Raleigh, NC 27605
(919) 624-3718
chris@olsonlaw-pllc.com
Fax: (919) 834-1071
N.C. State Bar No. 21223
Local Civil Rule 83.1(d) Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below, I caused a copy of this document to be served on counsel of record for all parties by filing it via CM/ECF.

Dated: February 21, 2024

/s/ Alison R. Leff
One of Plaintiff's Attorneys

JA156

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3157-D

BRANDON CASE,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )          ORDER
                                       )
OFFICER BEASLEY, et al.,               )
                                       )
                    Defendants.        )

On December 8, 2023, the court directed Special Deputy Attorney General Bryan G.
Nichols ("Nichols") to show cause why the court should not strike defendants' motion for
summary judgment [D.E. 72]. On December 12, 2023, the court denied the parties' motions for
summary judgment without prejudice and gave the parties until January 26, 2024, to file renewed
motions for summary judgment. See [D.E. 73] 4. On December 13, 2023, Brandon Case ("Case"
or "plaintiff") moved for partial reconsideration of the court's December 12 order in light of its
December 8 order [D.E. 74]. On January 17, 2024, defendants responded in opposition to
plaintiff's motion for reconsideration [D.E. 77],[1] and Nichols responded to the court's show cause
order [D.E. 76]. On January 26, 2024, the parties filed motions for summary judgment [D.E. 78,
81].[2] On February 16, 2024, the time for defendants to respond in opposition to plaintiff's motion
for summary judgment expired, which is the day Nichols "left the employ of the North Carolina

_____

[1] The court grants defendants' motion for an extension of time to respond in opposition to
plaintiff's motion for reconsideration [D.E. 75].

[2] The court grants defendants' motion for leave to manually file a video exhibit [D.E. 85].

Department of Justice." [D.E. 89] 2. On February 20, 2024, Special Deputy Attorney General James B. Trachtman moved for an extension of time to file a response in opposition to plaintiff's motion for partial summary judgment [D.E. 89] and to deem the motion timely filed [D.E. 90]. On February 21, 2024, Case responded in opposition to defendants' motions [D.E. 91].

The court has considered Case's motion for reconsideration under the governing standard. See Fed. R. Civ. P. 54(b); Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514–15 (4th Cir. 2003). The court denies the motion. See, e.g., Fed. R. Civ. P. 56(e)(1); Andrew v. Clark, 561 F.3d 261, 271 (4th Cir. 2009); Suarez v. SouthernCarlson, Inc., No. 7:22-CV-21, 2023 WL 7117939, at *2 n.3 (E.D.N.C. Oct. 27, 2023) (unpublished) (collecting cases); cf. Dupree v. Younger, 598 U.S. 729, 735–36 (2023); McVey v. Stacy, 157 F.3d 271, 275 (4th Cir. 1998); Weber v. Specialized Loan Servicing, LLC, 341 F.R.D. 214, 216 (E.D.N.C. 2022).

As for defendants' motions for an extension of time to respond in opposition to plaintiff's motion for partial summary judgment and to deem the motion timely filed, the court grants the motions, and defendants shall have until March 18, 2024, to respond in opposition to plaintiff's motion for partial summary judgment. Cf. Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010).

In sum, the court GRANTS defendants' non-dispositive motions [D.E. 75, 85, 89, 90] and DIRECTS defendants to manually file the video exhibit on or before March 4, 2024. The court DENIES plaintiff's motion for reconsideration [D.E. 74]. The parties' motions for summary judgment [D.E. 78, 81] remain pending, and defendants shall have until March 18, 2024, to file any response in opposition to plaintiff's motion.

JA158

SO ORDERED. This 13 day of February, 2024.

James C. Dever III
JAMES C. DEVER III
United States District Judge

**JA159**

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3157-D

| | | |
|---|---|---|
| BRANDON CASE, | ) | |
| | ) | |
| Plaintiff | ) | **Plaintiff's Response in Opposition to** |
| | ) | **Defendants' Second Motion for** |
| v. | ) | **Summary Judgment** |
| | ) | |
| BRANDON BEASLEY et al., | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Defendants' second motion for summary judgment, ECF No. 82, presents a patchwork of general statements about Eighth Amendment law that, while relevant in an abstract sense, don't deal with the specific legal standards or facts at play in this case. Defendants do not clearly or correctly set out the applicable law, nor do they show how the evidence developed during discovery falls short of creating fact questions for a jury to decide. Instead, Defendants rely entirely on one irrelevant fact, which they repeat again and again across their 34-page memorandum: they could not have predicted Plaintiff Brandon Case would be attacked by the prisoner who attacked him. But precedent has instructed for nearly 30 years that an officer who knows of a substantial risk of assault cannot avoid liability for failure to protect by showing he didn't know the victim was especially likely to be attacked by the specific person who eventually committed the assault.

The relevant fact for summary judgment—which is uncontested—is that Defendants knew leaving open the hallway doors at Central Prison created a substantial risk of serious harm. Each Defendant admitted that by leaving the doors open, he created a risk that safekeepers and general population prisoners would mix in the hall; that such interactions predictably lead to

violence; and that he purposely disregarded that risk on the day Plaintiff Bradon Case was

attacked by a safekeeper at Central Prison. What's more, the facts show that the risk was obvious

and pervasive: before Case's attack, Defendants' supervisor reminded them "over and over" of

the danger that leaving hallway doors open would lead to violence from safekeepers and general

population prisoners meeting. Those facts are enough to require a trial in this case.

Defendants' appeal to qualified immunity rests on the same misunderstanding of the legal

standard that dooms their liability analysis. Moreover, the risk of harm to Case from Defendants'

conduct was obvious. As such, qualified immunity does not protect Defendants from liability.

Because Defendants present no factual or legal basis to support a judgment in their favor, the

Court should deny their motion and set this case for trial.

<u>**FACTS**</u>

On January 21, 2020, Brandon Case went to the second floor of the building where he

was housed at Central Prison, D block in Unit 2, to get a haircut. Plaintiff's Second Statement of

Additional Facts (hereafter, "2d Additional PSOF") ¶¶ 55, 60. After his haircut, Case walked

down the hallway toward the stairwell to the first floor, through an open door separating the

hallway from the stairwell, down the stairs, and through another open door separating the

stairwell from the first-floor hallway. *Id.* at ¶¶ 75–80.

As Case was traveling down the stairs, a group of prisoners classified as safekeepers was

entering the first-floor hallway, coming in from recreation. *Id.* at ¶ 82. Safekeepers are detainees

who are legally in the county's custody; but they are housed at state prisons for several reasons,

including because some safekeepers are unusually violent. *Id.* at ¶¶ 5–6. Safekeepers and general

population prisoners like Case are supposed to be kept separate. *Id.* at ¶¶ 8, 10–12.

Case emerged through the open door onto the first floor and walked down the last few

steps on the other side of the door. *Id*. at ¶¶ 80–81, 83. At the same time, the group of

safekeepers moved toward him, on their way to their cells on the second floor. *Id*. at ¶¶ 82–83.

Just after Case descended the last stairs into the hallway, a safekeeper named Kenneth Kennion

attacked him. *Id*. at ¶ 85. Kennion punched Case on the right side of the face, causing Case to fly

sideways and strike his head against the concrete wall before falling to the ground. *Id*. Kennion

stooped down and punched Case's head with his left fist and then twice more with his right fist.

*Id*. A correctional officer standing in the hallway ordered Kennion to stop. *Id*.  Kennion then put

his hands up. *Id*. While the officer moved to handcuff Kennion, Case struggled to his feet and

staggered off down the hallway, a trail of blood dripping from his face *Id*.

  Case and Kennion should never have met in the hallway as they did. The hallways at

Central Prison are closed off by sliding doors that lock in place and should always remain closed

when no one is passing through. *Id*. at ¶¶ 19–30. Correctional officers sit in control booths on

each floor of the cell block, directly across from the hallway doors. *Id*. at ¶¶ 13–15. Those

officers can open and close the hallway doors using buttons on a control panel in their booths. *Id*.

at ¶¶ 17–18. Before opening the doors to allow prisoners out of or into the hallway, the control

booth officers are supposed to check to make sure it is safe to do so. *Id*. at ¶¶ 24–25, 29–30.

They can check visually—by looking down the hallway in both directions—or they can make a

radio call to ensure the area where the prisoner is headed is safe and clear. *Id*. at ¶¶ 26–27.

  That didn't happen on January 21, 2020. *Id*. at ¶¶ 61–67. Defendant Kenny Custodio was

in the control booth on the second floor of D block in Unit 2 that day. *Id*. at ¶ 52. He'd left the

secure door to the stairwell open for an extended period because there were prisoners coming

and going to get haircuts from the barber who was set up in the second-floor hallway, and he

didn't want to be bothered by repeated requests to open the door. *Id*. at ¶¶ 61–62. Custodio did

not leave the door open by accident. *Id*. He made a conscious decision, knowing there was a risk that doing so might lead a general population prisoner to walk into the hallway while the safekeepers were returning from recreation, and that allowing those two populations to mix was unsafe. *Id*. at ¶¶ 33–41, 57–63.

Downstairs from Custodio, Defendant Eric Urieta, who was posted in the first-floor control booth of D block, made the same decision: he left the secure door separating the stairwell from the first-floor hallway open to avoid the hassle of responding to repeated requests from prisoners wishing to go upstairs for a haircut or returning from the barber. *Id*. at ¶¶ 53, 66–67. Like Custodio, Urieta made that decision knowing it created a risk that safekeepers and general population prisoners might encounter each other in the hallway. *Id*. at ¶¶ 46–51, 58, 68. Sometime after opening the first-floor hallway door, Urieta called Defendant Brandon Beasley over to relieve him in the control booth so he could use the bathroom. *Id*. at ¶ 69. Beasley took over, and Urieta walked out of the booth, leaving the hallway door ajar. *Id*. at ¶¶ 70–72. Beasley saw that the hallway door leading to the staircase was open; he knew it shouldn't have been; he had the time and ability to close it; but he decided to leave it that way. *Id*. at ¶¶ 72–74.

Because Defendants left the doors separating the stairwell from the first and second floors of D block open, Case was allowed to walk through the secure doors and pass into the stairwell even though safekeepers were moving through the hallway. *Id*. at ¶¶ 75, 77–84.

Case's injuries from the attack were grave. *Id*. at ¶ 95. Case was transported to Duke Medical Center where imaging showed a nasal bone fracture and complex fractures on both sides of his face. *Id*. He was admitted to the hospital for surgery, which included placing three metal implants secured by screws in the bones of his face. *Id*. at ¶¶ 95–97. Case will suffer from chronic facial pain for the rest of his life. *Id*. at ¶ 98.

4

JA163

On June 7, 2021, Case filed this lawsuit alleging that correctional officers Brandon

Beasley (Count I) and Eric Urieta (Count II), violated his rights under the Eighth Amendment to

United States Constitution by failing to protect him from Kennion's attack. *Id*. at ¶ 99. Case filed

an Amended Complaint on August 11, 2022, naming Kenny Custodio as an additional defendant

and adding an Eighth Amendment claim against Custodio as Count III. *Id*. at ¶ 100. All three

defendants now seek judgment in their favor. ECF No. 81.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only when, viewing the facts in the light most favorable

to the non-moving party, there is no genuine issue of material fact, and the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986); *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). "An issue is

'genuine' if a reasonable jury, based on the evidence, could find in favor of the non-moving

party." *Acosta v. Del Sol P'ship 2, Inc.*, No. 5:16-CV-231-BO, at *2 (E.D.N.C. Feb. 14, 2018)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (other citations omitted). To

prevent summary judgment, nonmoving parties must present "sufficient evidence" to allow

reasonable jurors to find for them. *Jones v. Harrison*, No. 4:12-CV-90-D, at *5 (E.D.N.C. July

21, 2014) (citing *Anderson*, 477 U.S. at 249–50).

## ARGUMENT

### I.   The Court Should Strike Portions of Defendants' Filings

The Court should strike portions of Defendants' summary judgment filings because their

statement of material facts, ECF No. 83, violates Local Civil Rule 56.1 in at least three ways.

First, Defendants' statement of facts doesn't contain numbered paragraphs. L. Civ. R. 56.1(a)(1)

("Any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 shall be

supported by a separate statement, in numbered paragraphs, of the material facts as to which the movant contends there is no genuine dispute."). So that he may cite Defendants' filing with specificity in this brief, Plaintiff reproduced Defendants' statement of facts with numbers in his concurrently filed response to that statement.

Second, Local Civil Rule 56.1(a)(4) requires that each fact statement "be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(c)." But many exhibits Defendants cite in their statement of facts are not admissible evidence. For example, Exhibits 1.1, 1.2, 1.3, and 1.4—disciplinary records for Plaintiff and Kennion and a policy that closely matches but is not identical to the disclosed version—were not disclosed during discovery under Rules 26 or 34, as far as Plaintiff is aware. *See* ECF Nos. 84-2, 84-3, 84-4, 84-5; 2d Additional PSOF ¶ 101. Defendants' motion for summary judgment may not rely on undisclosed evidence. Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless.").

The statement of facts relies on other inadmissible evidence too. At summary judgment, a party cannot disavow his deposition testimony "by referring to a subsequent affidavit . . . contradicting the deponent's prior testimony. . . ." *Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508, 512-13 (4th Cir. 2011)) (cleaned up; quoting *Erwin v. United States,* 591 F.3d 313, 325 n.7 (4th Cir. 2010) (other citations omitted). Exhibits 2, 3, and 4 are declarations from each defendant that include such information. ECF No. 84-9; ECF No. 84-10; ECF No. 84-12. For example, each declaration states the defendant "in no way" knew that "Brandon Case was in harm['s way]" before Kennion attacked him. ECF No. 84-9 ¶ 9; ECF No. 84-10 ¶ 11; ECF No. 84-9 ¶ 11. But all three defendants testified they knew of the risk from allowing safekeepers and

6

JA165

general population prisoners to mix in the hallway. *See, e.g.,* 2d Additional PSOF ¶¶ 38–40, 44, 50. Similarly, in Custodio's declaration, he claims he had no way to know Case might walk down the stairs at the same time Kennion was coming back from the yard. ECF No. 84-10 ¶ 10. But Custodio testified that he opened the door to let the safekeepers out for recreation, and that recreation lasts one hour, so a jury could certainly find he had a way to know when they'd return. 2d Additional PSOF ¶¶ 57–58. Defendants' statements in their declarations that contradict their deposition testimony are inadmissible at summary judgment. *See, e.g., Horton v. Methodist Univ., Inc.*, No. 5:16-CV-945-D, at *12 (E.D.N.C. Jan. 23, 2019) ("Horton cannot submit a supplemental affidavit that contradicts her deposition testimony to avoid summary judgment.") (citations omitted).

Third, Defendants fail to include required pincites in many paragraphs of their statement of facts. *See* L. Civ. R. 56.1(a)(4) ("Citations shall identify with specificity the relevant page and paragraph or line number of the evidence cited."). This makes it difficult for Plaintiff to locate the evidence Defendants claim supports their fact statements and to take a position on whether that evidence is indeed uncontested. For example, Defendants claim general population prisoners like Case were being "sent from" their cells to get haircuts, and then "sen[t] . . . back down" afterward on the day of the attack, implying Case's movement was being monitored by prison staff in some way. ECF No. 83 at 4 (¶ 12). Defendants cite only "*Exhibit 1.5*" to support that fact statement. Exhibit 1.5 is a 20-page PDF comprised of at least 18 different documents. (The exhibit also bears no bates label, making it impossible to tie to anything produced during discovery, though Plaintiff believes the exhibit is identical to other documents that were produced.) Likewise, several paragraphs of Defendants' statement of facts cite to entire depositions without any reference to page or line. *See, e.g.,* ECF No. 83 at 4 (¶¶ 13 &14).

The Court can and should strike the paragraphs of Defendants' statement of facts that cite to undisclosed exhibits, contradict Defendants' deposition testimony, or lack pincites, including the following paragraphs: 6, 9, 11, 12, 14, 18, 19, 21, 26, 29, 30, 33, 35, 40, 42, 43.

The Court should also reject any argument in Defendants' brief[1] that relies upon stricken factual statements. *Cf. Higgins v. Spence*, No. 5:07-CV-33-D(1), at *4 (E.D.N.C. Mar. 3, 2009) ("When a party fails to comply with Local Civil Rule 7.1, a court may deny its motion.") (citing *Williams v. Black*, No. 5:07-CT-3170-D, at *2 (E.D.N.C. Oct. 10, 2008) (unpublished); *Thomas v. Smith*, No. 5:07-CT-3159-FL, at *1 (E.D.N.C. July 22, 2008) (unpublished); *Masinick v. Am. Craftsmen, Inc.*, No. 5:07-CV-461-BR (E.D.N.C. Feb. 19, 2008) (unpublished); *ESA, Inc. v. Walton Constr. Co.*, No. 7:04-CV-75-F(3), at *1-2 (E.D.N.C. June 8, 2005) (unpublished); *Nationwide Mut. Ins. Co. v. McMahon*, 365 F. Supp. 2d 671, 673 (E.D.N.C. 2005); *Fayetteville, Cumberland County Black Democratic Caucus v. Cumberland County*, No. 90-2029, 1991 WL 23590, at *2-3 (4th Cir. Feb. 28, 1991) (per curiam) (unpublished) (affirming district court's denial of motion based on party's violation of predecessor to Local Civil Rule 7.1)); *Dykstra v. Temple*, No. 4:18-CV-145-FL, at *5 (E.D.N.C. Jan. 3, 2019) (denying motion, finding "defendants have attempted to circumvent this court's generous deadline for filing, and blatantly disregarded the motions practice rules in this district").

Without the inadmissible paragraphs, there are no facts in Defendants' statement that would absolve them of liability and therefore entitle them to summary judgment. All that remains are mundane statements about Case's allegations (ECF No. 83 ¶¶ 1–5), the prison facility and policies (*id.* at ¶¶ 7–8, 10, 13), and Case's attack (*id.* at ¶¶ 15–17, 20, 24, 31–32, 36–39); and irrelevant assertions about Case's and Kennion's history of violence and animus (*id.* at

---

[1] Defendants brief, ECF No. 82, exceeds the 30-page limit under Local Civil Rule 7.2(f)(2) though Defendants did not seek leave to file extra pages.

¶¶ 25, 27, 28, 34, 41). If the Court strikes the fact statements supported by inadmissible evidence, it may therefore deny the motion.

## II. Defendants' Summary Judgment Motion Fails on the Merits Too

Even if the Court considers Defendants' full motion on the merits, there is no basis for granting it. Defendants have failed to identify undisputed material facts that foreclose a jury finding of liability against them for violating Case's Eighth Amendment rights.

### A. Eighth Amendment Standard

"The Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Danser v. Stansberry*, No. 5:08-CT-3116-BO, at *10 (E.D.N.C. Mar. 21, 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)) (cleaned up). The Fourth Circuit recognizes that a prison official can violate a prisoner's Eighth Amendment rights by exhibiting deliberate indifference to a serious risk that an inmate will be attacked by another inmate. *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017). A deliberate indifference claim based on failure to protect a plaintiff from being attacked by another prisoner "may be characterized by three components: (1) the subjective knowledge of a substantial risk of serious harm; (2) the conscious disregard of that risk; and (3) the absence of intent to cause the harm risked." *Anderson*, 877 F.3d at 545. Last, a plaintiff must show the defendant was acting under color of law when the plaintiff's rights were violated. 42 U.S.C. § 1983; *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994).

Defendants' motion appears to challenge the first two elements of Case's claim: whether Defendants subjectively knew of a substantial risk of serious harm and whether they consciously disregarded that risk. The record abounds with evidence that would permit a jury to find for Case

JA168

on both elements.

**B. A Reasonable Jury Could Find Defendants Knew of a Substantial Risk of Serious Harm**

Defendants are not entitled to summary judgment on the first element of Plaintiff's claim because the record contains copious evidence Defendants knew of the very risk they disregarded and that eventually materialized.

By January 2020, each Defendant had years of experience working in Unit 2. 2d Additional PSOF ¶¶ 34, 42, 46. As such, they all knew safekeepers posed a special risk, and they knew safekeepers and general population prisoners were not to mix. *Id*. at ¶¶ 34–41, 43–45, 47–51. Each defendant knew that keeping the sallyport doors to the stairwells closed was a mandatory safety rule specifically aimed at preventing the mixing of safekeepers and general population prisoners. *Id*. They also knew, from their supervisors' admonishment, that complacency about keeping the doors closed had created unacceptable risks in the past. *Id*. at ¶¶ 30–31. What's more, Custodio and Urieta knew the safekeepers had gone out to recreation on the morning of January 21, 2020. *Id*. at ¶¶ 57, 68. They knew that recreation lasted an hour, so they knew to expect the safekeepers' return around the time Case finished his haircut and Urieta left the control booth for the bathroom. *Id*. at ¶ 58. Custodio testified that he knew Case was a general population prisoner; and he could see Case walking unescorted through the hallway to and from the barber. *Id*. at ¶¶ 75–77. Those facts would permit a jury to find that Defendants knew keeping open the sallyport doors separating the stairwell from the hallways on each floor created a substantial risk the safekeepers coming in from recreation would mix with general population prisoners in the hall, and someone would get hurt exactly as Case did get hurt.

The risk of harm that flowed from Defendants' conduct was also obvious. *Danser*, No. 5:08-CT-3116-BO, at *10-11 ("[A] factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious"). Defendants understood that prison is a dangerous place. 2d Additional PSOF ¶¶ 36, 42–43, 47. They knew Unit 2 housed both general population prisoners and safekeepers, and that safekeepers included prisoners who were so violent and aggressive they could not safely be housed at county jail. *Id.* at ¶¶ 3, 5–7, 10. And Defendants knew that the sallyport doors existed to control the movement of prisoners through the halls. *Id*. at ¶¶ 22–31. Based on that knowledge, a jury could find it was obvious that leaving the doors open created a substantial risk.

A jury could also find that the risk of which Defendants were aware was a substantial risk of serious harm. It is well-established that a physical attack by another prisoner constitutes serious harm in the context of a failure to protect claim. *See*, *e.g.*, *Cox v. Quinn*, 828 F.3d 227, 234 (4th Cir. 2016) (affirming denial of qualified immunity for defendants on failure to protect claim, recognizing as a serious harm plaintiff's beating by another prisoner that "lasted between 45 and 75 seconds" and caused "broken ribs, a loosened tooth, bruising, swelling, and abrasions"). Case's unrebutted expert witness, Dr. Kenya Williams, spells out the gravity of Case's injuries in her expert report, noting, among other things, that Case's nose was broken and the bones on both sides of his face were shattered. 2d Additional PSOF ¶¶ 95–98. Surgeons implanted three metal plates in Case's face to repair his injuries. *Id*. Given the pain Case still experiences today, Dr. Williams concludes that he cannot be expected to make a full recovery. *Id*. Those injuries easily meet the bar of seriousness. *See e.g., Cox*, 828 F.3d at 234 (recognizing as serious a beating that caused "broken ribs, a loosened tooth, bruising, swelling, and abrasions").

Defendants challenge the sufficiency of the evidence proving this element on one basis: they didn't know Kenneth Kennion would attack Plaintiff. ECF No. 82 at 18; *id.* at 21

JA170

(Defendants didn't know Kennion had a history of violence); *id.* at 22 (Defendants didn't know Kennion and Case were "at odds"). Their entire approach to summary judgment is captured as follows: "The relevant question is whether Defendants subjectively believed the assailant Kenneth Kennion posed a substantial risk of serious harm to other inmates." ECF No. 82 at 16. But that is not the relevant question at all. And the very cases Defendants cite—*Farmer*, *Makdessi*, and *Danser*—show why. Those cases show the relevant question is not what Defendants knew about *Kennion and Case*, but rather what they knew about the risk of harm from leaving the hallway doors open.

*Makdessi* explains that Defendants' actual knowledge that Case faced a risk of serious harm "can be proven through circumstantial evidence showing, for example, that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the [Defendants] had been exposed to information concerning the risk and thus must have known about it." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (cleaned up; quoting *Farmer,* 511 U.S. at 842). Those are precisely the circumstances here. Custodio, Urieta, and Beasley knew there was a substantial risk of inmate attacks if safekeepers and general population prisoners mixed, and for that reason, they knew they needed to keep the secure hallway doors closed. Each defendant testified that he had been exposed to information concerning the risk. *See, e.g.,* 2d Additional PSOF ¶¶ 38–41, 43–45, 49–51. And there's evidence the risk of safekeeper-on-population attacks was pervasive, long-standing, and expressly noted in the past: Defendants' supervisor, John Juehrs, sent them a memo after Case's attack scolding them: "I have told everyone over and over about the sally-port effect and the back doors being left open. I will not be telling anyone again. . . . This directive is due to safe keepers and population coming into contact too many

times when they shouldn't. Staff have become complacent when it comes to security and controlled movement of inmates in Unit Two." *Id.* at ¶¶ 30–31. Those facts would permit a jury to conclude both that the risk of harm from leaving the hallway doors open was obvious to Defendants, and that they'd been expressly put on notice.

It is thus irrelevant, as Defendants complain, that "nowhere does Plaintiff allege that he informed any of the Defendants of a threat to his safety posed by Kenneth Kennion." ECF No. 82 at 24. Setting aside that Defendants appear to be analyzing the sufficiency of Plaintiff's pleading (the motion to dismiss standard) rather than the factual record developed through discovery (the summary judgment standard), the Supreme Court conclusively rejected Defendants' framing of the Eighth Amendment analysis in *Farmer*. There, the Court cautioned that a defendant correctional officer may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843. This is because "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health,' and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). *See also Makdessi*, 789 F.3d at 134 (quoting *Farmer*, 511 U.S. at 843, 848–49) ("Nor is it dispositive that the prisoner did not give advance warning of the risk or protest his exposure to the risk.") (cleaned up).

Defendants' reliance on *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014) and *Wilkins*

*v. Upton*, (4th Cir. 2016), ECF No. 82 at 23–24, is equally misguided. In *Danser*, the Fourth Circuit reversed the denial of qualified immunity to prison officials who failed to protect the prisoner plaintiff from being attacked by another prisoner. The Court reasoned: "On this record, there is no evidence that" the defendant was exposed to information concerning the risk of attack the plaintiff faced and thus must have known about it. *Danser*, 772 F.3d at 348-49. *Danser* is not like this case at all. Here, there is abundant evidence that Defendants were exposed to information about the risk of safekeepers and general population prisoners meeting in the hallways, and that they knew about it. Indeed, each defendant *admitted* as much at his deposition. *Wilkins*, an unpublished decision, is inapposite, as it concerns qualified immunity for supervisory prison officials, noting there must be evidence of personal involvement for a supervisor to be liable for his subordinate's failure to protect a prisoner. *Wilkins*, 639 F. App'x at *10. No defendant in this case is sued on a theory of supervisory liability, so *Wilkins* has nothing relevant to say about liability here.

### C. A Reasonable Jury Could Find Defendants Consciously Disregarded the Risk Presented By Leaving the Hallway Doors Open

The record would also permit a reasonable juror to find that Case satisfied the second element of his Eighth Amendment claim, conscious disregard of a substantial risk of serious harm. *Anderson*, 877 F.3d at 545.

Custodio, who was in the control booth on the second floor, testified that he'd left the secure door to the stairwell open for an extended period on purpose because he didn't want to be bothered by repeated requests to open the door while haircuts were ongoing. 2d Additional PSOF ¶¶ 52, 61–62. Based on his experience and training, and the fact that he'd been in the second-floor control booth for hours before the attack, the jury could find that Custodio chose to leave the door open knowing a general population prisoner could go downstairs while the safekeepers

were returning from recreation, and that allowing those two populations to mix was unsafe. *Id*. at ¶¶ 33–41, 57–63. Downstairs from Custodio, Defendant Eric Urieta made the same decision: he left the secure door to first-floor hallway open to avoid the hassle of responding to repeated requests from prisoners wishing to go upstairs for a haircut or returning from the barber. *Id*. at ¶¶ 53, 66–67. Like Custodio, Urieta knew, when he left the door open, that a general population prisoner could walk by while the safekeepers were coming in from yard. *Id*. at ¶¶ 46–51, 58, 68. When Beasley took over for Urieta as the first-floor control booth officer, he made the same intentional choice as his colleagues. Beasley saw that the hallway door leading to the staircase was open; he knew it shouldn't have been; he could have closed it; but he decided to leave it that way. *Id*. at ¶¶ 72–74.

Defendants mount a cursory attack against this evidence, arguing that "Plaintiff's allegations in this case, at most, amounts [sic] to mere negligence, not deliberate indifference." ECF No. 17; *id*. at 27. They elaborate: "There were a lot of things going on the day of in [sic] the incident, with lots of movement of offenders and correctional officers switching places." ECF No. 82 at 17. Specifically, Defendants point out Urieta was in the bathroom when the attack happened, Custodio was upstairs and didn't see the attack, and Beasley did know the safekeepers or Case were coming. ECF No. 82 at 17–18.

Defendants' negligence argument has no legal or factual support. Defendants essentially ask the Court to accept counsel's representation that they were just distracted and could not therefore have been deliberately indifferent. But the Court must analyze Plaintiff's claim according to the legal elements required to establish an Eighth Amendment violation and the evidence in the record. Defendants are not entitled to summary judgment unless there are no facts that would permit a jury to find Plaintiff proved each element. Rather than undertake that

analysis, Defendants proceed as if evidence supporting Plaintiff's claim does not exist. ECF No. 82 at 18 ("There is no evidence that Defendant Custodio, Defendant Beasley or Defendant Urieta had actual knowledge of a substantial risk of harm to satisfy the requirements of a 1983 claim."). As discussed above, the testimony and video evidence would support a jury finding that Defendants *intentionally* left the hallway doors open because it was convenient to do so; knew that doing so might give safekeepers and population prisoners a chance to meet in the hallway; knew it was dangerous for those populations to mix; and had the ability and opportunity to close the doors before the attack occurred, but chose not to. *See, e.g.,* 2d Additional PSOF ¶¶ 16–31; 38–45; 47–51; 62–68; 72–74. Defendants have not done the work—nor could they on the record in this case—to show that no jury question remains on the second element of Plaintiff's deliberate indifference claim.

### D. Qualified Immunity Does Not Protect Defendants from Liability

#### 1. Defendants are not entitled to qualified immunity.

To overcome qualified immunity, Case must show: (1) the facts, taken in the light most favorable to him, depict Defendants' violation of a constitutional right; and (2) "that right was clearly established at the time of the challenged conduct." *King v. Riley*, No. 22-6410, at *7 (4th Cir. Aug. 4, 2023) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The analysis above shows that a reasonable jury could find a violation of a constitutional right. Defendants' last chance is therefore the "clearly established" part of the qualified immunity analysis.

In *King*, however, the Fourth Circuit noted that it has "carved out a class of deliberate-indifference claims to treat differently," reasoning that "officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly established prong." *Id.* This is because "sometimes, context makes the violation 'obvious' and case law is thus not needed to

**JA175**

establish awareness." *Id.* (citing *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022); *Thorpe v. Clarke*, 37 F.4th 926, 933–40 (4th Cir. 2022)). In other words, "when plaintiffs have made a showing sufficient to demonstrate an intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity." *Thorpe*, 37 F.4th at 934 (cleaned up; quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001)); *see also Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996) (where Defendants intentionally violated the Eighth Amendment, "the two [qualified immunity] inquiries effectively collapse into one"). This is such a case. Here, Defendants *intentionally* left the hallway doors open, knowing it was a safety hazard. For Custodio and Urieta, a jury could also find they did so knowing the safekeepers were out at recreation, on their way back soon, and general population prisoners were traveling through the hallways to and from the barber. Having intentionally ignored a known risk to inmate safety, Defendants cannot rely on the clearly established prong to avoid liability.

But even if the Court disagrees that this case falls into the class of deliberate indifference claims to be treated differently, the right at issue here was clearly established when Custodio, Urieta, and Beasley failed to protect Case in January 2020. In analyzing this question, the Court "must define the right in light of the specific context of the case, not as a broad general proposition. It is not necessary, however, that the exact conduct at issue have been previously held unlawful; rather, [the] analysis must take into consideration not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016) (cleaned up; quoting *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004); *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2001)). Here, a reasonable jury could find Defendants knew the door

separating the staircases from the prison hallways needed to be closed and locked to prevent prisoner-on-prisoner assault, 2d Additional PSOF ¶¶ 41, 45, 51; they knew that in Unit 2, violently aggressive safekeepers lived upstairs and general population prisoners lived downstairs, *id*. at ¶¶ 3–7, 10; and they knew allowing those prisoner populations to interact was unsafe, *id.* at ¶¶ 38–40, 44, 50. Their job as control booth officers was to keep those doors closed, and to open them only after conducting safety checks. *Id*. at ¶¶ 24–31. And yet they disregarded that risk and left the doors open, purely for their convenience. *Id.* at ¶¶ 62–68, 72–74, 89–94. As in *Cox*, where the Fourth Circuit upheld denial of qualified immunity: "Under the law of this Circuit, an objectively reasonable correctional officer—certified or uncertified—would have known that these actions were unreasonable, ran afoul of clearly established law, and violated rights 'manifestly included within more general applications of the core constitutional principle' articulated in Farmer." *Cox*, 828 F.3d at 239 (quoting *Odom*, 349 F.3d at 773). Accordingly, Defendants are not entitled to qualified immunity.

Defendants' qualified immunity analysis falls flat. Defendants first argue that their conduct does not rise to the level of a constitutional violation because the record is devoid of evidence "which suggests, let alone proves, that Defendants had any reason to believe Kennion himself specifically posed a threat to Plaintiff's safety." ECF No. 82 at 30. As discussed above, that framing of the Eighth Amendment analysis misstates the law. Under the correct legal standard—which asks whether Defendants knew of a substantial risk of serious harm to any prisoner by any prisoner created from leaving the hallway doors unsecured—there are sufficient facts to permit a jury to find Defendants liable.

Defendants next argue they are entitled to a two-pronged qualified immunity analysis under *King*, and they are immune from liability because Case did not have a clearly established

right in 2020 "to have correctional officers keep him separate from safekeepers" or to have the control booth operated in a non-deficient manner. ECF No. 82 at 30, 32. Assuming the Court were inclined to reach the clearly established prong of the qualified immunity analysis, Defendants' argument would fail because they define the relevant right too narrowly. Again, the Fourth Circuit has instructed that the district court "analysis must take into consideration not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Cox*, 828 F.3d at 238 (4th Cir. 2016) (cleaned up; quoting *Parrish*, 372 F.3d at 301; *Odom*, 349 F.3d at 773. Here, the core constitutional principle Case invokes is the duty the Eighth Amendment imposes on prison officials to protect prisoners from violence at the hands of other prisoners. *Danser*, No. 5:08-CT-3116-BO, at *10 (explaining, for qualified immunity analysis in failure to protect case where plaintiff was attacked by another prisoner while unsupervised in an outdoor recreation space: "The constitutional right at issue is [the plaintiff's] Eighth Amendment right to be protected from violence committed by other prisoners.") (citing *Farmer*, 511 U.S. at 833–85).

The Fourth Circuit has long recognized that a prison official violates a prisoner's Eighth Amendment rights by exhibiting deliberate indifference to a serious risk that an inmate will be attacked by another inmate. *Anderson*, 877 F.3d at 545. *Farmer* and the cases that followed it clearly established the rights Defendants violated when they ignored the risk to general population prisoners like Plaintiff from leaving hallway doors at Central Prison unsecured.[2]

**2. Qualified immunity is not a legitimate doctrine.**

Qualified immunity is textually illegitimate and should be overturned. Case

---

[2] Under the qualified immunity heading, Defendants also argue they are entitled to summary judgment as to any official capacity claim against them. ECF No. 82 at 33. Because Plaintiff does not sue any defendant in his official capacity, the Court need not consider this argument.

acknowledges that this Court cannot overrule the Supreme Court but wishes to preserve the arguments reflected in Judge Don Willett's concurrence in *Rogers v. Jarrett*, No. 21-2020 (5th Cir. Mar. 30, 2023). Relying on recent scholarship, Judge Willett explained that qualified immunity has no basis in the text of § 1983. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023). When the Supreme Court invented qualified immunity, it reasoned that, had the Congress that passed § 1983 wished to abolish the common law immunity doctrines available to state officials, it would have said so explicitly. Because Congress didn't explicitly negate background law when it adopted § 1983, the Supreme Court found those background principles—including immunity—still applied.

But it turns out the as-passed version of § 1983 *did* contain a clause explicitly negating background immunities. The relevant language provided that state actors would be liable for constitutional violations "notwithstanding" "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary. . . ." Then, by simple accident, this notwithstanding clause was omitted when the law was codified. The Supreme Court based its original qualified-immunity decision on the incomplete codified version, rather than the text of the law as Congress passed it. The notwithstanding clause should have the effect Congress clearly intended: qualified immunity should be abolished.

## CONCLUSION

For all those reasons, the Court should deny Defendants' summary judgment motion and set this case for trial on all claims that remain after deciding Plaintiff's second affirmative motion for partial summary judgment, ECF No. 78.

JA179

Dated: March 18, 2024          Respectfully submitted,

/s/ Alison R. Leff

Alison R. Leff
The Civil Rights Group, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
(708) 722-2241 (phone)
alison@civilrightsgroup.com
Ill. Bar No. 6296422
Attorney for Plaintiff

G. Christopher Olson
Olson Law, PLLC
514 Daniels St., #136
Raleigh, NC 27605
(919) 624-3718
chris@olsonlaw-pllc.com
Fax: (919) 834-1071
N.C. State Bar No. 21223
Local Civil Rule 83.1(d) Counsel for Plaintiff

**JA180**

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I electronically filed the foregoing

Plaintiff's Response in Opposition to Defendants' Second Motion for Summary Judgment with

the Clerk of Court using the CM/ECF system, which will send notification of such filing to

Defendants Brandon Beasley, Eric Urieta, and Kenny Custodio, as well as counsel of record for

all parties.

Dated: March 18, 2024                    Respectfully submitted,

                                         /s/ Alison R. Leff

                                         Alison R. Leff
                                         The Civil Rights Group, LLC
                                         2045 W Grand Ave, Ste B, PMB 62448
                                         Chicago, IL 60612
                                         (708) 722-2241 (phone)
                                         alison@civilrightsgroup.com
                                         Ill. Bar No. 6296422
                                         Attorney for Plaintiff

                                         G. Christopher Olson
                                         Olson Law, PLLC
                                         514 Daniels St., #136
                                         Raleigh, NC 27605
                                         (919) 624-3718
                                         chris@olsonlaw-pllc.com
                                         Fax: (919) 834-1071
                                         N.C. State Bar No. 21223
                                         Local Civil Rule 83.1(d) Counsel for Plaintiff

JA181

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
FILE NO. 5:21-CT-03157-D

| | | |
|---|---|---|
| BRANDON CASE, | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF** |
| Plaintiff, | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | |
| BRANDON BEASLEY, ERIC URIETA, | ) | |
| KENNY CUSTODIO, and UNKNOWN | ) | |
| EMPLOYEES OF THE STATE OF | ) | |
| NORTH CAROLINA, | ) | |

Defendants.

NOW COMES Defendant Kenny Custodio (hereinafter "Defendant"), by and through undersigned counsel pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully submits this Response Memorandum in Opposition to Plaintiff's motion for partial summary judgment [D.E. 78]. In opposition of the motion for partial summary judgment, Defendant Custodio states the following:

**STATEMENT OF THE CASE**

On June 7, 2021, Plaintiff, a state incarcerated offender, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging his Eighth Amendment rights were violated by Defendants Beasley and Urieta . [D.E. 1] On June 9, 2021, the Court completed its initial frivolity review allowing Plaintiff's Complaint to proceed against Defendants Beasley and Urieta and directed the Clerk to continue management of the case regarding Defendants. [D.E. 8]

On September 13, 2021, Defendants Beasley and Urieta filed an Answer and raised defenses as to plaintiff's Complaint. [D.E. 15] On June 6, 2022, Plaintiff filed a motion to Amend

1

JA182

Complaint, which was granted by the Court. [D.E. 29, 30] On August 11, 2022, Plaintiff filed an Amended Complaint against Defendants Beasley, Urieta and Custodio. [D.E. 31]

On August 14, 2023, Plaintiff filed a partial motion for summary judgment. [D.E. 49] Defendants filed several motions for extension of time to file dispositive motions which were granted by the Court. [D.E. 54, 56] On September 5, 2024, Defendants filed a first motion for summary judgment as well as an Answer to the amended complaint and a motion to deem the Answer timely filed. [D.E. 57, 58, 60] On December 12, 2023, the Court entered an order allowing the answer to the amended complaint, allowing Defendant Custodio to amend his answers to Plaintiff's requests for admissions, and denying the motions for summary judgment and giving the parties until January 26, 2024 to file renewed motions for summary judgment which comply with the Order and local rules. [D.E. 73]

On January 26, 2024, Plaintiff filed his Second Motion for Partial Summary Judgment as to Defendant Custodio on Count Three of Plaintiff's Complaint. [D.E. 78] Plaintiff filed an accompanying Memorandum in Support and Statement of Material Facts, however, appears to reference the previously filed Appendix when referencing supporting record evidence. [D.E. 79, 80] **<u>Defendants filed their Motion for Summary Judgment with accompanying memorandum, statement of material facts, and appendix.</u>** [D.E. 81-84]

After motions for summary judgment were filed, Plaintiff moved for an extension of time to respond, Attorney of Record Bryan Nichols left the Agency, Section Head Jamie Trachtman substituted in for an interim period, and Undersigned substituted in on the case on March 15, 2024. [D.E. 86-93]

Undersigned promptly moved for a sixty-day (60) extension of time to respond to Plaintiff's Motion for Partial Summary Judgment, Plaintiff opposed, and the Court granted

2

Defendant until April 12, 2024. [D.E. 94, 99-100].

Plaintiff filed his Response to Defendants' Motion for Summary Judgment on March 18, 2024. [D.E. 98].

**<u>STATEMENT OF FACTS</u>**

Plaintiff's allegations arise from an incident at Central Prison ("Central") in Raleigh, North Carolina that occurred on January 21, 2020. [D.E. 31, ¶ 24] Plaintiff was the victim of a violent assault at the hands of Safekeeper Kennion, but alleges Defendants are liable. [D.E. 31] On January 21, 2020, Plaintiff Case received a haircut on the upstairs floor at Central Prison.

Unit 2 of Central Prison houses pre-trial detainees called Safekeepers on the second floor of the unit and General Population Inmates on the ground floor. (DE-84, Exhibit 4.1 Depo of Beasley Pg. 45) In January, 2020, Plaintiff Case was incarcerated in Unit 2 of Central Prison; Case was also serving as a janitor of the Unit and was allowed to move around the facility for cleaning duties. *Id.*

Pursuant to NCDPS Policy .0504(a) Safekeepers must be <u>housed</u> separately from general population offenders. DE-84, *Exhibit 1.3.* Safekeepers are pre-trial detainees (not convicted offenders) who normally would be housed in a county jail however they either (1) pose a serious escape risk, (2) exhibit violently aggressive behavior that cannot be contained and warrants a higher level of supervision; (3) needs to be protected from other prisoners and the county jail facility cannot provide such protection; .....or (4) requires medical or mental health treatment. *Id.* Unit 2 of Central Prison houses Safekeepers on the second floor and General Population Inmates on the ground floor. (DE-84, Exhibit Depo of Beasley Pg. 45).

On the day of the incident, correctional staff were conducting inmate haircuts in the upstairs hallway of Unit 2 outside of the sergeant's office. DE-84, *Exhibit 1.5* Regular Population Inmates

**JA184**

housed on the ground floor of Unit 2 were being sent from their downstairs cells up to the barber upstairs who would proceed to cut their hair and then send them back down to their assigned area on the first floor. *Id.*

To get to the barber located on the second floor, the inmates had to go up one flight of stairs and there is a door at the top and bottom of the stairwell. Id, Exhibit *3.1 and 4.1 Depositions Custodio and Beasley*

The upstairs stairwell door is controlled by a correctional officer in a control booth on the second floor. DE-84, *Exhibit 3.1 Deposition of Custodio.* The downstairs stairwell door is controlled by a correctional officer in a control booth on the ground floor. Id, Exhibit *4.1 Deposition of Beasley.* Because of the number of inmates going up and down the stairwell to get haircuts and return to their cells in a short period of time, the correctional officers in the upstairs and downstairs control booths had left the doors open at the top and bottom of the stairwell. Id, Exhibit *3.1 and 4.1 Depositions Custodio and Beasley.*

Plaintiff Brandon Case received a haircut upstairs and after getting his haircut he began to walk down the stairwell to the ground floor. Id, Exhibit *1.6 and 1.7 Videos of Incident*

At the exact same time Case was walking down the stairs, a group of safekeeper inmates were returning from their recreation time and were walking down the first-floor hallway to go up the stairwell and return to their second floor cells. *Id.*

Plaintiff Brandon Case and Inmate Kenneth Kenyon met at the bottom of the stairwell and Inmate Kenyon punched Plaintiff Case in the facial area several times. *Id.*

Officer Beasley who was stationed in the downstairs control booth and could observe the attack through a window called a code 4 for assistance via radio. *Id, Exhibit 4 – Declaration of Beasley.* Officer Hinton who was escorting the inmates back from recreation and

4

**JA185**

was in the room where the attack occurred approached Inmate Kenyon who after punching Plaintiff Case several times, immediately turned around and submitted to be restrained by placing his hands behind his back. *Id, Exhibit 1.7 Videos of Incident.* Plaintiff Case was escorted to the nurse's station by correctional staff. *Id.*

Correctional Officer Brandon Beasley was in the downstairs control booth when the attack occurred; he was not aware and did not hear a radio call that a group of inmates were returning from recreation and were coming down the hall towards the stairwell. Id, Exhibit *4.1 – Deposition of Beasley* Furthermore, once he did see the safekeepers, he recognized they were supposed to be coming up the stairwell to go back to their assigned cells. *Id.* He was not aware of Plaintiff Case getting a haircut upstairs because Beasley had not been in the control booth earlier. *Id.*

Custodio was employed by the North Carolina Department of Public Safety as a Correctional Officer at Central Prison in Raleigh, North Carolina but has since left State Employment. (DE-84, Exhibit 3, Custodio Declaration ¶ 3)

On January 21, 2020, Custodio was working in Unit 2, D Block of Central Prison which is the day and location the incident occurred between inmate Brandon Case and Kenneth Kennion. (Id, Custodio Declaration ¶4 ) On that day, Custodio had been stationed in the upstairs control booth. (Id, Custodio Declaration ¶5 ) Before the fight occurred, inmates had been getting haircuts upstairs in the hallway outside of the sergeant's office. (Id, Custodio Declaration ¶6 ) Because so many inmates were going up and down the stairs to get haircuts, the upstairs door to the stairwell was left open for a period of time. (Id, Custodio Declaration ¶7 )

Inmate Brandon Case got a haircut upstairs and went downstairs to go back to his cell when he apparently encountered Kenneth Kennion in the hallway coming back from recreation. (Id, Custodio Declaration ¶8 ) Custodio was upstairs in his control booth monitoring the cell block

5

when Officer Beasley yelled that Case and Kennion were fighting. (DE-84, *Exhibit 3.1 Depo of Custodio Pg. 78*).

Custodio did not see Kenneth Kennion punch Brandon Case because it occurred downstairs and Custodio was upstairs in the control booth. (DE-84, Exhibit 3, Custodio Declaration ¶9 ) Custodio did hear the alarm when the fight broke out. (Id, Custodio Declaration ¶10 ) Before the fight, in no way did Custodio know that inmate Brandon Case was in harm or would be punched by Kenneth Kennion. Id, Custodio Declaration ¶11. Custodio did not know and had no way of knowing that Kenneth Kennion would be walking in the downstairs hall at the exact time that Brandon Case went down the stairs. *Id*, (Custodio Declaration ¶12 ) Custodio generally knew of inmate Brandon Case beforehand because he was the janitor. Id, Custodio Declaration ¶13. Custodio also did not hear a radio call announcing that safe keepers were coming in from recreation. (DE-84, Exhibit 3, Depo of Custodio Pg. 79)  Custodio does not know whether there was a radio call saying that inmates were coming in from recreation. *Id*, (Exhibit Depo of Custodio Pg. 79) Had there been a radio transmission that safekeepers were coming back from recreation, Custodio would not have let Offender Brandon Case down the stairs. Id, Exhibit 3.1 Depo of Custodio Pg. 106)

While the policy is to keep Safekeepers and General Population inmates separated, the total separation of both populations is not without its challenges. See Exhibit 1 to the Response Appendix, Declaration of CP Captain John Raymond, ¶3, attached to the Response Appendix.  For instance, both safekeepers and regular population offenders often have appointments throughout the facility, which could be in the same general location and time.  Id. Or one group could be leaving an area of an appointment while regular staff offenders could be arriving to see that same provider/diagnostic staff. Id. General Population Offenders, such as janitors, can be out in the

6

hallways at these times. Id. When this occurs, the escorting officers will order General Population Offenders to step to the side while the Safekeeper Inmates pass. Id. Safekeepers are escorted in a line and the escorting officers stay at the back and middle to ensure they are able to observe the inmate actions and prevent being attacked from behind or to prevent other disruptive behavior by the inmates. *Id*.

Although Plaintiff relies on unresponded to requests for admissions when asserting entitlement to summary judgment, Defendant Custodio was allowed to amend answers to Plaintiff's RFA's and did so. See Exhibit 2 and DE-73.

Further, Custodio was not aware of any subjective knowledge of a substantial risk of serious injury for Plaintiff. Exhibit 3, Declaration of Custodio; co-cited to DE-84, Exhibit 3; Exhibit 1 (Raymond Dec., ¶4).

## **STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the moving party has the burden of "demonstrate[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

7

JA188

**LEGAL ARGUMENT**

**I.    NO FAILURE TO PROTECT**

The United States Supreme Court has found that the Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments" on a prisoner and requires that prison officials "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834; *see also Madkessi v. Fields,* 789 F.3d 126, 133 (4th Cir. 2015). The negligent failure to protect an inmate from assaults by other prisoners, or by other prison guards, does not rise to the level of an unconstitutional violation.  *Davidson v. Cannon,* 474 U.S. 344, 348 (1986).

While "[t]he government and its officials are not free to let the state of nature take its course," *Farmer,* 511 U.S. at 833, "[t]he burden is on the prisoner to demonstrate that the prison official violated the Eighth Amendment, and that burden is a heavy one." *Strickland v. Halsey,* 638 Fed. Appx. 179, 184 (4th Cir. 2015) (quoting *Pyles v. Fahim,* 771 F.3d 403, 408-09 (7th Cir. 2014)).

**A. Two-Part Test – Objective and Subjective Inquiry**

In order to prevail on such a claim, Plaintiff "must satisfy a two-part test, consisting of both an objective and subjective inquiry for liability to attach." *Raynor v. Pugh,* 817 F.3d 123, 127 (4th Cir. 2016).

In the context of a claim based on a failure to prevent harm, the objective prong requires a plaintiff to show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 843; *see also Makdessi,* 789 F.3d at 133.

8

**JA189**

The subjective prong, on the other hand, requires the plaintiff to show that prison officials acted with deliberate indifference to inmate health or safety. *Farmer,* 511 U.S. at 834; *see also Makdessi,* 789 F.3d at 133. In other words, the official must "consciously disregard" a known risk of serious harm. *Anderson¸* 877 F.3d at 544 (quoting *Farmer,* 511 U.S. at 839). "[D]eliberate indifference entails more than ordinary lack of due care for the prisoner's interest of safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Makdessi,* 789 F.3d at 133 (quoting *Farmer,* 511 U.S. at 835)

Thus, "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

"Importantly, deliberate indifference is 'a very high standard.'" *Danser,* 772 F.3d at 347 (quoting *Grayson v. Peed,* 195 F.3d 693, 695 (4th Cir. 1999)). Evidence tending to establish "mere negligence" will not suffice. *Grayson,* 195 F.3d at 695.

### 1.    Plaintiff Cannot Meet the Objective Prong

To meet the objective prong for a claim based on a failure to prevent harm, the plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* at 834. While a single act has been sufficient for courts to find a plaintiff to have met the objective prong (*Makdessi,* 789 F.3d at 133), relying only on the injury wholly invalidates the existence of an objective prong. While Plaintiff has sufficiently shown he has suffered an injury, he has not shown he was placed under conditions that posed a substantial risk of serious harm, as required by the language in *Farmer* and *Makdessi*. *Id*. In *Makdessi*, although the objective prong was not given any significant analysis, the *Makdessi* decision set out facts showing Makdessi was

9

a vulnerable inmate held amidst multiple violent offenders. *Id.* Here, Plaintiff does not exhibit such vulnerabilities and the placement separated General Population inmates from Safekeepers, other than incidental passings, like what would have otherwise happened here. Exhibit 1-Raymond, ¶3; DE-84, Exhibit 3.1 Custodio Depo Transcript (separated because of who se custody, not necessarily due to safety). The conditions cannot be said to have posed a substantial risk of serious injury merely because an elaborate set of coincidences aligned for an unexpectedly unhinged Safekeeper to surprise attack a General Population inmate. This case therefore is differentiated from any case finding a single instance of injury to automatically meet the objective prong. To follow the language in Farmer, the injury must arise from the substantial risk the conditions posed, not simply because there was an injury. To find otherwise would mean that the objective prong requires --an injury,-- and nothing more. And here, nothing existing prior to the attack by Kennion on Case indicated there were conditions posing a substantial risk of serious injury.

### 2. Plaintiff cannot Meet the Subjective Prong

The subjective prong requires the Plaintiff to show that Defendant Custodio "consciously disregarded" a known risk of serious harm. *Anderson¸* 877 F.3d at 544 (quoting *Farmer,* 511 U.S. at 839). [D]deliberate indifference entails more than ordinary lack of due care for the prisoner's interest of safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Makdessi,* 789 F.3d at 133 (quoting *Farmer,* 511 U.S. at 835)

Courts have recognized that knowledge of an inmate's past violence does not, on its own, rise to the level of deliberate indifference. *See Taylor v. Little,* 58 F. + 66, 68 (6th Cir. 2003) (finding evidence that an inmate had recently attacked someone, had been hostile to staff or another

10

correctional facility, had been incarcerated for violent felonies, merely suggested, at most, that "[the inmate], *not unlike many inmates in our prison system* is prone to antisocial and sometimes violent behavior" and did not "suggest that prison officials should have been aware that he might randomly attack a fellow inmate") *see also Street v. Corr. Corp. of Am.,* 102 F.3d 810 (6th Cir. 1996)(finding that incarcerating a prisoner in the same unit of the prison as the victim was not deliberate indifference where both inmates had a history of violence).

There is no evidence that a substantial risk of serious harm was longstanding, pervasive, and well-documented before Plaintiff was attacked by the Inmate Kennion or that Defendants had been "exposed to information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. 842.

The fact that prison is a dangerous place that houses violent inmates or that this unit 2 at Central Prison housed all types of offenders including safekeepers and regular population inmates is not enough to show an obvious risk. *See Rich v. Bruce,* 129 F.3d 336, 339-40 (4th Cir. 1997)

Further the fact that the Inmate was a safekeeper does not rise to the level of imparting knowledge on Defendants that this inmate would attack Plaintiff. *See, e.g., Strickland,* 638 Fed. Appx. At 185-86. The relevant question is whether Defendants subjectively believed the assailant Kenneth Kennion posed a substantial risk of serious harm to other inmates.

Evidence that the inmate was a safekeeper is not enough to establish actual knowledge of a substantial threat of harm. This is not enough to infer knowledge to the Defendants.

Even if a Defendant did violated policy by leaving the stairwell doors open and the top and bottom of the stairs, the law is clear that violation of a policy does not, in and of itself, rise to the level of a constitutional violation. *See United States v. Caceres,* 440 U.S. 741 (1978); *Riccio v. Cty. Of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990)

11

Moreover, Plaintiff fails to present a forecast of evidence that Defendants knew Plaintiff and Kennion were at odds, or that Kennion posed a threat to Plaintiff's safety. Since the forecast of evidence fails to include anything tending to prove this essential element of Plaintiff's claim, Plaintiff's motion should be denied.

While the Fourth Circuit has held that this "actual knowledge" can be proven through circumstantial evidence, that evidence must be such that "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

In *Makdessi*, the Fourth Circuit considered an appeal from a Virginia inmate challenging the dismissal of his deliberate indifference claims against prison officials. *Makdessi*, 789 F.3d at 129. The plaintiff had personally complained about threats from other inmates to one prison official for a period of approximately three years, yet his complaints garnered no response. *Id*. Those complaints eventually became more specific in nature, as Makdessi complained about his cellmate, whom he identified as an aggressive gang member, and requested a new assignment or movement to protective custody. *Id*. at 130. Again, the complaints were met with no response and, over a period of four months, Makdessi suffered physical and sexual assault at the hands of his cellmate and his gang affiliates, ending only when staff finally intervened. *Id*.

Reversing the district court, the Fourth Circuit concluded that Makdessi was "vulnerable to harassment and attacks by other inmates" due to physical and mental health conditions and that his history of complaints was so well documented that prison officials should have detected the risk posed to him. *Id*. at 135. The Court expressly noted "that actual knowledge can be shown by

12

circumstantial evidence that the risk was so obvious that the Defendants had to know it." *Id*. at 133. As the court concluded, a plaintiff's failure to give advance notice of the risk was not dispositive "if it can be shown that the circumstances made it reasonable to believe that the defendants were aware of a serious risk to the plaintiff but took no protective action." *Id*. (citing *Farmer,* 511 U.S. at 848-9).

However, this "circumstantial evidence" cannot consist of only unsupported speculation. *Danser*, 772 F.3d at 344, (citing *Othentec Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008) (defendants' mere access to information insufficient to demonstrate that they actually used that information)); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (conclusory assertions about defendant's motivation and state of mind not sufficient to withstand summary judgment)).

Similarly, in *Wilkins v. Upton*, 2016 U.S. App. LEXIS 3873, 4-5 (4th Cir. 2016) (unpublished), the Fourth Circuit reversed and remanded the district court's denial of qualified immunity to supervisory officials in a claim regarding sexual assault allegations. The Fourth Circuit held, as in *Danser*, that the record was devoid of any evidence which supported the assertion that the defendants had any knowledge whatsoever of their subordinate's alleged actions or that they had a reason to know of such a risk posed by the subordinate officer. *Id*. That absence of evidence was "fatal" to the plaintiff's claims. *Id*.

In the instant case, Plaintiff alleges that Defendants failed to protect him against an alleged danger posed to him by Kenneth Kennion. Yet, in the instant case, there is no evidence that Defendants "actually knew of and disregarded a substantial risk of serious injury" posed to Plaintiff by Kenneth Kennion. *Parrish*, 372 F.3d at 302. Prison can be a dangerous place with inmate on inmate violence occurring, however, nowhere does Plaintiff allege that he informed any

13

**JA194**

of the Defendants of a threat to his safety posed by Kenneth Kennion.

The contours of the Eighth Amendment do not require Defendants to predict Kennion's assault and prevent it from occurring, especially when they had no prior knowledge of Kennion's intentions or any reason to suspect it. The conduct which Plaintiff attributes to Defendants simply cannot be reconciled with the record.

The record demonstrates that Defendant Custodio was having to open the slider door so often that it was more efficient to leave it open. Had there been an appropriate alert when the Safekeepers were entering, then Custodio could have closed the door and prevented any General Population Offender from entering the hallway. Otherwise, the subjective knowledge was that it was safe for General Population Offenders to enter the hallway after their haircuts.

**B. Policy Violations and Mere Negligence are Insufficient to Find § 1983 Liability.**

Violation of a prison policy by prison officials does not establish a constitutional violation. *See Riccio v. Cty of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights that the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

Plaintiff's allegations in this case, at most, amounts to mere negligence, not deliberate indifference. There is no evidence that Defendants actions or inaction rise to a level of a constitutional violation or from which a jury could find Defendants were deliberately indifferent to an obvious risk of substantial harm to the Plaintiff. The alleged negligent failure to protect Plaintiff Case from an assaults by Inmate Kenneth Kennion, does not rise to the level of an unconstitutional violation. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

Any deficiencies in Defendant's actions would amount, at most, to negligence which does

14

JA195

not rise to the level of deliberate indifference. *See Grayson v. Peed,* 195 F.3d 693, 695 (4th Cir. 1999). Plaintiff cannot create a dispute of fact by pointing to the absence of evidence in the record. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985)

C. Plaintiff has not Established Grounds to Survive Qualified Immunity

The United States Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), set forth objective standards for the utilization of the qualified immunity defense and gave specific benchmarks to the judiciary in determining when to protect public officials from undue interference with the exercise of their official duties. In setting forth the guidelines, the Supreme Court ruled that "government officials performing discretionary functions are shielded from liability and civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person should have known." *Id.* at 818.

The Court further held that "[r]eliance on the objective reasonableness of an official's conduct is measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

Subsequently, the Supreme Court held in *Anderson v. Creighton,* 483 U.S. 635 (1987), that a court must look for the "'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' a the time it was taken." *Id.* at 639. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right …[This] is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* at 640.

In determining whether an individual defendant is entitled to qualified immunity, this Court engages in a two-step process as set forth in *Saucier v. Katz,* 533 U.S. 194 (2001). The Court must first determine "whether a constitutional right would have been violated on the facts

15

alleged." *Id.* at 200. If the facts viewed in a light most favorable to the plaintiff do not establish a constitutional violation, the inquiry ends and the plaintiff cannot prevail. *Parrish,* 372 F.3d at 301. "Next, assuming that the violation of the right is established, the courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy,* 349 F.3d 731, 739 (4th Cir. 2003).

The Fourth Circuit Court of Appeals has recently addressed a similar fact pattern in their decision in *King v. Riley,* 76 F.4th 259, 263 (4th Cir. 2023)

In *King v. Riley,* a South Carolina inmate named King was murdered by another inmate. The estate of the deceased inmate sued pursuant to 1983 alleging that correctional staff were deliberately indifferent to King's safety and therefore responsible for his death. Summary Judgment was granted at the district court level and the estate appealed to the Fourth Circuit. The Fourth Circuit affirmed the district court decision, finding no error and that the prison guards on duty failed to violate a clearly established right therefore defendants were entitled to qualified immunity.

In the opinion the Court focused on the fact that there is not a clearly established right to properly conducted security checks. However, the Court noted that qualified immunity does not protect officials who knowingly disregard the law and that officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly established prong. If an official did not know their actions violated the Eighth Amendment, they are entitled to the same two-pronged qualified immunity approach as every government official.

Defendant Custodio is entitled to the two prong approach because they were aware of the risk of harm related to inmate-on-inmate violence, however the Constitution does not "obviously" require Defendants to keep safekeepers and regular population inmates away from

16

**JA197**

each other at all times or keep stairway doors closed at all times.

In establishing if a right is clearly established, the right at issue must first be defined. The Court should "pinpoint the precise constitutional right at issue." *King (*quoting, *Pfaller,* 55 F.4th at 445.) The unlawfulness must be "apparent" based on pre-existing law. *King (*quoting *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

The right at issue is Case's right to have correctional officers keep him separate from safekeepers, given a known and substantial potential risk of inmate-on-inmate violence in the Unit.

The undisputed evidence demonstrates that Defendant Custodio is entitled to qualified immunity because his alleged individual conduct was objectively reasonable in light of constitutional requirements. The Eighth Amendment does not command that Defendants predict an assault by Kennion which, if undertaken, would pose a risk of harm to Plaintiff.

There is no evidence in the record which suggests, let alone proves, that Defendant had any reason to believe Kennion himself specifically posed a threat to Plaintiff's safety. As a result, Defendants are entitled to qualified immunity and Plaintiff's motion for summary judgment should be denied.

Plaintiff has also failed to demonstrate that Defendant ever had any subjective or objective reason to believe that Kennion specifically posed an unreasonable risk of harm to him. In the absence of any specific knowledge of a specific risk posed to Plaintiff by Kennion, Defendant could not have understood that any failure to take action to protect Plaintiff from Kennion – whatever that action might be – exposed Defendant to liability or jeopardized Plaintiff's constitutional rights.

Moreover, whatever level of knowledge Defendants may have had about risks to inmates

17

at Central Prison generally due to previously reported assaults, the fact that Plaintiff was subsequently injured in an assault hardly provides notice, imputable to Defendant before the assault, that any inaction by Defendant was unlawful. For this additional reasoning, Plaintinff has not demonstrated a claim sufficient to survive qualified immunity and his motion should be denied.

The qualified immunity inquiry must focus on the specific factual situation in this case to determine whether Defendants enjoy immunity. *See Parrish,* 372 F.3d at 301. "If the right was not clearly established in the specific context of the case-that is, if it was not clear to a reasonable officer that the conduct in which the allegedly engaged was unlawful in the situation he confronted-then the law affords immunity from suit." *Clem v. Corbeau,* 284 F.3d 543, 549 (4th Cir. 2002).

This Court has explained that the nature of the right violated must be defined "at a high level of particularity." *Edwards v. City of Goldsboro,* 178 F.3d 231, 250-51 (4th Cir. 1999). "[W]hen the legality of a particular course of action is open to reasonable dispute, an officer will not be subjected to trial and liability." *Figg v. Schroeder,* 312 F.3d 625, 636 (4th Cir. 2002).

In other words, as the Supreme Court has phrased the standard, the unlawfulness of the conduct must be "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

The evidence in the record shows that even if it were determined that Defendants acted with negligence or deliberate indifference, that was no clearly established law putting them on notice that a constitutional violation occurs when the control booth is operated in a deficient manner. The record also shows that Defendant Custodio was upstairs in the control booth operating the slider door at the top of the stairs and that there was another slide door at the bottom of the stairs.

The Supreme Court has found that qualified immunity protects all but the plainly

18

incompetent or those who knowingly violated the law. *Malley v. Briggs,* 475 U.S. 335, 341 (1986),

Therefore, the Court must determine whether Defendants were either plainly incompetent or that each defendant knowingly violated Plaintiff's constitutional rights, and if it does not find this, Defendants are entitled to qualified immunity.

No bright line was transgressed by Defendant Custodio. Even if the court finds that there is evidence of a constitutional violation, there is not evidence such a violation was clearly established.

**<u>CONCLUSION</u>**

For the forgoing, Plaintiff's Motion for Partial Summary Judgment should be denied.

This the 12th day of April, 2024.

JOSHUA H. STEIN
ATTORNEY GENERAL


/s/J. Locke Milholland, IV
J. Locke Milholland, IV
Special Deputy Attorney General
N.C. State Bar No. 35449
N.C. Department of Justice
Public Safety Section
9001 Mail Service Center
Raleigh, North Carolina 27699-9001
Telephone:  (919) 716-6545
Facsimile:   (919) 716-6761
E-Mail:      JMilholland@ncdoj.gov


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this day, I electronically filed the MEMORANDUM OF LAW IN

19

JA200

SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the

CM/ECF system.


Alison R. Leff, Esq.                          G. Christopher Olson
Law Office of Thomas R. Kayes, LLC            Olson Law, PLLC
2045 W Grand Ave., Suite B, PMB 62448         514 Daniels Street, #136
Chicago, IL 60612                             Raleigh, NC 27605
*Attorneys for Plaintiff*                     *Attorneys for Plaintiff*


This the 12th day of April, 2024.

                                    /s/J. Locke Milholland, IV
                                    J. Locke Milholland, IV
                                    Special Deputy Attorney General

JA201

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-3157-D

BRANDON CASE,           )
                                  )
            Plaintiff,     )
                                  )
            v.                )        **ORDER**
                                    )
OFFICER BEASLEY, et al.,    )
                                  )
          Defendants.    )

On January 21, 2020, a "safekeeper" inmate named Kenneth Kennion ("Kennion")[1] assaulted Brandon Case ("Case" or "plaintiff") at Central Prison "without provocation," leaving Case permanently disfigured and "in constant pain since the attack." Am. Compl. [D.E. 31] ¶¶ 24, 30, 33, 41. Case sues three correctional officers (Custodio, Beasley, and Urieta) under 42 U.S.C. § 1983 and alleges that they failed to protect him from Kennion's assault and thereby violated the Eighth Amendment. See id. ¶¶ 9–11, 49–69.[2] Case seeks summary judgment on count three of the amended complaint against Custodio. See [D.E. 78]. Defendants seek summary judgment and argue that even viewing the evidence in the light most favorable to Case, defendants were, at most, negligent and therefore did not violate Case's constitutional rights. [D.E. 82] 2. Alternatively,

---

[1] The parties occasionally spell the name of Case's assailant as Kenyon. See, e.g., Def.'s Statement of Material Facts ("DSMF") [D.E. 83] 5; [D.E. 96] ¶ 18.

[2] Case also names as defendants "Unknown Employees of the State of North Carolina . . . whose misconduct resulted in Case's injuries but whose names Case does not yet know." Am. Compl. ¶ 12. Case has not moved to amend his complaint to name any additional defendants. Accordingly, the court dismisses these defendants. Cf. Haba v. Arthur, 851 F. App'x 405, 406 (4th Cir. 2021) (per curiam); Chidi Njoku v. Unknown Special Unit Staff, 217 F.3d 840, at *1 (4th Cir. 2000) (per curiam) (unpublished); Schiff v. Kennedy, 691 F.2d 196, 197–98 (4th Cir. 1982).

defendants assert qualified immunity. See id. at 27–32. As explained below, the court agrees with the defendants, grants defendants' motion for summary judgment, and denies plaintiff's motion for summary judgment.

## I.

Case alleges that "while he was a prisoner of North Carolina living at Central Prison, Defendants . . . failed to protect him from being attacked by Kennion." Pl.'s Statement of Material Facts ("PSMF") [D.E. 80] ¶ 80; see [D.E. 102] ¶ 80.[3] Safekeepers are pretrial detainees who county jails send to be housed at Central Prison. "One of the reasons a county jail may send a safekeeper to Central Prison is that the prisoner is so violent and aggressive the jail [cannot] safely house him." PSMF ¶¶ 5–6; see [D.E. 102] ¶¶ 5–6. The parties have presented no evidence, however, that Kennion had a history of assaulting other inmates. Moreover, there are other reasons a county jail can send a pretrial detainee to Central Prison for safekeeper status. See DSMF 3 (listing other reasons a county jail can transfer a pretrial detainee to safekeeper status); [D.E. 96] ¶ 8.[4] Furthermore, safekeepers wear specific uniforms at Central Prison to visually distinguish them from general population inmates. PSMF ¶¶ 8–9; see [D.E. 102] ¶¶ 8–9.

"Unit 2 of Central Prison houses Safekeepers on the second floor and General Population Inmates on the ground floor." DSMF 3; see [D.E. 96] ¶ 10; PSMF ¶¶ 3, 10; [D.E. 102] ¶¶ 3, 10. Safekeepers and general population inmates "are never supposed to be in the same hallway at the

---

[3] Because defendants failed to number the paragraphs in their statement of material facts as required by Local Civil Rule 56.1(a)(1), see [D.E. 83], the court uses the paragraph numbers that Case used in his opposing statement of material facts.

[4] Case objects to defendants' citation to public records which they did not disclose in discovery. See [D.E. 96] ¶¶ 6, 8–9, 11. "However, courts do not typically order discovery of public records which are equally accessible to all parties." Eshelman v. Puma Biotechnology, Inc., No. 7:16-CV-18, 2018 WL 1702773, at *6 (E.D.N.C. Apr. 6, 2018) (unpublished) (collecting cases).

2

same time." PSMF ¶ 12; see [D.E. 102] ¶ 12. Correctional officers occupy control booths on each floor and employ locking sallyport doors and visual confirmation to control access to the stairwells and hallways. See PSMF ¶¶ 17–20, 22–25, 30; [D.E. 102] ¶¶ 17–20, 22–25, 30. "Another way a control booth officer can make sure the hallway is clear is to use a radio to communicate with officers in other parts of Unit 2. A control booth officer should not unlock the door to a secure hallway without conducting those safety checks." PSMF ¶¶ 27–28; see [D.E. 102] ¶¶ 27–28.

On the day Kennion attacked Case, general population inmates, including Case, "were getting haircuts in the hallway near the second-floor control booth on D block of Unit 2[]" while safekeeper inmates were at recreation. PSMF ¶¶ 43, 46–47; see [D.E. 102] ¶¶ 43, 46–47; DSMF 7; [D.E. 96] ¶ 15. Custodio was assigned to the upstairs control booth while Urieta and Beasley were assigned to the downstairs control booth.[5] See PSMF ¶ 41; [D.E. 102] ¶ 41; DSMF 5–6; [D.E. 96] ¶ 20, 23, 31–32. "Because of the number of inmates going up and down the stairwell to get haircuts and return to their cells in a short period of time, the correctional officers in the upstairs and downstairs control booths had left the doors open at the top and bottom of the stairwell." DSMF 5; [D.E. 96] ¶ 14; see also PSMF ¶ 49 (Custodio "decided to leave the stairwell door open because it was easier to do so than to open and close the door for each prisoner who came and went for a haircut"); [D.E. 102] ¶ 49; [D.E. 96] ¶ 23.

An unidentified officer may have placed a radio call announcing the safekeepers' return from recreation. Defendants deny hearing any such radio call. Compare DSMF 6, 8, 11 with [D.E.

---

[5] Urieta was in the restroom when Kennion attacked Case. See DSMF 6; [D.E. 96] ¶ 32. "On that day, prior to the incident Beasley had been stationed on downstairs patrol[,]" but was working the downstairs control booth when Kennion attacked Case. DSMF 11; see [D.E. 96] ¶ 36.

3

96] ¶¶ 4, 19, 26, 30. Regardless, the answer to this disputed issue is not material in this case under the Eighth Amendment.

"After getting his haircut [Case] began to walk down the stairwell to the ground floor. At the exact same time Case was walking down the stairs, a group of safekeeper inmates were returning from their recreation time and were walking down the first-floor hallway to go up the stairwell and return to their second floor cells." DSMF 5; see [D.E. 96] ¶¶ 15–17. "When Plaintiff Case entered the hallway, Kennion attacked Case allegedly without provocation. Kennion struck Case in the face repeatedly before a correctional officer intervened." DSMF 2; see [D.E. 96] ¶ 5; cf. PSMF ¶ 63; [D.E. 102] ¶ 63. Defendant "Beasley yelled that Case and Kennion were fighting." DSMF 7; see [D.E. 96] ¶ 24. Beasley also "called an alarm over the radio and several staff members rushed to the area and immediately took charge of the situation." DSMF 12; see [D.E. 96] ¶ 41. Before the attack, defendants were "not aware that Kenneth Kennion or Brandon Case had any animosity towards one another or were somehow at odds with each other before Kennion punched Case." DSMF 8, 10, 12; see [D.E. 96] ¶¶ 27, 34, 41.

## II.

### A.

A court may grant summary judgment when, after reviewing the record as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleadings, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a

4

genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 248–49. In doing so, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, LLC, 630 F.3d 351, 354 (4th Cir. 2011).

Here, the parties have submitted video recordings capturing Kennion's attack on Case. See [D.E. 52-11, 52-12, 68-3, 84-7, 84-8, 92]. Video evidence can affect the summary judgment standard. See Scott, 550 U.S. at 378; Alexander v. Connor, 105 F.4th 174, 179 (4th Cir. 2024); Jones v. Solomon, 90 F.4th 198, 204 (4th Cir. 2024); Brooks v. Johnson, 924 F.3d 104, 111–12, 115 (4th Cir. 2019). Where the video contradicts the nonmoving party's version of the facts such that no reasonable jury could believe the nonmoving party, the court must view the facts in the light depicted by the video. See Scott, 550 U.S. at 379–81; see, e.g., Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605 (E.D.N.C. 2009). But this exception is a "narrow" one. Lewis v. Caraballo, 98 F.4th 521, 529 (4th Cir. 2024). In this case, the video recordings have no sound. Furthermore, while the video recordings show Kennion attacking Case, the videos fail to adequately capture defendants' conduct. Thus, the court does not rely on the video recordings in resolving the motions.

### B.

Prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (cleaned up); see Hudson v. Palmer, 468

5

U.S. 517, 526–27 (1984); Ford v. Hooks, 108 F.4th 224, 229 (4th Cir. 2024); King v. Riley, 76 F.4th 259, 264 (4th Cir. 2023); Brown v. N.C. Dep't of Corr., 612 F.3d 720, 722–23 (4th Cir. 2010); Price v. Sasser, 65 F.3d 342, 345 (4th Cir. 1995); Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987). However, "[n]ot every injury suffered by a prisoner at the hands of another establishes liability against a prison official." Brown, 612 F.3d at 723; see Farmer, 511 U.S. at 834; Ford, 108 F.4th at 230. "Only an extreme deprivation, that is, a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof, will satisfy the objective component of an Eighth Amendment claim challenging the conditions of confinement." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (quotation omitted); see Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997).

The subjective prong requires the prisoner to show that the prison official acted with deliberate indifference to the inmate's health or safety. See, e.g., Farmer, 511 U.S. at 834–40; Ford, 108 F.4th at 230; De'lonta, 708 F.3d at 525; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). Although "deliberate indifference entails something more than mere negligence, . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Deliberate indifference requires that "a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta, 708 F.3d at 525 (quotation omitted); see Farmer, 511 U.S. at 837; Johnson, 145 F.3d at 167. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see Makdessi v. Fields, 789 F.3d 126, 133–34 (4th Cir. 2015). "It is not enough that the [prison official] should have recognized" the objectively serious condition, medical need, or risk of harm. Parrish ex rel.

6

Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis omitted). Rather, a plaintiff must prove "actual knowledge of the risk of harm to the inmate." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis omitted). A prisoner's failure to give warning of, or protest exposure to, the objectively serious risk does not conclusively show that a prison official lacked actual knowledge. See Makdessi, 789 F.3d at 134. Moreover, a prisoner can prove "[a] prison official's subjective actual knowledge . . . through circumstantial evidence." Id. at 133. Furthermore, a risk "of harm might be so obvious that the factfinder could conclude that the [prison official] did know of it because he could not have failed to know of it." Id.

Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious risk of harm. Iko, 535 F.3d at 241 (quotation and emphasis omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); see Wilson v. Seiter, 501 U.S. 294, 298–99 (1991); Alexander, 105 F.4th at 182; Ford, 108 F.4th at 230. Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. "Liability under § 1983 must be analyzed individually for each defendant." Jones, 90 F.4th at 207; see King, 76 F.4th at 269.

The parties focus on whether defendants acted with deliberate indifference to Case's safety by leaving the stairwell doors unlocked. See [D.E. 79] 7–11; [D.E. 82] 21–27. The record lacks any direct evidence that defendants knew that "the risk to which [Case] was exposed in the [stairwell] was any different from, or greater than, the risk of violence that exists generally in the prison environment." Jordan v. Maryland, No. CV 22-1541, 2024 WL 3597203, at *12 (D. Md. July 31, 2024) (unpublished); see, e.g., Farmer, 511 U.S. at 842; King, 76 F.4th at 266 n.7; Danser

7

v. Stansberry, 772 F.3d 340, 348–49 (4th Cir. 2014); Rich v. Bruce, 129 F.3d 336, 338–40 (4th Cir. 1997); cf. Koon v. North Carolina, 50 F.4th 398, 407–10 (4th Cir. 2022). The record lacks any circumstantial evidence demonstrating a "truly obvious" risk to Case due to defendants' failure to keep the stairwell doors locked.[6] Koon, 50 F.4th at 407; see Farmer, 511 U.S. at 842; Makdessi, 789 F.3d at 133; Danser, 772 F.3d at 348–49; Rich, 129 F.3d at 338–40; cf. King, 76 F.4th at 265. Although the defendants may have permitted the safekeepers to pass through the hallway with general population inmates, not all safekeepers received their designation as a result of being violent and aggressive. See Chapter C, § .1601(b)(1), "Safekeepers," State of North Carolina Department of Public Safety Prisons, Policy & Procedures (listing other reasons for safekeeper designation). Moreover, neither party presents evidence to suggest that Kennion had ever before attacked another inmate. To the extent Case relies on defendants' alleged failure to follow policies or training, Case has not demonstrated that defendants violated the Constitution. See, e.g., King, 76 F.4th at 267; Danser, 772 F.3d at 348–49; Rich, 129 F.3d at 338–40; Jordan, 2024 WL 3597203, at *13. Accordingly, the court grants defendants' motion for summary judgment and denies plaintiff's motion for partial summary judgment.

## C.

Defendants also argue that they are entitled to qualified immunity. See [D.E. 82] 27–32. Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

---

[6] In his complaint, Case alleged that his "attack . . . was at least the third time in recent months that a safekeeper attacked a general population inmate because of staff's failure to follow protocols to keep general population inmates separated from safekeepers[,]" including an assault "in the same spot where Case was attacked[.]" Am Compl. ¶¶ 46–47. Case, however, did not verify his complaint and did not produce evidence in the record to support this allegation. Cf. Jones, 90 F.4th at 206 & n.7; Raynor v. Pugh, 817 F.3d 123, 129 (4th Cir. 2016).

8

JA209

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Rivas-Villegas v. Cortesluna, 595 U.S. 1, 4–8 (2021) (per curiam); City of Tahlequah v. Bond, 595 U.S. 9, 12–14 (2021) (per curiam); City of Escondido v. Emmons, 586 U.S. 38, 42–44 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103–08 (2018) (per curiam); District of Columbia v. Wesby, 583 U.S. 48, 62–68 (2018); Hernandez v. Mesa, 582 U.S. 548, 554 (2017) (per curiam); Ziglar v. Abbasi, 582 U.S. 120, 150–52 (2017); White v. Pauly, 580 U.S. 73, 78–80 (2017) (per curiam); Mullenix v. Luna, 577 U.S. 7, 11–13 (2015) (per curiam); Taylor v. Barkes, 575 U.S. 822, 825–27 (2015) (per curiam); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 611 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam); Reichle v. Howards, 566 U.S. 658, 664 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 584 U.S. at 104; Wesby, 583 U.S. at 63; Ziglar, 582 U.S. at 151–52; White, 580 U.S. at 79–80; Mullenix, 577 U.S. at 12; Taylor, 575 U.S. at 825; Sheehan, 575 U.S. at 611; Carroll, 574 U.S. at 17.

In analyzing qualified immunity, the court asks, "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (cleaned up); see Reichle, 566 U.S. at 664; Lewis, 98 F.4th at 530; King, 76 F.4th at 264–65; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts may decide which question to address first. See Pearson, 555 U.S. at 242; Lewis, 98 F.4th at 530. Qualified immunity shields a defendant if the answer to either question is "no." See Reichle, 566 U.S. at 664; Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011); Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir.

9

2007); Bostic, 667 F. Supp. 2d at 605–06. "A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, 563 U.S. at 741 (cleaned up). Although a case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." Id.; see Reichle, 566 U.S. at 664.

Case has not shown that the defendants violated the Constitution or that the alleged right was clearly established. At most, defendants were negligent. See, e.g., King, 76 F.4th at 266–68; Danser, 772 F.3d at 348–49; Rich, 129 F.3d at 338–40. Accordingly, defendants are entitled to qualified immunity.

## III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 81] and DENIES plaintiff's second motion for partial summary judgment [D.E. 78]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and his court's local rules. The clerk shall close the case.

SO ORDERED. This 30 day of August, 2024.

JAMES C. DEVER III
United States District Judge

10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

BRANDON CASE,
              Plaintiff,

      v.                                   **Judgment in a Civil Case**

OFFICER BEASLEY, OFFICER URIETA,
KENNY CUSTODIO and UNKNOWN
EMPLOYEES OF THE STATE OF NORTH
CAROLINA,
              Defendants.              Case Number: 5:21-CT-3157-D

**Decision by Court.**

This action came before the Honorable James C. Dever III, United States District Judge, for consideration of the plaintiff's second motion for partial summary judgment and defendants' motion for summary judgment.

**IT IS ORDERED AND ADJUDGED** that plaintiff's second motion for partial summary judgment is denied, defendants' motion for summary judgment is granted and this action is hereby dismissed.

This Judgment Filed and Entered on August 30, 2024, with service on:
Alison R. Leff, G. Christopher Olson and John Locke Milholland, IV
 (via CM/ECF Notice of Electronic Filing)

August 30, 2024                    Peter A. Moore, Jr.
                                       Clerk of Court

                              By:                        
                                      Deputy Clerk

JA212

United States District Court for the  Eastern

District of  North Carolina - Western Division

Docket Number  5:21-CT-3157-D

BRANDON CASE,

Plaintiff,

)
v. )       Notice of Appeal
)
BRANDON BEASLEY, ERIC URIETA, )
KENNY CUSTODIO and UNKNOWN
EMPLOYEES OF THE STATE OF NORTH
CAROLINA,

Defendants.

Brandon Case (name all parties taking the appeal)*
appeal to the United States Court of Appeals for the  Fourth  Circuit from the final judgment
entered on  August 30, 2024  (state the date the judgment was entered).

(s)  Alison R. Leff

Attorney for  Brandon Case

Address:  Loevy + Loevy

311 N. Aberdeen Street

Chicago, IL 60607

[**Note to inmate filers:** *If you are an inmate confined in an institution and you seek the timing
benefit of Fed. R. App. P. 4(c)(1), complete the Declaration of Inmate Filing and file that
declaration along with this Notice of Appeal*]

_____

* See Rule 3(c) for permissible ways of identifying appellants.

12/01/2021  SCC

JA213