**No. 24-6953**

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

BRANDON CASE,

*Plaintiff-Appellant,*

v.

BRANDON BEASLEY et al.,

*Defendants-Appellees.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
No. 5:21-CT-03157-D

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

Rosalind E. Dillon
Alison R. Leff
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
dillon@loevy.com

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. ii

INTRODUCTION ...........................................................................1

ARGUMENT ..................................................................................2

    I.   Defendants Are Not Entitled To Summary Judgment On Case's Eighth Amendment Deliberate-Indifference Claim. ...................................2

        A.   Knowingly Creating A Substantial Safety Risk For Convenience Violates The Subjective Component Of The Eighth Amendment. .........4

        B.   Defendants Did Not Respond Reasonably To The Risk Of Serious Harm Their Actions Created. ...............................................11

        C.   Defendants Misunderstand *Farmer v. Brennan* ....................................13

        D.   Defendants' Qualified Immunity Argument Fails. ...............................15

    II.   The District Court Abused Its Discretion In Allowing Custodio To Oppose Case's Motion For Summary Judgment. ....................................17

CONCLUSION ..............................................................................20

CERTIFICATE OF COMPLIANCE ......................................................21

CERTIFICATE OF SERVICE ...........................................................22

i

## TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Anderson v. Kingsley*, 877 F.3d 539 (4th Cir. 2017) ............................................4

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011) ................................................15

*Brown v. N.C. Dep't of Corr.,* 612 F.3d 720 (4th Cir. 2010) ..................................11

*Case v. Ahitow,* 301 F.3d 605 (7th Cir. 2002) ..................................................11

*Cox v. Quinn,* 828 F.3d 227 (4th Cir. 2016) ........................................................4, 16

*Danser v. Stansberry,* 772 F.3d 340 (4th Cir. 2014) ..............................................16

*Dean v. Jones,* 984 F.3d 295 (4th Cir. 2021) ......................................................3

*De'lonta v. Johnson,* 708 F.3d 520 (4th Cir. 2013) ................................................2

*Farmer v. Brennan,* 511 U.S. 825 (1994) ............................................ 3, 6, 9, 13, 14

*Judge v. Quinn,* 612 F.3d 537 (7th Cir. 2010) ......................................................13

*King v. Riley,* 76 F.4th 259 (4th Cir. 2023) ...........................................................15

*Makdessi v. Fields,* 789 F.3d 126 (4th Cir. 2015) ......................................................4

*Quinn v. Zerkle,* 111 F.4th 281 (4th Cir. 2024) ..................................................17

*Randolph v. Maryland,* 74 F. Supp. 2d 537 (D. Md. Nov. 18, 1999)..............14

*Robinson v. Wix Filtration Corp., LLC,* 599 F.3d 403 (4th Cir. 2010) ........... 17, 18

*Steves & Sons, Inc. v. JELD-WEN, Inc.,* 988 F.3d 690 (4th Cir. 2021) .................13

*Thorpe v. Clarke,* 37 F.4th 926 (4th Cir. 2022)......................................................15

*Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999)..........................13

**Rules**

Fed. R. Civ. P. 6 .......................................................................................17

**Other**

*Classification*, NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, (last visited

July 11, 2025), dac.nc.gov/adult-corrections/prisons/classification ......................7

## INTRODUCTION

Plaintiff Brandon Case, while a general population prisoner at Central Prison, was passing through a secure hallway in his housing unit when he was brutally attacked by a safekeeper—a member of a group of prisoners that includes unusually violent pre-trial detainees. That attack would not have happened but for the deliberate indifference of the three correctional officer Defendants.

Defendant correctional officers do not contest that their job on the day of the attack was to keep doors to certain hallways—including the one Case was passing through—closed and locked, allowing prisoners to pass only after conducting safety checks to make sure the area was safe and clear. And record evidence shows that each Defendant understood that their job was important to prevent the mixing of general population prisoners and safekeepers for safety reasons. Nevertheless, Defendants left the hallway doors wide open for an extended period on the morning Case was attacked for their own convenience while the safekeepers were out at recreation. They did not even bother to close the doors after they were alerted to the safekeepers' imminent return, an action that not only was required of them, but that would have easily averted the substantial risk they had created that safekeepers and general population prisoners would come face-to-face in the unsecured hallway.

Defendants cannot deny that knowingly creating a substantial risk of harm that a prisoner will be attacked and then doing nothing upon learning that risk of

harm is imminent constitutes deliberate indifference. Instead, Defendants urge this Court to omit material facts, draw inferences in their favor, and treat disputed facts as undisputed. But that, of course, is not how summary judgment works. Viewing the record in a light most favorable to Case, a jury could not only conclude that the Defendants knew leaving the secured hallway doors wide-open while the safekeepers were returning from recreation created a substantial risk of harm to any general population prisoner also in the unit's hallways, but also that Defendants could have easily shut the doors but instead did nothing. And it's long been established that prison officials who know of a substantial risk of harm, including harm inflicted by other prisoners, and fail to respond reasonably are not entitled to qualified immunity. For those reasons, and for the reasons stated in Case's opening brief, this Court should reverse the district court's entry of summary judgment for Defendants.

## ARGUMENT

I.   **Defendants Are Not Entitled To Summary Judgment On Case's Eighth Amendment Deliberate-Indifference Claim.**

As Defendants concede, the question at issue in this case is whether Defendants "actually [knew] of and disregard[ed] an objectively serious risk of harm." Appellees' Br. at 8-9 (quoting *De'lonta v. Johnson*, 208 F.3d 520, 525 (4th Cir. 2013)).

At summary judgment, the Court must view "the facts in the light most favorable to" the nonmovant and draw "all reasonable inferences in [the nonmovant's] favor." *Dean v. Jones*, 984 F.3d 295, 301 (4th Cir. 2021). Summary judgment must be denied if reasonable minds might differ on the inferences arising from undisputed facts. *See id*. Defendants' brief is replete with their version of the facts. But the question at this stage, of course, is not whether Defendants' version of the facts, with all inferences drawn in their favor, entitled them to summary judgment. *See id*. It's whether Case's version of the facts entitles him to trial.

Here, Case has put forward sufficient evidence supporting his version of the facts: (1) that all three Defendant correctional officers—Custodio, Beasley, and Urieta—understood that their job was to keep certain hallways secure and allow prisoners to pass only after conducting safety checks to prevent violence from general population prisoners mixing with safekeepers, and (2) notwithstanding that knowledge, Defendants left secure hallway doors wide open for an extended period for convenience sake, even after they were alerted of an imminent safety risk. *See* Opening Br. at 20-27. As a result, Case was brutally beaten—an obvious risk that the locked doors were meant to combat—and the bones in his face were shattered. *Id*.

Accordingly, Case is entitled to have a jury determine whether Defendants' actions violated the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 842

(1994) (explaining the Eighth Amendment forbids "fail[ing] to act despite … knowledge of a substantial risk of serious harm."); *Anderson v. Kingsley*, 877 F.3d 539, 545-46 (4th Cir. 2017).

### A. Knowingly Creating A Substantial Safety Risk For Convenience Violates The Subjective Component Of The Eighth Amendment.

Whether a defendant knows of a risk of serious harm is a question of fact, and a factfinder can assume knowledge from evidence that the risk "was longstanding, pervasive, well-documented, or expressly noted," or even by the very fact that the risk was obvious. *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) (cleaned up); *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

Case offered a mountain of evidence from which a factfinder could conclude that Defendant correctional officers not only knew of a substantial risk of serious injury, but that they knowingly created that risk for their own convenience. *See* Opening Br. at 22-24. That evidence includes: (1) testimony from Defendant correctional officers that they knew safekeepers posed a special safety risk and that it was unsafe for them to mix with general population prisoners, *id*. at 22; (2) testimony that Defendants each knew that keeping the sallyport doors to the stairwells closed to secure the hallways was a mandatory safety rule in order to prevent the mixing of safekeepers and general population prisoners, *id*. at 23; (3) record evidence and testimony that the risk of safekeeper attacks was longstanding and well-known among Defendant correctional officers, *id*. at 23; and (4) record

4

evidence and testimony that Defendant correctional officers knew specifically of the safekeepers' imminent return to the unit at the same time general population prisoners were moving freely through the unit, *id*. at 24. A jury could reasonably conclude from that evidence, as the district court was required to recognize, that Defendants knew keeping the sallyport doors separating the stairwell from the hallways on each floor of the unit open created a substantial risk that the safekeepers coming in from recreation would mix with general population prisoners in the secured hallways and that someone could get hurt.

Defendants' response is that "[t]he record lacks any direct evidence that defendants knew that 'the risk to which [Case] was exposed in the [stairwell] was any different from, or greater than, the risk of violence that exists generally in the prison environment." Appellees' Br. at 10. But that argument reads the record in a light most favorable to Defendants and resolves a question that must be left to the jury. That's not how summary judgment works.

**1.** Defendants start by suggesting safekeepers do not present any specific security risk at the prison, accusing Plaintiff of "stigmatiz[ing] all safekeepers as so violent they cannot be contained," when, in actuality, safekeepers may be housed in prison for other reasons. Appellees' Br. at 11. Case has done no such thing, and the fact that some safekeepers were too violent to be housed in county jail and others might be in prison for medical or other non-violent reasons makes no difference. In

fact, the Supreme Court has explained precisely why it does not matter whether all safekeepers were unusually violent: "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843; *see also* Opening Br. at 30-31. This means that so long as there is evidence that *some* safekeepers are unusually violent, a reasonable juror could conclude that Defendants knew there was a risk of harm to general population prisoners in the hallway from leaving the sallyport doors open during safekeepers' recreation period. To that point, Defendants have no response.

Instead, they say that the safekeepers "being kept at the prison due to being a security risk for the jail are kept because of the jail's security risk, not the prison's, in that the jail is not able to contain the prisoner." Appellees' Br. at 11. But the fact that the prison is better equipped to house the safekeepers does not mean that the security and safety risk presented by the safekeepers evaporates inside the prison walls. In fact, Defendant correctional officers specifically know that the rules around separating general population prisoners and safekeepers are in place for safety and security reasons. *See* Opening Br. at 22-23 (citing ECF No. 52-3, Custodio Dep. Tr., at 41:23-42:13, 45:4-65:17, 133:4-135:12; ECF No. 52-4, Beasley Dep. Tr., at 43:9-48:14, 113:3-9; ECF No. 52-5, Juehrs Dep. Tr., at 31:9-32:2, 92:17-93:23).

To the extent Defendants argue that the safety risk safekeepers pose to general population prisoners is contrived because safekeepers will become part of the prison's general population if they are convicted, that argument is as flawed as it is irrelevant. Appellees' Br. at 11. To start, prisoners in the North Carolina Department of Adult Corrections—as in most if not all state corrections systems—are assigned different custody levels based on a variety of factors including the safety risks they present.[1] In other words, there is no guarantee that all safekeepers who are convicted, even the unusually violent ones, would eventually end up housed in general population with prisoners like Case. In addition, the fact that some safekeepers may one day become a part of general population has no bearing at all on the question here, which is whether safekeepers, as a group admittedly containing prisoners whose behavior is so "violently aggressive" that they cannot be contained in jail, posed a known safety risk to general population prisoners, like Case. And Case has offered ample evidence from which a trier of fact could conclude that they did. *See* Opening Br. at 30-31; *see also* ECF No. 68-4, Smith Dep. Tr. at 13:12-15:15 (testifying that safekeepers present a high risk of violence to general population prisoners).

---

[1] *See Classification*, NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, (last visited July 11, 2025), dac.nc.gov/adult-corrections/prisons/classification (explaining that inmates are assigned to custodial levels including close, medium, minimum I, minimum II, and minimum III, which are based on safety risks presented by the inmate)

**2.** Next, Defendants seem to argue that because the sallyport door protocol was a "general safety measure" meant to protect everyone from the warden to prisoners, it's irrelevant to the question whether the Defendant correctional officers knew of a substantial risk of harm when they left those doors open. Appellees' Br. at 12. But that Defendants put *everyone* from the "Warden, down to nursing" to other prisoners at risk by deliberately leaving the sallyport doors open for their own convenience changes nothing. *Farmer* does not require that a defendant correctly predict the person who will be harmed by his deliberate indifference. If a defendant knows *any* person might be harmed by his conduct, and he ignores that risk of harm, he may be liable. Here, the evidence supports a conclusion that Defendants were well aware that, among the reasons for the sallyport door rules was to prevent safekeepers and general population prisoners like Case from mixing due to safety concerns. Opening Br. at 30-31. That is enough to make them liable under the Eighth Amendment.

**3.** Defendants next insist that the record does not demonstrate a longstanding and pervasive history of safekeepers assaulting inmates. Appellees' Br. at 12. Again, this is a question for the jury, not an undisputed fact on which summary judgment may be based. What's more, Defendants do not dispute that their supervisor, John Juehrs, circulated a memorandum "admonishing officers for a history of not following sally-port policy," but they say the memo did not specifically say anything

8

about safekeeper attacks. *Id*. But the memo was circulated immediately following the attack on Case, explaining that the sallyport directive is "due to safe keepers and [general] population coming into contact too many times when they shouldn't." JA039-40. And the memo admonishes staff for complacency "when it comes to *security* and controlled movement of inmates on Unit 2." *Id*. (emphasis added). From that, a reasonable inference is that the correctional officers were being admonished because they had created a *security* risk for Case by deliberately leaving the sallyport doors open while safekeepers were returning from recreation, a risk they'd been warned about repeatedly.

As for their argument that Beasley and Urieta's ability to recall only one other instance where a safekeeper attacked a general population inmate somehow demands the conclusion that there was not a long-standing or pervasive risk of serious harm from safekeepers attacking general population inmates, that too is wrong. Appellees' Br. at 12. Defendants cite no caselaw suggesting that at least two prior violent attacks by safekeepers on general population prisoners and a memorandum indicating that correctional officers had been warned "over and over" about the risk of safekeepers and general populations mixing because of security concerns is insufficient as a matter of law to conclude that the risk of safekeeper violence was "longstanding, pervasive, … or expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842. Instead, they simply ask the Court to resolve this disputed fact question in

9

their favor by construing the evidence in a manner favorable to the defense. Contrary to Defendants' suggestion, a jury must decide whether the history of attacks, the policy requiring the doors to be kept closed, and John Juehrs' memo, among other evidence, are sufficient to find that Defendants knew they were putting prisoners at risk by leaving the sallyport doors open.

**4.** Finally, Defendants say that the fact that they knew approximately when the safekeepers went to recreation, that recreation was an hour, and that approximately an hour had passed is "too vague to legally conclude Defendants had actual knowledge safekeepers were returning." Appellees' Br. at 13. That is because Defendants "relied on officers calling out on the radio when safekeepers return, but the radio call-out was not received." *Id*. Again, whether those facts support a finding that Defendants knew of a safety risk is for the jury to decide at trial—this is a contested fact issue that can't be decided at summary judgment.

And Defendants' argument fails for at least two additional reasons. For one, Defendants offer no legal support for their assertion that the evidence Case points to is "too vague" to draw the conclusion that the Defendant officers knew the safekeepers' return was imminent. Indeed, all three Defendants were experienced correctional officers whose sole job at the time Case was attacked was to control the movement of people through the secured hallways using the sallyport doors. Opening Br. at 25-27, 30-31. As for Defendants' proclamation that a radio call-out

10

was never received, that is contradictory to other testimony suggesting that such a radio call-out was made and was received. Opening Br. at 24. This is a quintessential disputed fact that cannot serve as a basis for summary judgment. Defendants cannot get over that dispute by simply attesting that they were never alerted to the safekeepers' imminent arrival by phone—they've merely established that there is a genuine issue of material fact precluding summary judgment on the matter.

### B. Defendants Did Not Respond Reasonably To The Risk Of Serious Harm Their Actions Created.

Prison officials are deliberately indifferent if they are aware that "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Here, the evidence supports an inference that Defendants could have easily averted the danger to Case by closing the sallyport doors—especially once they were alerted to the imminent arrival of the safekeepers—but chose not to. Opening Br. at 25-27. Defendants do not quarrel with that general principle. Instead, they respond that the failure to close the sallyport doors was not an unconstitutional response because they responded reasonably to the situation in other ways. Defendants are wrong.

**1.** First, Defendants argue that they "had the reasonable response of listening out for the call-out on the radio that safekeepers were returning, but which was not transmitted." Appellees' Br. at 14 (citing JA204). But that argument could only

11

possibly work if this Court treats as undisputed an obviously disputed fact: Whether Defendants received a call-out on the radio that the safekeepers were returning from recreation. While Defendants testified that they did not receive the radio call, that testimony only gets them so far. That is because Case has pointed to record evidence suggesting that Defendants did actually receive the call-out they proclaim was never made, including that: (1) escort officer Richard Smith testified that a radio call was made, Opening Br. at 24 (citing ECF No. 68-4, Smith Dep. Tr., at 39:1-16); (2) escort officer Kassey Black initially recalled that a radio call was made and testified that she can't think of any reason why it would not have been made, *id.* (citing ECF No. 52-10, Black Dep. Tr., at 60:7-22, 84:25-88:24); and (3) Beasley and Custodio testified that their radios were on and working, *id*. (citing ECF No. 52-4 at 76:1-25; ECF No. 52-3 at 48:6-18, 79:11-80:9). And, once Defendants received that call-out alerting them that the safekeepers were returning from recreation at the same time general population prisoners, including Case, were in the secure hallways, they still chose not to close the sally-port doors. Opening Br. at 25-27.

**2.** Next, Defendants say that once they became aware of the attack itself, they responded reasonably "with a call-out." Appellees' Br. at 14. That is irrelevant. Case has never argued that Defendants responded inadequately *after* he was attacked. His argument is, and has always been, that Defendants' deliberate indifference led to his attack—that they created a substantial risk of serious harm and then chose to do

absolutely nothing even after they learned the substantial risk of harm was imminent. *See*, *e.g.*, Opening Br. at 21-24.

**3.** Finally, Defendants say their actions were, at most, negligent. *Id*. at 14-15. They offer no analysis on this front, and so the argument is waived. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) ("[P]erfunctory and undeveloped arguments … are waived." (quoting *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010))). Even assuming the argument wasn't waived, Case stands on his Opening Brief which details at length why, because the record contains evidence from which a reasonable juror could infer Defendants' actual knowledge of a substantial risk of serious harm, the question of whether Defendants' conduct constitutes negligence or deliberate indifference is one for a trier of fact. *See* Opening Br. at 28-32.

### C. Defendants Misunderstand *Farmer v. Brennan*

The district court, in entering summary judgment for Defendants, incorrectly reasoned in part that Case was required to prove that Defendants knew of a substantial risk that Kenneth Kennion (the safekeeper who attacked Case) specifically might attack Case. JA209. Defendants embrace that error, urging that the district court's reasoning on that front "aligns with *Farmer*." Appellees' Br. at 15. Defendants seem to be arguing that the *Farmer* holding removed a "specific threat" requirement only for prisoners "belong[ing] to an identifiable group of

prisoners who are frequently singled out for violent attack by other inmates," and "where a danger is so common and uncontrolled that all prisoners face a pervasive risk of attack." Appellees' Br. at 16 (quoting *Randolph v. Maryland*, 74 F. Supp. 2d 537, 542 (D. Md. Nov. 18, 1999)). And because, according to Defendants, Case does not fall into either category, the district court holding him to that kind of "specific threat" requirement—a pre-*Farmer* requirement where a "prisoner had to demonstrate that prison officials knew the assailant presented a specific risk to that particular prisoner"—was proper. *Id*. at 15 (quoting *Randolph*, 74 F. Supp. 2d at 542). That argument misstates the law.

The Supreme Court did not mince words when it held in *Farmer* that an officer cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843. After *Farmer*, then, Case did not need to offer any evidence that Kennion himself presented a specific safety risk to Case. He simply needed to show that Defendants knew that the safekeepers presented an unacceptable safety risk to general population prisoners, like Case. And he did so with evidence that Defendants knew: (1) safekeepers included violently aggressive prisoners; (2) there was a history of violent altercations between safekeepers and general population prisoners; (3) there were policies in place to

prevent safekeepers from mixing with general population prisoners in secure hallways for safety reasons; and (4) their job was to keep the secured hallway doors locked until they confirmed that the hallways were clear and that the prisoners could pass safely. Opening Br. at 31. *Farmer* leaves no room for Defendants to escape liability by arguing they didn't know Kennion was likely to attack someone. The Court must overturn the district court's holdings on that basis.

> **D.**     **Defendants' Qualified Immunity Argument Fails.**

As was just explained, Case has shown that Defendants violated his constitutional rights when they acted with deliberate indifference toward a substantial risk of harm of their own making. *Supra* Section IA-B; *see also* Opening Br. at 20-32. In the Fourth Circuit "officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly established prong." *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023); *see also Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("[W]hen plaintiffs have made a showing sufficient to demonstrate an intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity." *Id*. (cleaned up)). Because Case's evidence supports a conclusion that Defendants intentionally ignored a known risk to inmate safety, Defendants cannot rely on the clearly established prong to avoid liability. *See id*. at 934 (explaining that dismissal on qualified immunity grounds of an Eighth

Amendment claim is "improper so long as the officers' mental state remains genuinely in issue."). Defendants do not respond to that argument.

Instead, Defendants insist that, even if Plaintiff has demonstrated a constitutional violation, Plaintiff cannot show that it was clearly established at the time of the violation. Appellees' Br. at 18-20. That is because, Defendants say, the clearly established right at issue is "to protect inmates from inmate attacks by ensuring sally-port doors are closed at all times until it is confirmed the hallway is free of safekeepers." Appellees' Br. at 20. As was just explained, this Court need not entertain such an argument because Defendants cannot avoid liability via the clearly established prong. *See also* Opening Br. at 32-33.

Even if reliance on the clearly established prong were possible here, this Court has expressly defined the constitutional right at issue as a prisoner's "Eighth Amendment right to be protected from violence committed by other prisoners." *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014). And as Case detailed in his opening brief, just before he was brutally attacked this Court had denied qualified immunity in a similar failure-to-protect case, holding: "[I]t has long been established that jail officials have a duty to protect inmates from a known risk of harm, including harm inflicted by other prisoners." *Cox*, 828 F.3d at 239. Defendants do not respond at all to Case's argument that *Cox*—and the Fourth Circuit caselaw cited therein— put Defendants on notice that their actions violated the constitution. *Compare*

Opening Br. at 34-36, *with* Appellees' Br. at 18-20. Instead, they simply try to re-define the right at issue so specifically—the right to have corrections officers keep sally-port doors "closed at all times until it is confirmed that the hallway is free of safekeepers"—that no prisoner could ever clear the first prong in a failure-to-protect case without a prior case with identical facts. Appellees' Br. at 20. That is not, and has never been, the standard for the clearly established inquiry. *See*, *e.g.*, *Quinn v. Zerkle*, 111 F.4th 281, 294 (4th Cir. 2024) ("[W]e need not have recognized a right on identical facts for it to be deemed clearly established."). This Court must overturn the district court's finding that Defendants are entitled to immunity from liability.

## II.    The District Court Abused Its Discretion In Allowing Custodio To Oppose Case's Motion For Summary Judgment.

A party seeking an extension of time after missing a filing deadline must demonstrate that failure to act within the specified time was the result of "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Excusable neglect is a high bar, and "a party that fails to act with diligence will be unable to establish that [her] conduct constituted excusable neglect." *Robinson v. Wix Filtration Corp., LLC*, 599 F.3d 403, 413 (4th Cir. 2010).

As Case explained in his opening brief, Custodio failed as a matter of law to show that excusable neglect explained his failure to timely respond to Case's motion for partial summary judgment. Opening Br. at 40-43. That is because Custodio's excuse for missing the response deadline was that defense counsel was very busy in

the leadup to his departure from the DOJ's office. JA146-49; Appellees' Br. at 22-23. And Fourth Circuit law is clear that a busyness and lack of diligence *do not* establish excusable neglect. *See*, *e.g.*, *Robinson*, 599 F.3d at 413. The district court abused its discretion in concluding otherwise. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("A district court abuses its discretion if its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding.").

Custodio responds that, because the substituted lawyer filed a belated motion soon after the deadline expired, in good faith, and with a request that did not impact or delay the proceedings, the district court acted within the bounds of discretion in granting their motion. Appellees' Br. at 23. Custodio attempts to shift the Court's focus to the supposed blamelessness of substitute counsel. But the relevant question before the district court was whether prior counsel's failure to request an extension was excusable neglect. It was the predecessor counsel who missed the filing deadline and didn't ask to extend it. What's more,  while "soft factors" can be part of the excusable neglect inquiry, they do not trump the fact that the reason identified for the neglect here—counsel being busy in the lead up to his departure from the North Carolina Department of Justice—is one that simply does not constitute excusable neglect under the law.  *See*, *e.g.*, *Robinson*, 599 F.3d at 413.

Custodio further insists that even if the district court abused its discretion by allowing him a third opportunity to respond to Case's partial motion for summary judgment, the abuse did not prejudice Plaintiff because it caused no delay given the timing of Plaintiff's response to Defendants' motion. But delay is not the only form of prejudice. By allowing Defendants to respond to summary judgment when they forfeited their chance to do so, Plaintiff was forced to expend time and resources preparing opposition materials.

Defendants' claim that the error had no impact on Plaintiff because the district court ultimately entered summary judgment for Defendants is equally baseless. Appellees' Br. at 24-25. That argument assumes that the district court's decision to grant summary judgment to Defendants and deny Case's partial motion without reasoning were correct. But the district court's entry of summary judgment must be reversed. And if the district court had disallowed Defendants' opposition, Case would have been spared both the expense of responding to Defendants' opposition and some of the resources devoted to this appeal. *See also* Opening Br. at 42-43 (explaining additional ways in which Case was prejudiced by the district court's abuse of discretion).

## CONCLUSION

For the reasons stated above and in Case's opening brief, this Court should reverse the district court's grant of summary judgment and remand to the district court for further proceedings.

Date: July 11, 2025                          Respectfully submitted,

                                              /s/ Rosalind E. Dillon
                                             Rosalind E. Dillon
                                             Alison R. Leff
                                             LOEVY & LOEVY
                                             311 N. Aberdeen St.
                                             Chicago, IL 60607
                                             (312) 243-5900
                                             dillon@loevy.com

                                             *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4735 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: July 11, 2025                          /s/ Rosalind E. Dillon
                                             Rosalind E. Dillon

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I electronically filed the foregoing *Reply Brief of Plaintiff-Appellant* with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: July 11, 2025

/s/ Rosalind E. Dillon
Rosalind E. Dillon